**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:

**ENERGY CONVERSION DEVICES, INC.,**
**et al.,**[1]

Debtors.

Chapter 11

Case No. 12-43166
(Jointly Administered)

Judge Thomas J. Tucker

**DISCLOSURE STATEMENT WITH RESPECT TO THE**
**SECOND AMENDED JOINT PLAN OF LIQUIDATION OF ENERGY CONVERSION**
**DEVICES, INC. AND UNITED SOLAR OVONIC LLC**

Robert B. Weiss, Esq.
Aaron M. Silver, Esq.
HONIGMAN MILLER SCHWARTZ AND COHN LLP
2290 First National Building
660 Woodward Avenue, Suite 2290
Detroit, Michigan 48226
(313) 465-7596 (Telephone)
(313) 465-7597 (Facsimile)
rweiss@honigman.com
asilver@honigman.com

*Counsel for the Debtors*

Dated: May 31, 2012

---

[1]The Debtors in these jointly administered cases are Energy Conversion Devices, Inc. (Case No. 12-43166) and United Solar Ovonic LLC (Case No. 12-43167).

# TABLE OF CONTENTS – DISCLOSURE STATEMENT

I.   INTRODUCTION ........................................................................................................................ 3
    A.   OVERVIEW OF CHAPTER 11 ................................................................................................... 3

II.  SUMMARY OF THE PLAN ..................................................................................................... 4
    A.   OVERVIEW OF THE PLAN ...................................................................................................... 4
         1.   *Unclassified Allowed Administrative Expense Claims and Priority Tax Claims* ...................... 4
         2.   *Classification of Claims and Equity Interests* ................................................................. 6
    B.   UNCLASSIFIED ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS. ................. 8
         1.   *Professional Fees.* ........................................................................................................ 8
         2.   *U.S. Trustee Fees.* ....................................................................................................... 9
         3.   *Administrative Expense Claims.* ................................................................................... 9
         4.   *Priority Tax Claim.* ...................................................................................................... 9
         5.   *Administrative Expense Claim Bar Date.* ...................................................................... 9
    C.   CLASSIFIED UNIMPAIRED CLAIMS ....................................................................................... 10
         1.   *Class 1:  Priority Claims.* ............................................................................................ 10
         2.   *Class 2A:  Secured Claims of ECD.* .............................................................................. 10
         2.   *Class 2B:  Secured Claims of Wieland-Davco Corporation.* ............................................ 10
         3.   *Class 3: General Unsecured Claims.* ............................................................................. 11
         4.   *Class 4:  Warranty Claims.* ......................................................................................... 11
         5.   *Class 5: Equity Interests.* ............................................................................................ 12

III. DESCRIPTION OF THE DEBTORS AND THE DEBTORS' BUSINESS ....................... 12
    A.   DESCRIPTION OF THE DEBTORS ........................................................................................ 12
    B.   DESCRIPTION OF THE PRINCIPALS ..................................................................................... 13
         1.   *Jay Knoll.* .................................................................................................................. 13
         2.   *Julian Hawkins.* ......................................................................................................... 14
         3.   *William Andrews.* ...................................................................................................... 15
         4.   *Joseph Conroy.* .......................................................................................................... 15
         5.   *Gregory G. Coppola.* ................................................................................................. 16
    C.   EVENTS LEADING TO CHAPTER 11 ..................................................................................... 16
         1.   *United Solar Ovonic* ................................................................................................... 16
         2.   *Ovonic Battery Company, Inc.* .................................................................................... 17
    D.   PLAN SUPPORT AGREEMENT .............................................................................................. 17

IV.  SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASES ............................... 19
    A.   PETITION DATE ................................................................................................................. 19
    B.   MANAGEMENT INCENTIVE PLAN ....................................................................................... 19
    C.   KEY EMPLOYEE RETENTION PROGRAM ............................................................................. 20
    D.   SEVERANCE COMPROMISE PROGRAM ................................................................................ 20
    E.   THE CASH MANAGEMENT ORDERS .................................................................................... 20
    F.   RETENTION OF PROFESSIONALS ......................................................................................... 21
         1.   *Debtor's Counsel.* ...................................................................................................... 21
         2.   *Committee's Counsel.* ................................................................................................. 21
         3.   *Ad Hoc Consortium's Counsel* .................................................................................... 22
         4.   *Debtors' Financial Consultants* ................................................................................... 22
         5.   *Appointment of Investment Banker* .............................................................................. 22
         6.   *Appointment of Auctioneers* ....................................................................................... 23
         7.   *Appointment of Scouler & Company, LLC* ................................................................... 23
         8.   *Other professionals.* ................................................................................................... 23
    G.   CONTRACT EMPLOYEES ..................................................................................................... 23
    H.   POST-PETITION SALE OF ASSETS ....................................................................................... 23
    I.   BAR DATES ...................................................................................................................... 24

    J.    SUMMARY OF MONTHLY OPERATING REPORTS ................................................................ 24

**V.    ASSETS AND LIABILITIES** .................................................................................................... **25**

    A.    LIQUIDATION ANALYSIS ...................................................................................................... 25
    B.    ASSETS .............................................................................................................................. 25
        1.    *Accounts receivable.* ...................................................................................................... 25
        2.    *Notes receivable* ............................................................................................................ 25
        3.    *Inventory.* ....................................................................................................................... 25
        4.    *Real Estate.* .................................................................................................................... 26
        5.    *Machinery and equipment.* ............................................................................................. 26
        6.    *Intellectual property* ...................................................................................................... 26
        7.    *Ovonyx.* .......................................................................................................................... 26
        8.    *Ovonic Battery Company, Inc.* ........................................................................................ 26
        9.    *Other Non-Debtor Subsidiaries* ...................................................................................... 26
    C.    PREFERENCES/FRAUDULENT TRANSFER .............................................................................. 27
    D.    CAUSES OF ACTION ........................................................................................................... 27
    E.    INTERCOMPANY ADVANCES ............................................................................................... 28
    F.    LIABILITIES ....................................................................................................................... 29
        1.    *ECD's 2013 Convertible Senior Notes* ........................................................................... 29
        2.    *ECD's Secured Claim against USO* ................................................................................ 29
        3.    *Warranties* ...................................................................................................................... 30
    G.    GUARANTEES, CO-DEBTORS, AND LETTERS OF CREDIT ...................................................... 31
        1.    *USO* ............................................................................................................................... 31
        2.    *ECD* .............................................................................................................................. 32
        3.    *Letters of Credit* ............................................................................................................ 32
    H.    LEASE REJECTIONS ........................................................................................................... 33
    I.    MSF ................................................................................................................................ 33
    J.    ECD SHAREHOLDER CLAIM ............................................................................................... 33

**VI.    DETAILS REGARDING IMPLEMENTATION OF PLAN** ............................................... **33**

    A.    SUBSTANTIVE CONSOLIDATION .......................................................................................... 33
        1.    *Substantive Consolidation.* ............................................................................................ 33
    B.    LIQUIDATION AND WARRANTY TRUSTS ............................................................................. 34
        1.    *Liquidation Trust* .......................................................................................................... 34
        2.    *Securities Matters* .......................................................................................................... 34
    C.    SALE OF ASSETS .............................................................................................................. 34
    D.    PRESERVATION OF CAUSES OF ACTION .............................................................................. 35
    E.    REJECTION OF EXECUTORY CONTRACT AND UNEXPIRED LEASES .......................................... 35
    F.    DISSOLUTION OF THE DEBTORS AND RESIGNATION OF OFFICERS AND DIRECTORS ..................... 35
    G.    EXCULPATION OF DEBTORS, COMMITTEE, AD HOC CONSORTIUM AND THEIR RESPECTIVE OFFICERS,
DIRECTORS AND PROFESSIONALS ............................................................................................... 36
    H.    RELEASE .......................................................................................................................... 36
    I.    INDEMNIFICATION AND OFFICER & DIRECTOR TAIL INSURANCE .......................................... 37
    J.    FINANCIAL STATEMENTS .................................................................................................... 37
    K.    NO DISCHARGE ................................................................................................................ 37

**VII.    VOTING PROCEDURES** ..................................................................................................... **37**

    A.    VOTING PROCEDURES ....................................................................................................... 37
    B.    ACCEPTANCE .................................................................................................................... 38
    C.    CONFIRMATION ................................................................................................................ 38
    D.    MODIFICATION ................................................................................................................. 39
    E.    EFFECT OF CONFIRMATION ................................................................................................ 39

**VIII.    CRAM-DOWN AND ABSOLUTE PRIORITY RULE** ........................................................ **39**

    A.    DISCRIMINATE UNFAIRLY .................................................................................................. 40
    B.    FAIR AND EQUITABLE STANDARD ....................................................................................... 40

**IX.  BEST INTERESTS TEST** .................................................................................................. **40**

**X.  FEASIBILITY** .................................................................................................................... **41**

**XI.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ............ **41**

   A.  ALTERNATIVE PLAN ......................................................................................................... 42
   B.  LIQUIDATION UNDER CHAPTER 7 ................................................................................... 42

**XII.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ....... **42**

   A.  FEDERAL INCOME TAX CONSEQUENCES TO ECD ......................................................... 42

**XIII.  VOTING INSTRUCTIONS** .............................................................................................. **43**

   A.  HOW TO VOTE ................................................................................................................. 43
   B.  CONFIRMATION HEARING ............................................................................................... 44

**XIV.  SUMMARY, RECOMMENDATION, AND CONCLUSION** ................................................ **44**

# DISCLOSURE STATEMENT WITH RESPECT TO THE SECOND AMENDED JOINT PLAN OF LIQUIDATION OF ENERGY CONVERSION DEVICES, INC. AND UNITED SOLAR OVONIC LLC

Pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), Energy Conversion Devices, Inc. ("**ECD**") and United Solar Ovonic LLC ("**USO**"), the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") propose the following disclosure statement (the "**Disclosure Statement**") pursuant to Section 1125(b) of the Bankruptcy Code for use in the solicitation of votes on the Second Amended Joint Plan of Liquidation of Energy Conversion Devices, Inc. and United Solar Ovonic LLC (the "**Plan**"). A copy of the Plan accompanies this Disclosure Statement.

This Disclosure Statement has been prepared in accordance with Section 1125 of the Bankruptcy Code and not in accordance with federal or state securities laws or other applicable nonbankruptcy laws. Entities holding or trading in or otherwise purchasing, selling or transferring claims against, interests in or securities of, the Debtors should evaluate this Disclosure Statement only in light of the purpose for which it was prepared.

This Disclosure Statement has not been approved or disapproved by the U.S. Securities and Exchange Commission (the "**SEC**") or by any state securities commission or similar public, governmental or regulatory authority, and neither such commission nor any such authority has passed upon the accuracy or adequacy of the statements contained herein.

The Plan is proposed jointly by the Debtors but constitutes a separate Plan for each Debtor. Each voting Class of Creditors as to each Debtor will vote in favor or against the respective Plan. If each Debtor confirms its respective Plan, the separate estates will be substantively consolidated for purposes of distributions under the Plan. Except as expressly specified in the Plan, the classifications of claims and equity interests shall be deemed to apply separately with respect to each Plan proposed by each Debtor.

The Plan provides that the separate estates will be substantively consolidated, but the separate estates of the Debtors have not yet been consolidated, substantively or otherwise. For purposes of voting in favor or against the Plan, claims and equity interests against one Debtor will be deemed to have voted for or against the respective Debtor's Plan for which the claim relates, and claims of creditors that hold claims against both Debtors will be treated as separate claims with respect to each Debtor's estate for voting purposes.

The Plan is a liquidating plan. The Debtors are in the process of selling their assets and the Debtors or the Liquidation Trustee will continue to sell any remaining assets with Court approval or pursuant to the terms of the Plan and the Liquidation Trust Agreement until all assets are fully liquidated or abandoned. The Plan provides for initial distributions described herein, followed by the funding of a Warranty Trust, and the vesting of all remaining assets of the Debtors in the Liquidation Trust. The Liquidation Trustee will liquidate or abandon all of the remaining assets and distribute the proceeds from such liquidation. The distributions of the proceeds of the sales shall be made to the holders of Allowed Claims in order of the priorities set forth in the Plan.

1

The Plan further provides for the termination of all Equity Interests in the Debtors and the dissolutions of the Debtors from and after the Effective Date.

The Plan implements the Plan Support Agreement between the Debtors and the Ad Hoc Consortium which was executed prior to the Petition Date.

The Bankruptcy Court has granted this Disclosure Statement preliminary approval. The Debtors are seeking final approval of this Disclosure Statement under Section 1125 of the Bankruptcy Code and confirmation of the Plan at a joint hearing to be held on **[_], 2012 at [_] a.m. (EST)** U.S. Bankruptcy Court for the Eastern District of Michigan located at Courtroom 1925, 211 West Fort Street Bldg., Detroit, MI 48226.

On that date, the Bankruptcy Court will conduct a hearing to determine whether this Disclosure Statement contains adequate information to permit holders of impaired claims to make an informed judgment in exercising their rights to vote to accept or to reject the Plan. If this Disclosure Statement is approved as having "adequate information," the Bankruptcy Court will immediately thereafter conduct a hearing to consider confirmation of the Plan.

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference should be made to the Plan and to such documents for the full and complete statements of such terms and provisions. All capitalized terms used herein, unless otherwise provided, have the meanings set forth in Article I of the Plan.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Equity Interests in the Debtors under the Plan and will, upon the Effective Date of the Plan, be binding upon all holders of Claims against and Equity Interests in the Debtors and their Estates, and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan, or any other operative document, the terms of the Plan and such other operative document are controlling.

The Plan contains various bar dates for asserting claims. The Administrative Expense Claims Bar Date, the date by which a party must file a motion for allowance of an Administrative Expense Claim is forty-five (45) days after the Effective Date of the Plan. Except as to the Liquidation Trustee, the deadline to object to claims is ninety (90) days after the Effective Date of the Plan. The right to assert a claim or bring an objection will be waived unless a creditor complies with these deadlines.

The Debtors believe that confirmation of the Plan and consummation of the liquidation provided for therein is in the best interests of the Debtors and their creditors. Accordingly, the Debtors urge each creditor that is impaired under and entitled to vote with respect to the Plan to vote to accept the Plan. Detailed voting instructions are set forth in Article VII of this Disclosure Statement.

To be counted, a ballot containing your acceptance or rejection of the Plan must be received by the Debtors' balloting agent, Kurtzman Carson Consultants LLC ("**KCC**"), no later

than the balloting deadline provided herein by first class U.S. mail or delivered by messenger or overnight courier, ballots sent by facsimile, telecopy, or e-mail will not be accepted. **The balloting deadline is [__], 2012.** To be considered, all ballots must be received by KCC at Energy Conversion Devices Ballot Processing, Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA 90245, by no later than 4:30 p.m. (PST) on [__], 2012. Ballots received after the balloting deadline will not be counted or otherwise considered.

**THE DEBTORS STRONGLY URGE ACCEPTANCE OF THE PLAN.**

**NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS AND SCHEDULES ATTACHED HERETO. THE ACCURACY OF THE ACCOUNTING, FINANCIAL, ECONOMIC AND OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS THE EXCLUSIVE RESPONSIBILITY OF THE DEBTORS.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT AT ANY TIME AFTER THE DATE HEREOF SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN ANY CHANGE IN THE INFORMATION STATED HEREIN.**

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE INFORMATION REGARDING THE HISTORY, BUSINESS AND OPERATIONS OF THE DEBTORS AND THE HISTORICAL AND PROJECTED FINANCIAL INFORMATION REGARDING THE DEBTORS IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN.**

**FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ALL SUMMARIES. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN ITS ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENTS.**

## I. INTRODUCTION

*A.    Overview of Chapter 11*

On February 14, 2012, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

Chapter 11 may be used to effectuate an orderly liquidation of a debtor's business and assets. The commencement of a chapter 11 case creates an estate that is comprised of all of the

legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code contemplates that the debtor, through its pre-bankruptcy management, will continue to operate its business in the ordinary course and remain in possession of its property during the case while it seeks to negotiate and implement a liquidation plan. The bankruptcy court must approve any activities that are not within the ordinary course of the debtor's business.

The consummation of a plan is a principal objective of a chapter 11 case. A plan of liquidation sets forth liquidation as a means for satisfying claims against and interests in a debtor. Confirmation of a plan of liquidation by the bankruptcy court makes the plan binding upon the debtor, any person or entity acquiring property under the plan and any creditor or of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.

## II. SUMMARY OF THE PLAN

This section summarizes the major terms of the Plan. The Plan is attached to this Disclosure Statement. Parties are encouraged to review the Plan in its entirety for a full understanding of its provision and impact on Claims and Equity Interests.

### A. *Overview of the Plan*

#### 1. Unclassified Allowed Administrative Expense Claims and Priority Tax Claims

Allowed Administrative Expense Claims and Priority Tax Claims against the Debtors are not classified for the purposes of voting on or receiving distributions under the Plan. The following table is only a summary of Administrative Expense Claims and Priority Tax Claims that are estimated based on books and records and management estimation:

| Claim Type | Description | Estimated Amount of Claims | Treatment |
|---|---|---|---|
| Allowed Administrative Expense Claims | Professional Fees | Approximately $1,900,000 in unpaid professional fees in aggregate for both Debtors as of April 30, 2012. The Debtors are unable to accurately estimate the professional fees attributable to each estate. | All Allowed Professional Fees shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court. |
| | U.S. Trustee Fees | As of April 30, 2012, approximately $15,275 in aggregate, consisting of approximately $4,875 attributable to ECD and $10,400 attributable to USO | The United States Trustee's quarterly fees owed by the Debtors as of the Effective Date shall be paid in full without prior approval on the Effective Date or as soon as practicable thereafter. |

4

| Claim Type | Description | Estimated Amount of Claims | Treatment |
|---|---|---|---|
| | Other fees | This includes, without limitation, any operating expenses incurred since the Petition Date allowed under Section 503 of the Bankruptcy Code, valid reclamation claims and allowed claims under Section 503(b)(9) of the Bankruptcy Code for goods received within twenty days prior to the Petition Date. Approximately $1,640,000 in aggregate, consisting of approximately $90,000 attributable to ECD and $1,550,000 attributable to USO. These values are estimates and do not include any amounts that may be payable under the Revised Management Incentive Plan. Based on the estimates in the liquidation analysis attached as Exhibit D, the amount payable under the Management Incentive Plan is approximately between $1.248 million and $1.722 million. | All Administrative Expense Claims will be paid the full unpaid amount of such Allowed Administrative Expense Claim in Cash on the Effective Date or as soon as practicable thereafter. |

12-43166-tjt    Doc 611-1    Filed 05/31/12    Entered 05/31/12 13:33:41    Page 9 of 56

| Claim Type | Description | Estimated Amount of Claims | Treatment |
|---|---|---|---|
| Priority Tax Claim | Allowed Priority Tax Claims | Approximately $100,000 in aggregate, consisting of approximately $0 attributable to ECD and $100,000 attributable to USO. As described below, this amount is the Debtors' estimate of the actual liability pursuant to a proof of claim filed by the Michigan Department of Treasury relating to ongoing audits of various tax liabilities for tax years 2008-2010. | Allowed Priority Tax Claims due and payable on or prior to the Effective Date will receive, on the later of the Effective Date or the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, or, in each such case, as soon as practicable thereafter, Cash in the full amount of the claim. |

2. <u>Classification of Claims and Equity Interests</u>

While the amount of distributions to certain classes is currently unknown, the Debtors believe that the Plan provides the best and most prompt possible recovery for holders of Claims. Under the Plan, Claims against and Equity Interests in the Debtors are divided into different classes as follows:

| <u>Class</u> | <u>Description</u> | <u>Status</u> | <u>Voting</u> |
|---|---|---|---|
| Class 1 | Priority Claims | Unimpaired | Not entitled to vote |
| Class 2A | Secured Claims of ECD | Impaired | Entitled to vote |
| Class 2B | Secured Claims of Wieland-Davco Corporation | Unimpaired | Not entitled to vote |
| Class 3 | General Unsecured Claims | Impaired | Entitled to vote |
| Class 4 | Warranty Claims | Impaired | Entitled to vote |
| Class 5 | Equity Interests | Impaired | Deemed to reject |

If the Plan is confirmed by the Bankruptcy Court, on the Effective Date and on certain times thereafter as Claims and Equity Interests are resolved, liquidated or otherwise allowed, the Debtors will make distributions in respect of the classes of Claims and Equity Interests as provided for in the Plan and as set forth below.

The following table is only a summary of the distribution to creditors. For a more detailed analysis, please refer to the discussion below:

6

| Class No. | Class Name | Estimated Amount of Claims | Treatment |
|---|---|---|---|
| Class 1 (Unimpaired – Not entitled to vote) | Priority Claims | The Debtors are not aware of any valid Priority Claims against either Debtor. | Allowed Priority Claims are expected to receive cash payment in full. |
| Class 2A (Impaired – Entitled to vote) | Secured Claims of ECD | Approximately $5,000,000 in aggregate, consisting of approximately $0 attributable to ECD and $5,000,000 attributable to USO | Subject to the occurrence of the Effective Date, Secured Claims in Class 2A shall be eliminated. |
| Class 2B (Unimpaired – Not entitled to vote) | Secured Claims of Wieland-Davco Corporation | Approximately $62,740.17 in aggregate, consisting of approximately $0 attributable to ECD and $62,740.17 attributable to USO | The holder of any Allowed Secured Claim in Class 2B will receive payment in full as either: (i) Cash in an amount of the Allowed Secured Claim, or (ii) in the discretion of the Debtors, transfer of title to the Collateral securing the Allowed Secured Claim. |
| Class 3 (Impaired – Entitled to vote) | General Unsecured Claims | Approximately $307,353,000 to $336,953,000 in aggregate, consisting of approximately $271,253,000 to $273,053,000 attributable to ECD and $36,100,000 to $63,900,000 attributable to USO | Provided that (i) that the face amount of all Administrative Expense Claims, Priority Tax Claims, Priority Claims, and Secured Claims have been paid in full, and (ii) that the assets required to be transferred to the Warranty Trust have been transferred to the Warranty Trust, all remaining Assets of the Debtors' Estates will be distributed for the benefit of the Allowed Class 3 General Unsecured Claims. |

| Class No. | Class Name | Estimated Amount of Claims | Treatment |
|---|---|---|---|
| Class 4 (Impaired – Entitled to vote) | Warranty Claims | The Debtors estimate Warranty Claims to be in the range of $10,000,000 to $20,000,000, all of which is attributable to USO. The Debtors have filed a motion in the Bankruptcy Court to estimate warranty claims. | Provided that that the face amount of all Administrative Expense Claims, Priority Tax Claims, Priority Claims, and Secured Claims have been paid in full and subject to the occurrence of the Effective Date, each holder of an Allowed Warranty Claim shall receive at the Liquidating Trustee's election, cash or inventory Pro Rata to other Allowed Warranty Claims. The percentage distribution to Allowed Warranty Claims will, to the greatest extent possible, be the same as the percentage distribution made to Allowed General Unsecured Claims. |
| Class 5 (Impaired – Deemed to reject) | Equity Interests | Not applicable | To the extent funds remain after payment in full of all Claims, holders of Allowed Equity Interests will receive Pro Rata payment of any surplus. As to Equity Interests in ECD, this treatment will be in full satisfaction of their Allowed Equity Interests and the Equity Interests will be terminated as of the Effective Date. ECD's Equity Interests in USO will vest in the Liquidation Trust of ECD. |

**B.**    ***Unclassified Administrative Expense Claims and Priority Tax Claims.***

1.    <u>Professional Fees.</u>

Subject to the provisions of Sections 328, 330, 331 and 503(b) of the Bankruptcy Code, all professionals seeking an award by the Bankruptcy Court of Professional Fees, or of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date, (a) shall file their respective final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date within forty-five (45) days after the Effective Date, and (b) if granted such an award by the Bankruptcy Court, shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (i) on the Effective Date or as soon as practicable thereafter; (ii) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter; (iii) at such time and upon such terms as may be agreed upon by such holder and the Debtors; or (iv) at such time and upon such terms as set forth in an order of the Bankruptcy Court. The unpaid Professional Fees projected as of April 30, 2012 is estimated to be $1,900,000.

2. U.S. Trustee Fees.

The United States Trustee's quarterly fees owed by the Debtors as of the Effective Date shall be paid in full on the Effective Date or as soon as practicable thereafter. All fees payable pursuant to 28 U.S.C. Section 1930 arising after the Effective Date will be paid by the Liquidation Trustee until entry of the Final Decree.

3. Administrative Expense Claims.

Each holder of an Allowed Administrative Expense Claim other than Professional Fees and United States Trustee Fees will be paid the full unpaid amount of such Allowed Administrative Expense Claim in Cash: (i) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Expense Claim is due or as soon as practicable thereafter); (ii) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Expense Claim is due); (iii) at such time and upon such terms as may be agreed upon by such holder and the Debtors; or (iv) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

The Debtors estimate that Administrative Expense Claims as of April 30, 2012 is $1,640,000, in aggregate, of which $90,000 is attributable to ECD and $1,550,000 is attributable to USO. No portion of this amount is attributable to post-petition funding provided by ECD to USO. If the Debtors' separate Estates are not substantively consolidated, parties in interest may challenge the basis for allocating Administrative Expense Claims between the Estates.

4. Priority Tax Claim.

On the later of the Effective Date or the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, or, in each such case, as soon as practicable thereafter, each holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date will receive on account of such Claim, in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code, Cash of a total value equal to the Allowed amount of such claim.

The Debtors estimate that as of April 30, 2012, Priority Tax Claims is $100,000, in aggregate, of which $0 is attributable to ECD and $100,000 is attributable to USO.

The Michigan Department of Treasury has filed a proof of claim against USO asserting a claim that it alleges to be entitled to priority in the amount of $369,041.13 relating to ongoing audits of Michigan Business Tax, Single Business Tax, and use tax liabilities for tax years 2008-2010 [Claim No. 28]. The Debtors contest the entire alleged liability but have estimated for purposes of this Disclosure Statement that the liability is a Priority Tax Claim of $100,000.

5. Administrative Expense Claim Bar Date.

No Administrative Expense Claim will be an Allowed Administrative Expense Claim and such Claim shall be forever barred and enjoined if it is not filed within forty-five (45) days after the Effective Date ("**Administrative Expense Claims Bar Date**").

*C.*     *Classified Unimpaired Claims*

1.     Class 1:  Priority Claims.

(i)     *Classification*:  Class 1 consists of Allowed Priority Claims.

(ii)     *Description*.  Priority Claim are Claims entitled to priority under Section 507(a) of the Bankruptcy Code, other than Administrative Expense Claims or Priority Tax Claims.

(iii)     *Treatment*:  Provided that the face amount of all Administrative Expense Claims and Priority Tax Claims entitled to greater priority than an Allowed Priority Claim have been paid in full or, to the extent not paid in full, funds sufficient to satisfy the face amount have been placed in a segregated reserve, on or as soon as reasonably practicable after the Effective Date, each holder of an Allowed Priority Claim shall receive its Pro Rata share of Cash distributions until all such claims are paid in full.

(iv)     *Voting*:  Allowed Priority Claims are not impaired and thus will not be entitled to vote to accept or reject the Plan.

2.     Class 2A:  Secured Claims of ECD.

(i)     *Classification*:  Class 2A consists of Allowed Secured Claims of ECD.

(ii)     *Description*.  Secured Claims of ECD are Claims based on an intercompany secured loan provided by ECD to USO secured by a Lien on property in which the Estate of USO has an interest.  The Debtors estimate that Secured Claims of ECD are $5,000,000, in aggregate, of which $0 is attributable to ECD and $5,000,000 is attributable to USO.  If the Estates are substantively consolidated, this intercompany secured loan will be eliminated.  If the Estates are not substantively consolidated, the characterization of this intercompany secured loan may be litigated and if Allowed, will be paid prior to any other Claims against USO.

(iii)     *Treatment*:  Subject to the occurrence of the Effective Date, Secured Claims in Class 2A shall be eliminated.

(iv)     *Voting*:  Allowed Secured Claims in Class 2A are impaired and, thus, the holders of such Allowed Secured Claims in Class 2A will be entitled to vote to accept or reject the Plan.

2.     Class 2B:  Secured Claims of Wieland-Davco Corporation.

(v)     *Classification*:  Class 2B consists of Allowed Secured Claims of Wieland-Davco Corporation.

(vi)     *Description*.  Secured Claims of Wieland-Davco Corporation are Claims secured by a Claim of Lien filed by Wieland-Davco Corporation on USO's Battle Creek

property.  The Debtors estimate that Secured Claims in Class 2B are $62,740.17, in aggregate, of which $0 is attributable to ECD and $62,740.17 is attributable to USO.

(vii)    *Treatment*:  The holder of any Allowed Secured Claim in Class 2B shall receive either: (i) Cash in an amount of the Allowed Secured Claim, or (ii) in the discretion of the Debtors, transfer of title to the Collateral securing the Allowed Secured Claim.

(viii)    *Voting*:  Allowed Secured Claims in Class 2B are not impaired and are not entitled to vote to accept or reject the Plan.

Any other Secured Claim will be treated as a separate Class applicable to the Debtor to which such claim relates and will be treated in accordance with Class 2A.

3.    Class 3: General Unsecured Claims.

(i)    *Classification*:  Class 3 consists of Allowed General Unsecured Claims.

(ii)    *Description*.  General Unsecured Claims are Unsecured Claims that are not Priority Claims, Administrative Expense Claims or Warranty Claims.

(iii)    *Treatment*:  Subject to the occurrence of the Effective Date, after payment of Administrative Expense Claims, Priority Tax Claims, Priority Claims, Secured Claims and funding of the Warranty Trust, all remaining Assets of the Debtors' Estates will be distributed for the benefit of the Class 3 General Unsecured Claims.  Each holder of an Allowed General Unsecured Claim shall receive a Pro Rata beneficial interest in the Liquidation Trust and any proceeds or distributions on account of such beneficial interest.

(iv)    *Voting*:  Allowed General Unsecured Claims in Class 3 are impaired, and, thus, the holders of such Allowed General Unsecured Claims in Class 3 will be entitled to vote to accept or reject the Plan.

4.    Class 4:  Warranty Claims.

(i)    *Classification*:  Class 4 consists of the Allowed Warranty Claims.

(ii)    *Description*. Warranty Claims are Claims of any Person that purchased, installed, owns, or had installed photovoltaic laminates or any components thereto manufactured and sold by the Debtors prior to the Effective Date relating to breach of any warranty relating to such product including without limitation, express or implied warranties relating to defects in material and workmanship, warranty of fitness for a particular purpose, power output warranties or any other assurance or warrant that the product will perform in any particular fashion, including claims arising out of contract, tort, or strict liability, and any damages including consequential, exemplary or punitive damages, to the extent allowable under applicable law.

As discussed in Article V.F.3 of this Disclosure Statement, the Debtors estimate that the aggregate Warranty Claims are approximately within a range of $10,000,000 to $20,000,000, all of which is attributable to USO.  The Debtors intend to file a motion under 11 U.S.C. 502(c) to

request the Bankruptcy Court to estimate, for purposes of distribution under the Plan, the aggregate value of Warranty Claims.

(iii)    *Treatment*:  Subject to the occurrence of the Effective Date, each holder of an Allowed Warranty Claim shall receive at the Liquidation Trustee's election cash or any remaining inventory in an amount not to exceed the Warranty Claim Percentage Amount.  For purposes of calculating the distribution amount, inventory will be valued at the Debtors' cost to manufacture the inventory.

(iv)    *Voting*:  Allowed Warranty Claims are impaired, and, thus, the holders of Warranty Claims will be entitled to vote to accept or reject the Plan.

5.    Class 5:  Equity Interests.

(i)    *Classification*:  Class 5 consists of the Allowed Equity Interests in ECD and USO.

(ii)    *Treatment*:  To the extent funds remain after payment in full of all Claims, holders of Allowed Equity Interests will receive Pro Rata payment of any surplus.  This treatment will be in full satisfaction of their Allowed Equity Interests and the Equity Interests will be terminated as of the Effective Date; provided, however, if the Estates are substantively consolidated, Equity Interests in USO will vest in the Liquidation Trust.

(iii)    *Voting*:  Allowed Equity Interest Claims are deemed to have rejected the Plan and are, therefore, not entitled to vote.

## III.  Description of the Debtors and the Debtors' Business

### A.    *Description of the Debtors*

Founded in 1961 in Detroit, Michigan, ECD has been at the forefront of materials science and renewable energy technology for over 50 years.  ECD is a Delaware corporation.  ECD's and its subsidiaries' achievements in the laboratory are well documented, with ECD and its subsidiaries having been granted over 100 U.S. and international patents in its continuing operations.  Beyond lab research, ECD and its subsidiaries have successfully commercialized several technologies, including solar photovoltaics ("**PV**") and nickel-metal-hydride ("**NiMH**") rechargeable batteries.  The development work associated with patents owned by one Debtor has been performed, in certain cases, by employees of the other Debtor.

ECD is primarily a holding company that operates through its subsidiaries.  ECD's directors as of the Petition Date were: Joseph A. Avila, Alan E. Barton, Robert I. Frey, Julian Hawkins, William J. Ketelhut, Jay B. Knoll, Stephen Rabinowitz, and George A. Schreiber, Jr. Its officers, as of the Petition Date, were: Julian Hawkins, William C. Andrews, Jay Knoll, Ghazaleh Koefod, Joseph P. Conroy, and Gregory G. Coppola.

ECD operates a business involving the manufacture and sale of lightweight, flexible thin-film PV laminates through its subsidiary, USO, owned directly and indirectly by ECD.  USO is a limited liability company organized under the laws of the state of Delaware.  As of the Petition

Date, USO's members were ECD and United Solar Ovonic Corporation, a non-Debtor entity. USO's officers, as of the Petition Date, were: William C. Andrews, Joseph P. Conroy, Gregory G. Coppola, Jayne Hannington, Julian Hawkins, Ghazaleh Koefod, James Zajdel and Joshua W. Yaker. USO was managed through its appointed officers, some of which are officers and directors of ECD. ECD, through its wholly owned subsidiary Solar Integrated Technologies, Inc. ("**SIT**"), was involved in a business that specialized in installing and servicing rooftop PV systems.

Prior to 2009, SIT was independently owned from ECD and engaged in the business of designing, manufacturing and installing PV roofing systems, and was one of USO's largest customers. In 2009, SIT was merged with and into a subsidiary of ECD, resulting in SIT as the surviving entity and wholly owned subsidiary of ECD (the "**Merger**"). Under the terms of the Merger, ECD acquired all of SIT's outstanding shares by paying 6.75 pence in cash (or approximately $0.11) for each share of SIT for an aggregate of $11.2 million and the surviving entity assumed the cash and third party debt of SIT which net to approximately $5.1 million. The surviving entity was not merged with ECD, but is a separate legal entity. SIT filed a voluntary petition under chapter 7 of the Bankruptcy Code on February 14, 2012.

## B.    Description of the Principals

On the Effective Date of the Plan, the Liquidation Trustee will be appointed under the Plan to exercise the rights and obligations of the Debtors. The Debtors' officers and directors will no longer be employed unless employed by the Liquidation Trustee.

The following is a summary of the background and activities of the principals that managed the Debtors during their Bankruptcy Cases:

1.    Jay Knoll.

Jay Knoll is the Chief Restructuring Officer ("**CRO**") and an Executive Vice President of ECD and also a member of the Board of Directors of ECD. Mr. Knoll is paid by ECD. The CRO's responsibilities include the primary responsibilities of leading the strategic initiatives of ECD, leading ECD's corporate strategy and coordinating with the holders of the company's convertible notes. The CRO and the Chief Executive Officer ("**CEO**") share responsibilities concerning ECD's shareholders, balance sheet and financial objectives. The CRO also supports the CEO in his responsibilities in managing (i) human resources, (ii) the operations and technology decisions of ECD, and (ii) the cash management and profits and losses of the Debtors. Mr. Knoll currently holds certain equity interests in ECD,[2] and except for employment

---

[2] Each of the Debtors' principals has been granted various equity-based compensation in the form of options, retention based stock grants and/or performance based incentives. The Debtors do not anticipate that any such equity-based compensation will have value to the recipient because (i) the options are out-of-the money, (ii) the retention agreements underlying the retention based grants have not been assumed by the Debtors, (iii) the performance based metrics will not be accomplished and/or (iv) the Plan will likely not result in distributions on account of equity.

related obligations, is not a creditor of the Debtors and has not guaranteed any of the Debtors' obligations.

Mr. Knoll holds a law degree. Prior to joining ECD, Mr. Knoll has served as corporate in-house counsel to multiple large corporations, including serving as general counsel for Collins & Aikman. In connection with his tenure at Collins & Aikman, Mr. Knoll obtained experience advising and guiding financially distressed companies through financial restructurings and negotiations with creditors, which skills are necessary for his role as CRO of ECD.

Mr. Knoll has been employed by ECD since June 2006. He was initially employed as Vice President and General Counsel. Mr. Knoll was promoted to Senior Vice President, General Counsel and Chief Administration Officer in October 2007; promoted to Executive Vice President in August 2009; promoted to Interim President May 6, 2011; and was appointed Chief Restructuring Officer and to the Board of Directors on December 5, 2011.

It is expected that Mr. Knoll will be terminated on June 1, 2012, but may be engaged by ECD and/or USO thereafter on an as needed basis to provide consulting services at an hourly rate. There is no current agreement as to Mr. Knoll's hourly rate in connection with any such consulting agreement.

Mr. Knoll's compensation package is summarized on **Exhibit A**.

2. Julian Hawkins.

Julian Hawkins was terminated on May 11, 2012. Prior to his termination, Mr. Hawkins was President and CEO of ECD, President of USO and also a member of the Board of Directors of ECD. Mr. Hawkins was paid by ECD. Mr. Hawkins responsibilities included the primary responsibilities of creating and managing the solar business relationships of the Debtors and managing (i) the Debtors' human resources obligations, (ii) the operations and technology decisions of the Debtors, and (iii) the cash management, profits and losses of the Debtors. The CEO and CRO share responsibilities concerning the Debtors' shareholders, balance sheet, and financial objectives. Mr. Hawkins currently holds certain equity interests in ECD, and except for employment related obligations, is not a creditor of the Debtors and has not guaranteed any of the Debtors' obligations.

Mr. Hawkins has extensive experience in the solar industry. Prior to joining the Debtors, Mr. Hawkins was Senior Vice President, Sales & Marketing of Abound Solar for over three years and has more than 25 years of experience in sales and marketing roles in Europe, Asia and the Americas, including senior management positions at Integrated Device Technologies, Infineon Technologies, and Samsung Semiconductor. The Debtors attracted Mr. Hawkins because of his extensive experience and reputation in sales and marketing, which were particularly important to the Debtors as they faced the challenging market conditions that led to these Bankruptcy Cases. Mr. Hawkins holds a Bachelor of Science in Computer Science from the Manchester University.

Mr. Hawkins was appointed by the Debtors on December 5, 2011. His compensation package is summarized on the **Exhibit A**.

    3. <u>William Andrews.</u>

William Andrews is the Chief Financial Officer ("**CFO**") and an Executive Vice President of both of the Debtors. Mr. Andrews is paid by ECD. The CFO's responsibilities include managing all aspects of the Debtors' finances, including presenting and reporting the financial information of the Debtors, overseeing the capital structure of the Debtors, budgeting, and supporting the CRO and CEO in their financial responsibilities. Mr. Andrews currently holds certain equity interests in ECD, and except for employment related obligations, is not a creditor of the Debtors and has not guaranteed any of the Debtors' obligations.

Prior to joining the Debtors, Mr. Andrews was employed in multiple financial positions, including at Houston-based Phillip Services Corp., Rollins Environmental Services, and GATX Corporation. Most recently, Mr. Andrews served as senior managing director and co-head of BBK Ltd.'s North American automotive practice, a national turnaround consulting firm; he also served as BBK's Interim CFO and spent two years on the executive committee. In his prior employment experience, Mr. Andrews gained experience in helping companies return to growth and profitability, valuable experience for his current role as CFO of the Debtors. Mr. Andrews earned his MBA from the Kellogg School of Management at Northwestern University.

Mr. Andrews has been employed by the Debtors since April 5, 2010. He was initially employed as Interim CFO, and promoted to CFO on November 10, 2010.

Mr. Andrews' compensation package is summarized on the Supplemental **Exhibit A**.

    4. <u>Joseph Conroy.</u>

Joseph Conroy was terminated on May 11, 2012. Mr. Conroy was an Executive Vice President of ECD and Senior Vice President of USO Operations at USO. Mr. Conroy was paid by USO. His responsibilities included managing and coordinating all aspects of the Debtors' operations, including engineering, research and development, engineering and manufacturing operations. Mr. Conroy currently holds certain equity interests in ECD, and except for employment related obligations, is not a creditor of the Debtors and has not guaranteed any of the Debtors' obligations.

Prior to joining the Debtors, Mr. Conroy had over thirteen years of experience in executive leadership positions with American Axle & Manufacturing, Inc., and more than eight years of progressive manufacturing leadership roles with General Motors Corporation. Mr. Conroy holds a BS in Mechanical Engineering from General Motors Institute and earned a MBA from Wayne State University.

Mr. Conroy has been employed by the Debtors since December 2007. He was initially employed as Vice President of Operations of USO, and was promoted to Senior Vice President of Operations in August 2008. In August 2009, he was named Executive Vice President of Operations.

Mr. Conroy's compensation package is summarized on the Supplemental **Exhibit A**.

    5. Gregory G. Coppola.

Gregory G. Coppola is the Vice President and Treasurer of both of the Debtors. Mr. Coppola is paid by ECD. Mr. Coppola's responsibilities include all aspects of the Debtors' cash management, including the maintenance of bank accounts, management of the collection of accounts receivable and payment of accounts payable of the Debtors, overseeing the risk management of the Debtors, managing the Debtor's financial planning and analysis activities, and supporting the CFO and CRO in their financial responsibilities. Mr. Coppola currently holds certain equity interests in ECD, and except for employment related obligations, is not a creditor of the Debtors and has not guaranteed any of the Debtors' obligations.

Mr. Coppola has extensive experience in finance and banking, valuable experiences for his role with the Debtors. Prior to joining the Debtors, Mr. Coppola was employed by BBK, Ltd., a global business advisory firm, most recently as Managing Director, where he gained knowledge and experience in helping distressed companies return to growth and profitability. Prior to BBK, Ltd., Mr. Coppola was First Vice President – Commercial Loans with Bank One, NA (now known as JP Morgan Chase) serving close to 15 years in both the Detroit and Chicago markets. Mr. Coppola has an MBA, from University of Wisconsin – Madison.

Mr. Coppola was initially a contract employee acting as Interim Treasurer beginning on July 12, 2010, and became a full time employee initially employed as Vice President - Treasurer on October 11, 2010 and promoted to on March 4, 2012 to his current position.

Mr. Coppola's compensation package is summarized on the Supplemental **Exhibit A**.

## C.    *Events Leading to Chapter 11.*

    1.    United Solar Ovonic

ECD's solar business is operated through its subsidiary USO. USO historically has incurred substantial losses, and funded these losses by receiving advances from its parent, ECD. Around the beginning of calendar year 2011, a multitude of industry, market and Debtors-specific factors converged to ultimately force the Debtors to initiate chapter 11 proceedings as to USO, including (i) explosive growth in manufacturing capacity of alternative solar products around the world, particularly low-cost commodity PV products, which has caused a precipitous decline in PV product pricing; (ii) substantial disruptions in key European markets due to abrupt reductions in solar incentives, which have eroded underlying PV system economics; (iii) contraction of available credit for the Debtors' customers for financing PV projects; (iv) ECD's overleveraged balance sheet, impairing ECD's ability to fund USO, driven principally by ECD's unsecured notes due in June 2013; (v) unnecessary and burdensome legacy costs that were incurred under industry conditions that have changed dramatically, such as burdensome supply contracts, warranty claims and unnecessary real estate leases; and (vi) inability to finance technology and product improvements that are critical to retaining and expanding the Debtors' competitiveness.

In response to these factors, the Debtors undertook a variety of cost-cutting and restructuring efforts over the last several years. Specifically, USO has reduced the cost of manufacturing its solar products and taken steps to align its expenses with expected revenue. In 2010, USO reconfigured its manufacturing footprint to take advantage of low-cost manufacturing opportunities in Mexico. Subsequently, in May 2011, the Debtors initiated a comprehensive cost-reduction program that included functional consolidation and organization realignment.

Through the remainder of 2011, sales volumes continued to suffer and USO management attempted to reposition the company through a renewed focus on technology enhancement and sales diversification through a new initiative called Open Solar™. The goal of Open Solar was to build a platform for innovation around USO's core PV technology and let third parties develop new products using USO's technology.

Notwithstanding the foregoing, in the fall of 2011, sales volume continued at unsustainably low volumes, and in order to preserve cash and minimize excess inventory, the Debtors and their affiliates temporarily suspended all manufacturing operations, furloughed approximately 240 employees and laid off another 530 full time employees and contractors.

### 2. Ovonic Battery Company, Inc.

In furtherance of the Debtors' efforts to restructure their businesses, ECD successfully closed a sale of its interest in Ovonic Battery Company, Inc. subsidiary ("**OBC**") on February 13, 2012. OBC is a pioneer in advanced battery technology, primarily as the inventor and worldwide licensor of NiMH battery technology, as well as state-of-the-art cathode materials for Lithium-Ion batteries. In July 2011, ECD engaged Quarton Partners, LLC ("**Quarton**") and began a thorough process to seek a sale of their interest in OBC. ECD negotiated and executed a definitive purchase agreement with BASF Corporation, to sell OBC for gross purchase price of approximately $58 million. At the purchaser's request, as a condition to closing the sale of OBC, SMH Capital Advisors and Diamondback Master Fund, Ltd, each of which is a member of the Ad Hoc Consortium, provided a release of any claims or causes of action they may otherwise have under any applicable state fraudulent transfer or state fraudulent conveyance laws with respect to the OBC transaction and agreed to notify the indenture trustee of the foregoing release and to instruct the indenture trustee not to commence, pursue and/or join in any cause of action pursuant to the indenture under any applicable state fraudulent transfer or state fraudulent conveyance laws with respect to the OBC transaction.

### D. Plan Support Agreement

Beginning in 2011, certain holders of the Notes began to express concern regarding the continuing operating losses being incurred by the Debtors. During the fall of 2011, the Debtors and counsel to the Ad Hoc Consortium began to discuss the Debtors' financial performance and plans. On December 12, 2011, the Debtors met with some of the members of the Ad Hoc Consortium (the "**Supporting Noteholders**") and their advisors to present a business plan and to obtain their support for the Debtors' business plan. The business plan required all of the Notes to convert into equity. The Debtors and those certain holders of the Notes were unable to reach consensus on a viable business plan, and the proposed debt conversion was not accepted by those certain holders of the Notes. Accordingly, because the Debtors believed that they could not

implement their business plan prior to the maturity of the Notes, the Debtors and the Supporting Noteholders negotiated a Plan Support Agreement. The major terms of the Plan Support Agreement are:

- The Debtors agreed to initiate a chapter 11 bankruptcy proceeding and comply with certain deadlines in connection with the cases;

- The Debtors would conduct a sale process of the Debtors' solar business to attempt to effectuate a going-concern sale in chapter 11, with certain milestones to be satisfied;

- The Supporting Noteholders would support a Management Incentive Plan, Key Employee Retention Plan and Employee Severance Compromise Program, each as outlined in the Plan Support Agreement;

- The Supporting Noteholders would support and vote in favor of a plan of reorganization requiring the Estates of ECD and USO to be substantively consolidated;

- In addition to certain fees paid to the Supporting Noteholders' professionals, the Debtors would pay retainers totaling $1,000,000 to professional representing the Ad Hoc Consortium, and committed that the plan of reorganization would provide that approved fees and expenses in excess of said retainer amounts shall be Administrative Expense Claims Allowed against the Debtors' Estates and payable on the Effective Date of the Plan to the extent the retainers are not sufficient to cover their approved fees and expenses incurred during the Bankruptcy Cases.

- The Plan would provide that none of the Debtors, the Ad Hoc Consortium, the Supporting Noteholders or the Committee, or any of their members, officers, directors, employees, advisors, attorneys or agents, shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with or arising out of the Bankruptcy Cases, except for their gross negligence or willful misconduct.

- To the maximum extent allowed under applicable law, the plan of reorganization would provide that each holder of a Claim or Equity Interest shall be deemed to have released all direct or derivative claims in connection with or related to any action or omission taking place prior to the Effective Date in any way relating to the Debtors, the Bankruptcy Cases, the Plan, the Plan Support Agreement, the Ad Hoc Consortium, the Supporting Noteholders or the Committee, against the Debtors, the Debtors' present and former directors, officers, employees, agents, financial advisors, attorneys and professionals, the Ad Hoc Consortium, the Supporting Noteholders, the Committee; provided, however, the foregoing shall not waive or release any causes of action arising out of (i) any contractual obligations owing by any such party or (ii) the willful misconduct, gross negligence, intentional fraud or criminal conduct.

- The plan of reorganization would provide that each Debtor shall be deemed to have released all claims in connection with or related to any action or omission taking place prior to the Effective Date in any way relating to the Debtors, the Bankruptcy Cases, the Plan, the Plan Support Agreement, the Ad Hoc Consortium, the Supporting Noteholders or the Committee, against the Debtors' present and former directors, officers, employees, agents, financial advisors, attorneys and professionals, the Ad Hoc Consortium, the Supporting Noteholders, the Committee; provided, however, the foregoing shall not waive or release any causes of action arising out of (i) any contractual obligations owing by any such party (ii) Avoidance Action or (iii) the willful misconduct, gross negligence, intentional fraud or criminal conduct.

Additional factual background relating to the Debtors' commencement of the Bankruptcy Cases is set forth in the *Declaration of William C. Andrews, Executive Vice President and Chief Financial Officer, In Support of First-Day Motions*, a copy of which is attached as **Exhibit B**.

## IV.  Significant Events during the Bankruptcy Cases

### A.    *Petition Date*

The Bankruptcy Cases were commenced when the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on February 14, 2012.  Since that date, the Debtors have been operating as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.  On February 17, 2012, the Bankruptcy Court entered an order allowing for the joint administration of the Bankruptcy Cases.  The Committee was appointed in this case on February 27, 2012.  As a consequence of the Debtors' commencement of the Bankruptcy Cases, all actions and proceedings against the Debtors and all acts to obtain property from the Debtors have been stayed under Section 362 of the Bankruptcy Code.

### B.    *Management Incentive Plan*

The Bankruptcy Court approved the terms of a Revised Management Incentive Plan.  Each of six executives is entitled to participate in the Revised Management Incentive Plan.  Under the terms of the Revised Management Incentive Plan, if there is a distribution to the holders of the Debtors' General Unsecured Claims under the Plan of at least 50% of the aggregate Allowed amount of the General Unsecured Claims against the Debtors, the participants will earn in aggregate $750,000 plus 3.5% of the amounts distributed to holders of General Unsecured Claims under the Plan in excess of 50%, except that in all cases the maximum amount of the incentive pool shall not exceed $3,000,000 in the aggregate.  If the distribution to holders of General Unsecured Claims is less than 50%, the participants are not entitled to any amount under the Revised Management Incentive Plan.  The participants are Messers Hawkins, Knoll, Andrews, Coppola, Conroy and Mr. Josh Yaker.  Fifty percent (50%) of the Revised Management Incentive Plan has vested, and the balance will vest upon the Effective Date.  The obligation to pay any obligation under the Management Incentive Plan is a joint obligation of both Debtors.  If the Estates are not substantively consolidated, parties-in-interest may challenge the estate to which such expense is allocated.  If the Estates are substantively consolidated, the allocation will be eliminated thereby avoiding litigation between

the Estates. Based on the estimates in the liquidation analysis attached as Exhibit D, the amount payable under the Management Incentive Plan is approximately between $1.248 million and $1.722 million.

## C.      *Key Employee Retention Program*

The Bankruptcy Court approved the terms of a Revised Key Employee Retention Program. Certain key technical employees of the Debtors were entitled to participate in the Revised Key Employee Retention Program; provided that such participant waived their right to participate in the Revised Severance Compromise Program, described below. Under the terms of the Revised Key Employee Retention Program, the participants would earn a retention bonus if they remained employed by the Debtors at either: (i) the closing of a going concern sale of the Debtors' solar business; or (ii) the termination of such going concern sale process. The Revised Key Employee Retention Program has vested and the obligations thereunder have been paid by the employer of such employee. The total cost of the Revised Key Employee Retention Program is approximately $567,000 in aggregate, consisting of approximately $15,000 attributable to ECD and $552,000 attributable to USO. The costs are allocated to the employer that employs the applicable participant.

## D.      *Severance Compromise Program*

The Bankruptcy Court approved the terms of a Revised Severance Compromise Program. Each non-insider employee is eligible to participate in the Revised Severance Compromise Program if, within seven days after the termination of his/her employment, he/she executes a release of all claims against the Debtors. Participants receive a cash payment from his/her employer equal to the greater of: (i) 100% of any liability of Company under the WARN Act or (ii) half of the amount of the unsecured claim against the Debtors that would be allowed under applicable law. As of April 30, 2012, the total payout under the Revised Severance Compromise Program is approximately $400,000 in aggregate, consisting of approximately $67,000 attributable to ECD and $333,000 attributable to USO. The costs are allocated to the employer that employs the applicable participant.

## E.      *The Cash Management Orders*

The Bankruptcy Court has entered an interim and final order relating to the Debtors' cash management system and intercompany funding [Docket Nos. 34, 278, 421 and 525] (as amended, the "**Cash Management Orders**").

The Cash Management Order authorizes ECD and USO to continue to use its pre-petition cash management system, subject to certain modifications. The Debtors' cash management system facilitates the timely and efficient collection, management and disbursement of funds used in the Debtors' businesses. Because of the nature of the cash management system and the disruption that would have resulted if Debtors were forced to radically change the cash management system, the Debtors sought and obtained Bankruptcy Court approval to continue using the cash management systems.

The Debtors' cash management system is computerized. This allows the Debtors to manage centrally all of their cash flow needs and includes the necessary accounting controls to

enable the Debtors to prepare operating reports, thereby permitting the Debtors to receive timely and accurate reporting and to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable. The cash management procedures that the Debtors use constitute ordinary, usual and essential business practices and are similar to those used by other comparable corporate enterprises. The cash management system benefits the Debtors in significant ways, including by allowing the Debtors to: (a) control corporate funds centrally; (b) ensure availability of funds when necessary; and (c) reduce administrative expenses by facilitating the movement of funds and more timely and accurate balance and presentment information. Certain pre-petition transfers made between ECD and USO under the cash management system may be challenged as fraudulent or preferential. If the Estates are substantively consolidated, all intercompany claims will be eliminated thereby avoiding any challenge.

The Cash Management Orders also authorize (i) USO to use ECD's cash collateral; (ii) grants to ECD replacement liens in the same categories of collateral that ECD was granted prior to the Petition Date to the extent of any diminution in the value of ECD's collateral, and (iii) authorized ECD to provide post-petition advances to USO entitled to priority under Section 503(b) of the Bankruptcy Code. No post-petition advances have been made under the Cash Management Orders.

The Cash Management Orders also provide that the Committee shall retain rights to assert any claims or causes of action, theory or defense challenging the rights granted under the Cash Management Orders in respect of the pre-petition credit agreement and the granting of post-petition replacement liens for USO's use of the alleged cash collateral granted under the Cash Management Orders, including without limitation, arguments that such amounts are equity and not debt. The Committee's deadline to assert such claim is June 30, 2012. If the Estates are substantively consolidated, all intercompany claims will be eliminated thereby avoiding any challenge.

## F.     *Retention of Professionals*

### 1.     Debtor's Counsel

The Debtors have retained the law firm Honigman Miller Schwartz and Cohn LLP as their bankruptcy counsel. The Bankruptcy Court entered an order approving employment of bankruptcy counsel on March 19, 2012. On March 21, 2012, the Bankruptcy Court entered the *Order Authorizing Employment of Covington & Burling LLP as Special Counsel for the Debtors* [Docket No. 228] for the purposes of: (i) assisting the Debtors in the potential disposition of assets and other complex commercial transactions; and (ii) providing legal advice to the Debtors regarding securities law compliance, corporate governance, tax, employee benefits, intellectual property and regulatory compliance. USO intends to retain Schaefer & Weiner as conflict counsel and ECD intends to retain McDonald Hopkins as conflicts counsel.

### 2. Committee's Counsel

The Committee retained the law firm of Foley & Lardner LLP as the Committee's counsel. The Bankruptcy Court entered an order approving the retention on April 20, 2012.

Pursuant to the retention order, the Committee adopted a procedure with respect to conflicts between the Estates whereby the Committee would form a USO subcommittee and an ECD subcommittee to handle such issues for each Estate. With respect to such conflicts, Foley & Lardner LLP represents the USO subcommittee. The ECD subcommittee has retained Clark Hill PLC as counsel. The Ad Hoc Consortium has filed a motion to vacate the employment order.

### 3. Ad Hoc Consortium's Counsel

The Ad Hoc Consortium retained the law firms of Pepper Hamilton LLP and Brown Rudnick LLP as the Ad Hoc Consortium's counsel. Pre-petition, ECD paid retainers to the Ad Hoc Consortium's counsel in the amounts of $1,000,000. The $1,000,000 retainer was allocated $400,000 to Duff & Phelps Securities, $500,000 to Brown Rudnick LLP and $100,000 to Pepper Hamilton LLP.

### 4. Debtors' Financial Consultants

On March 21, 2012, the Bankruptcy Court entered the *Order Granting Application to Employ Plante & Moran, PLLC as Accountant to the Debtors* [Docket No. 227]. The Debtors have retained Plante & Moran, PLLC to perform certain accounting, consulting services, and other financial analyses required by management in connection with the Bankruptcy Cases.

On March 21, 2012, the Bankruptcy Court entered the *Order Granting Application to Employ AlixPartners, LLP as Restructuring Advisor to the Debtors* [Docket No. 229]. AlixPartners, LLP renders financial advisory services to the Debtors including providing assistance to the Debtors in the business and financial aspects of a chapter 11 proceeding.

### 5. Appointment of Investment Banker

On March 21, 2012, the Bankruptcy Court entered the *Order Granting Application to Employ Quarton Partners, LLC as Special Financial Advisor to the Debtors* [Docket No. 225]. The Debtors have retained Quarton to perform certain investment banking and consulting services in connection with the formulation, analysis, negotiation, and implementation of a going concern sale of the solar business and of ECD's interest in Ovonyx, Inc. ("**Ovonyx**"), or other strategic alternatives relating to the Debtors' remaining operating businesses and assets. Before the Petition Date, Quarton received approximately $1,195,000 as a transaction fee for the sale of OBC. Since the Petition Date, Quarton's fees are as follows: (i) upon a sale of Ovonyx, Quarton will receive $300,000, plus 1.75% of the consideration received above $15,000,0000; (ii) for its services in connection with a sale of the Debtors' non-core solar operations located in Auburn Hills, Michigan and Ontario, Canada, Quarton received $250,000 on April 1, 2012, and upon such sale, Quarton will receive 1.75% of the consideration received; (iii) upon a sale of Ovonic Fuel Cell, Quarton will receive 1.75% of the consideration received in such transactions subject to a minimum transaction fee of $100,000 per transaction if multiple transactions occur; and (iv) Quarton was paid 3 monthly $125,000 per month for its services regarding the potential sale of the Debtors' solar business, as of the date hereof, no further monthly payments are being made. Upon certain sales of the solar business, Quarton may receive a transaction fee of $1,000,000 plus 3.00% of the consideration received by ECD over $25,000,000 on account of such transaction.

6. Appointment of Auctioneers

On March 24, 2012, the Bankruptcy Court entered the *Order Granting Application to Retain and Employ Auctioneers* [Docket No. 254]. Pursuant to this order, the Debtors have employed a joint venture of certain auctioneers (the "**Auctioneers**") to conduct auctions of the Debtors' assets as requested by the Debtors. The Auctioneers include Heritage Global Partners, Inc.; Hilco Industrial, LLC; Maynards Industries (1991) Inc.; Counsel RB Capital, LLC; and Van Acker Associates, LLC.

7. Appointment of Scouler & Company, LLC

On May 17, 2012, the Bankruptcy Court entered the *Order Pursuant to Sections 328(a) and 1103(a) of the Bankruptcy Code Authorizing Employment and Retention of Scouler & Company, LLC as Financial Advisor to the Official Committee of Unsecured Creditors Nunc Pro Tunc to March 10, 2012* [Docket No. 537]. The Committee has retained Scouler & Company, LLC to provide such advisory and consulting services to the Committee as it deems appropriate and feasible in order to advise the Committee during the course of these Bankruptcy Cases. Pursuant to their retention order, in the case of conflicts, Scouler & Company, LLC has been authorized to act for the USO subcommittee.

8. Other professionals

The Debtors have also sought to obtain Deloitte Tax LLP as a tax professional, Signature Associates, L.L.C. ("**Signature Associates**") to sell certain real estate and intend to seek to obtain Hilco IP Services LLC d/b/a Hilco Streambank ("**Hilco Streambank**") to market certain of the Debtors' intellectual property rights. In addition, the Debtors have retained the following various ordinary course professionals: (i) Grant Thornton LLP to provide audit services; (ii) Squire Sanders & Dempsey, LLP to provide European legal advice; (iii) Gifford, Krass, Sprinkle, Anderson & Citkowski, PC to provide patent legal advice; (iv) Towers Watson Delaware Inc. to provide compensation consulting services; (v) Dave Schumaker to provide intellectual property legal advice; (vi) DWYSYWD LLC to provide sale analysis services relating to phase change memory; (vii) Vercruysse Murray & Calzone, P.C. to provide employment and immigration legal services; and (viii) Baker & McKenzie Abogados, S.C. to provide Mexican legal advice.

G. **Contract Employees**

The Debtors have terminated employees post-petition, but have engaged Ghazaleh Koefod, a former officer of the Debtors, and Joshua Yaker, a former officer of USO, on an as needed basis to provide consulting services to the Debtors and USO, respectively, at hourly rates of $100 per hour and $150 per hour, respectively.

H. **Post-Petition Sale of Assets**

On February 24, 2012, the Debtors filed a motion pursuant to Section 363(b) of the Bankruptcy Code to seek authority to sell the stock or assets that comprise Debtors' solar business unit at auction ("**Sale Motion**") [Doc. No. 66]. The Bankruptcy Court entered an order

approving the auction and related bidding procedures (the "**Bidding Procedures Order**") [Docket No. 168].

With the assistance of Quarton, the Debtors engaged in a sale process. While the Debtors received multiple expressions of interest, only one bid qualified as a Qualified Bid (as defined in the Bankruptcy Court-approved Bidding Procedures Order) and that bid was at an unacceptable value. Accordingly, after consultation with the Committee and the Ad Hoc Consortium, the Debtors cancelled the auction and are proceeding to liquidate at an equipment auction.

The Debtors have conducted one sale of surplus equipment at a facility located in Auburn Hills, Michigan. The auction was completed in March 2012 and the net sales proceeds totaled $716,877.61. The Auctioneers remitted this amount to the Debtors along with the Debtors' share of the buyer's premiums totaling $50,181.43.

The Debtors are also actively pursuing a sale of the ECD's interest in Ovonyx. Ovonyx was co-founded with ECD to commercialize the ECD's proprietary non-volatile phase change random access memory technology used in such applications as smartphones, computers, digital cameras and microelectronics. ECD owns 38.6% of the common stock of Ovonyx. The process to sell Ovonyx is ongoing. ECD is a party to a stockholders agreement in connection with Ovonyx (the "**Stockholders Agreement**"). The Stockholders Agreement entitles ECD to elect two of five members of Ovonyx's Board. The Stockholders Agreement also contains certain restrictions on transfer interests in Ovonyx, the right to include its shares in certain sales by other stockholders and a right of first refusal in favor of each member to purchase stock in Ovonyx in certain circumstances. The Stockholders Agreement may be an executory contract that could be assumed or rejected by ECD. As described above, Quarton is entitled to a fee in relation to a completed sale of Ovonyx.

The Debtors have remaining assets in the form of equipment, inventory, intellectual property and real property that the Debtors or the Liquidation Trustee may sell in both private sales and auctions. As to the inventory, the Debtors may use some or all of the inventory to satisfy Warranty Claims. The Debtors or Liquidation Trustee may abandon a portion of the remaining assets if the Liquidation Trustee believes that the costs of sale, storage and/or moving costs exceed the value of such assets.

## I.    *Bar Dates*

The Bankruptcy Court entered an order setting an unsecured claims bar date for June 21, 2012, at 5:00 p.m. EST and setting a governmental claims bar date for August 13, 2012, at 5:00 p.m. EST.

The Plan provides for an Administrative Expense Claim bar date forty-five days after the Effective Date, and a bar date for any creditor who has a Claim as a result of the rejection of an executory contract or unexpired lease thirty days after the Effective Date.

## J.    *Summary of Monthly Operating Reports*

The Debtors have filed operating reports during the pendency of their Bankruptcy Cases for February 2012 through April 30, 2012. The most recent Monthly Operating Reports,

attached as **Exhibit C**, show that the ECD and USO have an ending balances of $141,325,674 and $11,721,600, respectively, in all investment and bank accounts as of April 30, 2012.

## V.  Assets and Liabilities

### A.    *Liquidation Analysis*

**Exhibit D** contains a liquidation analysis for each of the Estates, separately, and for the substantively consolidated Debtors (the "**Liquidation Analysis**") estimating the realizable value of the Debtors' assets in the event each of the Debtors is independently liquidated and in the event they are liquidated as a substantively consolidated estate.

### B.    *Assets*

1.    Accounts receivable.

The Debtors have valued accounts receivable based on management's expected realization net of costs to collect based on management experience with the customer base and age of the receivable.   Accounts receivable may be collected at amounts less than the projected value for a variety of reasons, including, without limitation, because account debtors may assert setoffs, account debtors may be uncollectible, or the costs to collect the receivables may be higher than projected.

USO owns an accounts receivable owing from SIT of a book value of $23,497,492.00. The collectability of a material portion of the USO's SIT accounts receivable is doubtful.  SIT is now in chapter 7 bankruptcy proceedings.  Information regarding the estate of SIT may be found on the Annual Trustee's Report for the period ending: 3/31/12 [Case No. 12-43169, United States Bankruptcy Court for the Eastern District of Michigan, Docket No. 44], which was filed in the SIT bankruptcy case and is attached as **Exhibit E** (the "**SIT Annual Trustee's Report**").

2.    Notes receivable

ECD owns a notes receivable owing from SIT of a book value of $41,812,183.00.  The collectability of a material portion of the ECD's SIT notes receivables is doubtful.  SIT is now in chapter 7 bankruptcy proceedings.  Information regarding the estate of SIT may be found on the SIT Annual Trustee's Report.

3.    Inventory.

Inventories consist of certain raw materials, work-in-process and finished goods owned by USO.  The Debtors have valued inventory based on management's expected realizable value. Inventory may be realized at amounts less than projected because the selling price may be lower than expected and the cost of obtaining possession of inventory may be higher than expected. Historically the finished goods have been sold to distributors and end users with a warranty. In determining the value of the inventory, management has assumed no warranty will be offered during the liquidation therefore depressing the ultimate recovery from the sale of the inventory.

4. Real Estate.

USO owns real estate consisting of real property and improvements located at 1 and 2 Solar Parkway, Greenville, Michigan 48838 and 10 Clark Road, Battle Creek, Michigan 49037. The Debtors have valued this real estate based on informal valuations provided by Signature Associates, the Debtors' real estate consultant and assuming a carrying period of six to nine months. The realizable value of the real estate may be more or less based primarily on changes in the economic environment.

5. Machinery and equipment.

Machinery and equipment is owned by USO. The Debtors have valued machinery and equipment based on management's expected realizable value. The Debtors' machinery and equipment is unique and specialized and has a limited market. Prior to the Petition Date, the Debtors received an equipment appraisal, which reflected a forced liquidation value of approximately $4 million. In formulating its estimate, Debtors' management considered the appraisals, and also projected values based on the Debtors' experience from the March 2012 auction of similar equipment and discussions with the Auctioneers. The amount realized from the auction of the equipment may vary materially from the estimates.

6. Intellectual property

The Debtors have valued intellectual property based on management's expected realizable value.

7. Ovonyx.

ECD is conducting an ongoing sale process for its interest in Ovonyx. Disclosing the Debtors' projected value at this time would be detrimental to the sale process and may impair the purchase price.

Any value realized for ECD's interest in Ovonyx has no impact to USO creditors in a stand-alone USO liquidation because ECD owns the interests in Ovonyx.

8. Ovonic Battery Company, Inc.

Prior to filing for chapter 11, ECD completed the sale of its subsidiary OBC. As part of the transaction ECD was required to escrow $3 million of the proceeds for a period of 3 years. The purpose of the escrow is to secure ECD's indemnity obligation primarily relating to any breach of a representation or warranty made by ECD under the applicable transaction agreement. The escrow agent is JPMorgan Chase Bank, N.A.

9. Other Non-Debtor Subsidiaries

The Debtors believe that their non-Debtor subsidiaries have only nominal value because the liabilities of each non-Debtor subsidiary exceed the value of the assets of the respective non-Debtor subsidiary.

*C.      Preferences/Fraudulent Transfer*

The Debtors have not concluded their analysis of the realizable value of preference causes of action at this time.  During the 90 days prior to the Petition Date, ECD and USO made aggregate transfers of $10,725,303.12 and $17,991,784.22, respectively.

Exhibit F is a non-exhaustive list of Causes of Action that will be transferred to the Liquidation Trust on the Effective Date.  The Debtors may provide a supplemental non-exclusive list of Causes of Action in connection with the Plan Supplement.

Within the 6 years prior to the Petition Date, USO transferred to ECD ownership of patents that were developed by USO employees.  The Debtors have not fully investigated the value of such patents or the value received by USO in exchange for any such patents invented by an employee of USO but subsequently assigned to ECD, nor have the Debtors fully examined any other defenses that ECD may have to an alleged fraudulent transfer conveyance claim relating to the patents.  As disclosed on Exhibit F, during the year prior to the Petition Date, ECD and USO made transfers to Insiders of $44,826,735.76 and $37,325,891.56, respectively.  These amounts include approximately $39.6 million made by ECD to USO and approximately $10.4 million made by USO to ECD.  Of the amounts advanced by ECD to USO during this one year period, more than $10.4 million was advanced subsequent to the times that $10.4 million was advanced by USO to ECD.   The Committee has also requested that the Debtors disclose, and Exhibit F includes, allegedly potential fraudulent transfers made by USO to ECD on September 30, 2010 and October 31, 2010 of $18,000,000 and $5,000,000, respectively.  All of the transfers between ECD and USO were made in connection with, and accounted for under, the Debtors' cash management system.  As discussed above, ECD and USO benefitted from the cash management system.  In addition, the aggregate amount of transfers made by ECD to USO subsequent to the times of the transfers from USO to ECD exceeds the amount of the USO transfers to ECD.  If the Debtors' Estates are not substantively consolidated, parties-in-interest may challenge these intercompany transfers.   Moreover, if the Debtors' Estates are not substantively consolidated, parties in interest may assert that USO is obligated to pay ECD the amount of approximately $792 million on account of net aggregate intercompany advances made by ECD to USO.   If the Estates are substantively consolidated, these claims will be eliminated.

The Committee has also requested that the Debtors disclose, and Exhibit F includes, allegedly potential fraudulent transfers made by USO to OBC on August 31, 2010 of $10,000,000.  Any such claim will not be eliminated under the Plan.

*D.      Causes of action*

Other than certain avoidance actions described above, the Debtors do not believe there to be any valid claims against the Debtors present and former directors and officers, the Committee, the Ad Hoc Consortium and their respective employees, agents, financial advisors, attorneys and professionals.  Any recovery from preferential or fraudulent transfers will benefit the Debtors collectively if the Plan is confirmed or, alternatively if the Plan is not confirmed, would benefit the respective Debtor.

On May 15, 2012, USO filed a Complaint for Breach of Contract, Account Stated, and Unjust Enrichment against Ontility LLC ("**Ontility**"), commencing Adversary Proceeding No. 12-04917. USO seeks payment of $958,817.60, plus contractual interest and pre- and post-judgment interest, for 4,268 solar laminates that Ontility received from USO on or about December 29, 2011, but for which Ontility failed to pay USO.

The Debtors will provide a non-exclusive list of causes of action in connection with the Plan Supplement.

### E.   *Intercompany Advances*

ECD has advanced approximately $792 million to USO since 2003. From July 2011 to the present, ECD and USO reflect that these advances were loans from ECD to USO, and debts owed by USO to ECD. Other than book entries in the general ledger, there are no other documents or instruments evidencing these advances as debt. Before July 2011, these advances from ECD to USO have been treated on the Debtors' books as capital contributions from ECD to USO. Since ECD and USO have historically published consolidated financial statements, the separate accounting for the transaction is not reflected in historical published financial statements. However, internal balance sheets of USO reflect these advances as capital contributions until the fourth quarter of 2011, when they were reflected in internal balance sheets as debt. The approximately $792 million obligation consists of between $300 to $400 million advanced to fund capital expenditures, between $300 to $400 million advanced to fund losses at USO and between $60 to $70 million in interest. The interest portion reflects interest, amortization of original issue discount, deferred financing costs and other expenses accruing under the Notes that are allocated to USO in the entirety. Under the Cash Management Orders, the Committee reserved the right to challenge the character of these claims and must bring any such challenge by June 30, 2012. The Committee may file such challenge. If the Estates are substantively consolidated, these intercompany claims will be eliminated. If the Estates are not substantively consolidated, the characterization of the intercompany advances may be litigated, and parties in interest may assert that USO is obligated to pay ECD the amount of approximately $792 million on account of the net aggregate intercompany advances made by ECD to USO.

Each of ECD and USO have separately filed a proof of claim in the SIT chapter 7 bankruptcy case, in the amounts of $48,047,816.04 and $23,497,493.37, respectively. The claims have not been liquidated, but include, (i) as to ECD: promissory notes and claims for preference and/or fraudulent transfers, and (ii) as to USO: accounts receivable, preference and/or fraudulent conveyance claims and indemnification, contribution or subrogation claims relating to warranty liability attributable to SIT or its subsidiaries and affiliates.

During the one year prior to the Petition Date, USO made transfers to or for the benefit of ECD subsidiaries: (i) SIT of $2,161,335; and (ii) Solar Integrated Technologies GmbH of $3,569,280; and USO subsidiaries: (i) United Solar Canada, LLC of $1,058,941; (ii) United Solar Systems de Mexico, S.A. de C.V. of $14,511,491; (iii) United Solar Ovonic Europe GmbH of $3,604,857; and (iv) United Solar Ovonic Italy S.r.L of $138,370. During the one year prior to the Petition Date, ECD made transfers to SIT of $410,004. Except for the Canadian affiliate, each of the aforementioned affiliates is primarily a sales office or employer without cash or substantial physical assets available to repay all employee obligations that may be entitled to

priority under applicable law. Moreover, the cost of obtaining possession of any physical assets located Canada may exceed the value of those assets. Therefore for purposes of the Liquidation Analysis, the Debtors have projected that they will not collect any portion of the advances to these foreign affiliates.

### F. Liabilities.

The projected amount of Administrative Expense Claims, Priority Tax Claims, Priority Claims, Secured Claims, General Unsecured Claims and Warranty Claims is reflected in Article II above.

### 1. ECD's 2013 Convertible Senior Notes

In 2008, ECD completed an offering of $316.3 million of convertible senior unsecured notes. The unsecured notes bear interest at a rate of 3.0% per year. If the unsecured notes are not converted, they will mature on June 15, 2013. Interest is payable semi-annually on June 15 and December 15, with a 30 day cure period. The currently outstanding principal balance of the Notes is approximately $263,153,000. The Debtors have timely made all interest payments under the Notes, except the interest payment due on December 15, 2011, which was made within the 30 day grace period.

Under a share lending agreement to which ECD is a party (the "**Share Lending Agreement**"), 3,444,975 shares of ECD's stock were offered to an affiliate of Credit Suisse Securities (USA) LLC ("**CS Affiliate**"). Under the Share Lending Agreement, the CS Affiliate agreed to use the borrowed shares to facilitate transactions by which the investors in the Notes were entitled to sell the shares they received under the Share Lending Agreement. The affiliate received all of the proceeds of the sale of the borrowed shares and ECD received a nominal lending fee. The shares were required to be returned to ECD by June 15, 2013. For financial reporting purposes, ECD reported the borrowed shares as outstanding for the purposes of computing and reporting its earnings per share. ECD stated in its June 12, 2008 Prospectus issued in conjunction with the note offering that this Share Lending Agreement was designed to make the Note offering more attractive to investors and to allow it to issue the Notes on a more favorable basis that could otherwise have been achieved. These Notes were convertible notes which, in some circumstances, could have been converted into ECD stock at the option of each holder of the Notes; however, it does not appear that the conditions to trigger the conversion option of the Notes ever occurred. Upon issuance of the Notes, ECD received net cash proceeds from the Note offering of $306,762,500. The purchasers of Notes received the Notes and, if they chose to do so, any shares borrowed pursuant to the Share Lending Agreement, which shares could have, but were not required, to have been, sold in the market subject to the obligation to redeliver the shares by June 15, 2013. The Debtors have no knowledge as to the identity or extent that any noteholder, past or present, participated in the Share Lending Agreement. There are currently approximately 187,000 shares outstanding under the Share Lending Agreement.

### 2. ECD's Secured Claim against USO

On December 19, 2011, the Debtors entered into a Line of Credit Agreement and Security Agreement under which ECD provided a $5,000,000 secured credit facility in exchange

for a first-priority lien and security interest in all of the accounts, documents, instruments, general intangibles, deposit accounts, letter-of-credit rights and chattel paper, all supporting obligations and all monies and claims for money due or to become due and all security held or granted; all of the investment property; all of the inventory; all rights in the Economic Development Grant Agreement between the Michigan Strategic Fund and the City of Greenville, Grant No. MSC 203036-EDIG, as amended; and all other present and future personal property. Prior to these agreements, ECD's advances to USO were not secured. Under the Cash Management Orders, the Committee reserved the right to challenge the character of this secured claim and must bring any such challenge by June 30, 2012. The Committee may file such challenge. If the Estates are substantively consolidated, this secured claim will be eliminated. If the Estates are not substantively consolidated, the characterization of this secured claim may be litigated, and if the secured claim is Allowed, it will be paid prior to USO General Unsecured Claims.

3. Warranties

Since April 2009, USO has generally provided a limited product warranty and a limited power output guaranty relating to the product that it sells. In certain circumstances, the warranty runs to the purchaser and/or end user of the product. USO's standard product warranty currently in effect warrants that its solar laminates are free from defects in material and workmanship for a period of five years. The standard power output guaranty currently in effect warrants that: (i) during the first ten years from the date of sale, the product will produce 92% of the minimum power output rating; (ii) during the first twenty years from the date of sale, the product will produce 84% of the minimum power output rating; and (iii) during the first twenty-five years from the date of sale, the product will produce 80% of the minimum power output rating. The warranties are the exclusive remedy available to owners. Prior to April 2009, USO did not provide a warranty as to defects and workmanship and the power output warranty was more restrictive both as to output levels and limitations on warranty eligibility. If the product does not conform to the warranty, USO may, at its option, (i) repair or replace the product, (ii) provide supplemental product to meet the minimum power output, or (iii) refund a prorated portion the purchase price.

The warranty states that it is only effective if the product was purchased from authorized persons, installed in an approved application and the installation was registered. Among other exclusions, the warranty excludes failures due to misuse, neglect, improper or nonconforming installation, application to unapproved substrates, damage or corrosion caused by substrates, roofing material, thermal expansion, and repairs by anyone other than USO-approved technicians.

The aggregate amount of warranty claims is unknown at this time. The Debtors have typically accrued a warranty liability for financial reporting purposes at 1% of the sale price, with the actual amount of warranty claims adjusted if the actual claim exceeds the estimate. As of the Petition Date, the Debtors financial records reflect a warranty liability of $10,176,836. This estimate does not account for any liability arising from the power output warranty, but the Debtors expect any such liability to be nominal. The Debtors currently have in their possession over 15 megawatts of solar laminates that, if not sold, could be used to service warranty claims.

The Plan proposes to create a warranty trust. The Warranty Trust will be funded with cash and inventory that is not sold, if any. The inventory contributed to the Warranty Trust will be valued at the Debtors' cost to manufacture the inventory. To determine the amount of warranty claims, the Debtors intend to file a motion under Section 502(c) of the Bankruptcy Code estimating the aggregate amount of warranty claims. The Liquidation Trustee will pay each warranty claimant in cash or inventory, at the Liquidation Trustee's discretion, an amount from the Warranty Trust equal to the greatest extent practicable to the same distribution percentage payable to the General Unsecured Claims.

Since commencement of the Bankruptcy Cases, the Debtors have not performed any warranty repairs or replacements.

The nature of the defects related to the product are generally categorized as: (i) delamination; (ii) electrical failures; (iii) thermal events; or (iv) mechanical failures. A common failure claimed by certain customers of the Debtors relates to debonding, which occurs when the laminate fails to adhere to the surface on which it was applied. The Debtors do not believe that debonding failures are subject to the warranty, because the Debtors cannot control surface preparation, application methods or environmental conditions at the time of installation. The warranty also expressly excludes installations not in conformance with USO specifications and application to unapproved substrates.

## G.     *Guarantees, Co-Debtors, and Letters of Credit*

1.     <u>USO</u>

USO guaranteed United Solar Systems de Mexico, S.A. de C.V.'s, its Mexican subsidiary, lease obligations to Vesta Baja California, S. de R.L. de C.V.

Certain of USO's lease obligations are guaranteed by ECD. ECD guaranteed USO's lease obligation to Auburn Hills Commerce Park III. A $793,833.37 letter of credit was also issued by USO to the landlord. Post-petition, the landlord drew on the letter of credit.

ECD also guaranteed USO's lease obligations to LBA Realty Fund III-Company II, LLC and to JBD Troy, LLC. The Debtors are not aware of any claims that have been made under these leases or guarantees, but such claims may arise if the lease is rejected. The Debtors expect to reject these leases.

Under one USO warranty, ECD guaranteed USO's obligation under its standard warranty, as described above. The beneficiary of the guarantee is Enfinity NV, a company organized under the laws of Belgium. The Debtors are not aware of any claims that have been made under this warranty or guaranty.

ECD guaranteed USO's performance under certain turnkey design, engineering, procurement, and construction contracts ("**EPC Contracts**"). The beneficiary of these guarantees is NJR Clean Energy Ventures Corporation, a New Jersey corporation. The Debtors are not aware of any claims that have been made under these contracts or guarantees. Performance under these contracts is guaranteed by a $3,000,000 letter of credit.

2. ECD

As described above, ECD has guaranteed certain lease, warranty, and performance obligations of USO.

Furthermore, ECD guaranteed the lease obligations of USO's Canadian subsidiary, United Solar Canada ULC. The beneficiary of the guarantee is Jordan Properties. The Debtors are unaware of any claims that have been made under this guarantee. ECD expects a claim for breach will be asserted.

ECD guaranteed the performance of Solar Integrated Technologies S.r.l. ("**SIT SRL**") under certain EPC Contracts where SIT SRL performed installation services of solar laminates. The beneficiary of these guarantees is ContourGlobal Helios S.r.l. The EPC Contracts have been substantially performed and the Debtors are unaware of any claims that have been made under these contracts or guarantees. Performance under these contracts is guaranteed by certain letters of credit, as described in further detail in the following section.

ECD also guaranteed the performance under EPC Contracts by SIT SRL to Puglia Solar Portfolio 2 di Puglia Solar Portfolio 2 GP Srl Scoieta in Accomandita Semplice and Puglia Solar Portfolio 3 di Puglia Solar Portfolio 2 GP Srl Scoieta in Accomandita Semplice regarding SIT SRL's installation services of solar laminates. These contracts have been substantially performed and the Debtors are unaware of any claims that have been made under these contracts or guarantees.

ECD guaranteed the performance of Solar Integrated Technologies GmbH ("**SIT GMBH**") under certain EPC Contracts where SIT GMBH performed installation services of solar laminates. The beneficiary of these guarantees is ContourGlobal Solar Investments Limited. The EPC Contracts have been substantially performed and the Debtors are unaware of any claims that have been made under these contracts or guarantees.

ECD also guaranteed the performance of SIT GMBH to Denoracel, S.L.U. and Janollo, S.L.U. regarding SIT GMBH's installation services of solar laminates. These contracts have been substantially performed and the Debtors are unaware of any claims that have been made under these contracts or guarantees.

3. Letters of Credit

As described above, the performance of SIT SRL under certain EPC Contracts was secured by letters of credit totaling €961,025.00. After receiving a notice of non-renewal, all of the letters of credit were drawn down on by UniCredit S.P.A., which granted the performance bond related to the installation services SIT SRL provided. However, since no claim has been made under any of the contracts or guarantees, the Debtors expect that all or substantially all of these draws will be returned by UniCredit S.P.A to USO.

ECD guaranteed USO's lease obligation to Auburn Hills Commerce Park III. USO also issued a $793,833.37 letter of credit. Post-petition, after the lease was rejected, the landlord drew on the letter of credit. The Debtors expect the landlord will assert a claim in excess of this amount pursuant to section 502(a)(6) of the Bankruptcy Code.

## H.    Lease Rejections

ECD and USO are parties to six (6) leases relating to nonresidential real estate that will likely be rejected.  The Debtors expect rejection damage claims of $2,850,000 to $6,950,000.

## I.    MSF

USO is a third party beneficiary under an agreement between the Michigan Strategic Fund ("**MSF**") and the City of Greenville, Michigan.  The agreement contains certain job creation targets that were not satisfied.  The MSF has alleged that USO owes the MSF approximately $9.0 million, and USO believes the MSF is obligated to pay USO a net amount of approximately $4.7 million.

## J.    ECD Shareholder Claim

One shareholder owning stock of ECD at the end of the day on February 13, 2012 claims that the February 14, 2012 filings for bankruptcy and intent to carry out the Plan Support Agreement announced on February 14, 2012 may give rise to a claim for damages.  The Debtors contest and dispute any such claim, and no such claim has been filed.

## VI.  Details regarding implementation of plan

## A.    Substantive Consolidation

1.    Substantive Consolidation.

(i)     On the Effective Date, the Estates will be substantively consolidated for the following purposes: (i) all assets and liabilities of the Estates shall be treated as though they were merged for purposes of distribution; (ii) all Claims based upon guarantees of collection, payment or performance made by one Debtor as to the obligations of another Debtor shall be discharged, released and of no further force or effect; (iii) any obligation of any Debtor and all guarantees thereof executed by one or more of the Debtors shall be deemed to be one obligation of the Estates; (iv) any Claims filed or to be filed in connection with any such obligation and such guarantees shall be deemed one Claim against the consolidated Estates; (v) any intercompany Claims and any Cause of Action of one Debtor as to the other Debtor, including without limitation, Claims arising under the Cash Management Orders, will be discharged and of no force and effect; and (vi) each and every Claim filed in the individual Bankruptcy Case of any of the Debtors shall be deemed filed against the consolidated Estates and shall be deemed a single Claim of the consolidated Estates under the Plan on and after the Effective Date.

(ii)    The substantive consolidation provided for herein shall not, other than for the express purposes described above related to the Plan and distributions to be made hereunder, affect the separate legal and corporate structures of the Debtors or the rights and defenses of the Liquidation Trust or any third party pertaining to any Causes of Action or otherwise.

### B.    *Liquidation and Warranty Trusts*

All remaining assets of the Debtors after payment of the unclassified claims and Class 1 (Priority Claims) and Class 2B Claims (Secured Claims), including without limitation the Causes of Action and Avoidance Actions, will vest in the Liquidation Trust; provided, however, at the Liquidation Trustee's discretion, cash and/or inventory (valued at the Debtors' cost to manufacture) will be allocated to a sub-trust for warranty claimants (the "**Warranty Trust**") at a percentage equal, to the greatest extent practicable, to the same distribution percentage payable to the General Unsecured Claims.

### 1.    Liquidation Trust

The Liquidation Trustee will enter into the Liquidation Trust Agreement and on and after the Effective Date all actions required of and/or otherwise specified herein to be performed by the Debtors shall be performed by the Liquidation Trustee, or his or her designee, in the name of, and on behalf of, the Debtors and the Estates.  The Liquidation Trustee shall assume all of the fiduciary responsibilities, duties and obligations previously undertaken by the Debtors' board of directors, managing member, general partners and officers that arise after the Effective Date under the Plan, the Liquidation Trust Agreement and applicable law.  The Liquidation Trustee will seek approval for all material decisions regarding the Liquidation Trust from a three-person oversight committee comprised of two members selected by the Ad Hoc Consortium and one member selected by the Committee.  The Plan provides for the exculpation and indemnification of the Liquidation Trustee and its employees, professionals and agents except for actions which constitute gross negligence or willful misconduct.  The Liquidation Trustee will owe the fiduciary duties of the Debtors to the holders of Claims and Equity Interests.  The Liquidation Trustee may be removed for cause by motion to the Bankruptcy Court by a party in interest.

### 2. Securities Matters

The sole purpose of the Liquidation Trust and the Warranty Trust will be to liquidate the Estates' Assets and to distribute to creditors, including partially satisfying Debtors repair and replacement obligations under warranties.  The beneficial interest of the Liquidation Trust and the Warranty Trust will not be represented by certificates.  The Debtors will not be seeking a no-action letter from the SEC with respect to Securities Exchange Act of 1934 registration of the Liquidation Trust or the Warranty Trust.  The Plan does not provide for the issuance of unregistered securities and therefore the Disclosure Statement does not require exemption from registration requirement of Section 5 of the Securities Act of 1933.

### C.    *Sale of Assets*

Through the Plan, unless abandoned, the Debtors will sell or otherwise liquidate the remaining assets of the Estates, including the Debtors' equipment, intellectual property and real property, free and clear of all Liens, claims and encumbrances whatsoever (but not in violation of any applicable federal laws or regulations regarding restrictions on the transfer or sale of the assets, including without limitation, restrictions arising under 15 U.S.C. § 278n and 42 U.S.C. section 5908), with such Liens, claims, and encumbrances to attach to the proceeds in the order of their priority, pursuant to motions under Section 363 of the Bankruptcy Code.  The United

States Government also claims certain agreements with the Government provide for government-reserved rights on Government funded assets.

### D.     *Preservation of Causes of Action*

The Liquidation Trustee shall exclusively retain and may prosecute any Causes of Action that it determines to pursue or may abandon any such Causes of Action. Except as expressly provided in the Plan, and unless expressly waived, relinquished, exculpated, released, compromised or settled in the Plan, the Confirmation Order, any Final Order, or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, the Liquidation Trustee will exclusively retain and may enforce, as the representative of the Estates under Section 1123(b)(3)(B), and the Debtors expressly reserve and preserve for these purposes, in accordance with Sections 1123(a)(5)(B) and 1123(b)(3) of the Bankruptcy Code, any Claims, demands, rights and Causes of Action that the Debtors or the Estates may hold against any Person or entity, including Avoidance Actions, which shall vest in the Liquidation Trust, which Causes of Action will be further identified in the Plan Supplement. Accordingly, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action by virtue of, or in connection with, the confirmation, consummation of effectiveness of the Plan. The Liquidation Trustee or his or her respective successors or assigns exclusively may pursue such retained Claims, demands, rights or Causes of Action.

### E.     *Rejection of Executory Contract and Unexpired Leases*

Unless already assumed or rejected, all executory contracts and unexpired leases of the Debtors which are not the subject of a pending application to assume as of the Effective Date, will be rejected. This includes all Compensation and Benefits Programs except for the Revised Management Incentive Plan, the Revised Key Employee Retention Program and the Revised Severance Compromise Program, which was approved by the Bankruptcy Court post-petition.

### F.     *Dissolution of the Debtors and Resignation of Officers and Directors*

From and after the Effective Date, the Debtors shall be deemed dissolved for all purposes. Upon the Effective Date, all of the Debtors' officers, directors, managing members, general partners or other governing authorities shall be deemed to have been terminated by the Debtors and they shall be released from any responsibilities, duties and obligations that arise after the Effective Date to the Debtors or their creditors under the Plan, the Liquidation Trust Agreement, or under applicable law. Under no circumstances shall such parties be entitled to any compensation from the Debtors or the Liquidation Trustee for services provided after the Effective Date, unless such individuals are subsequently employed by the Liquidation Trustee to assist him/her in the consummation of the Plan or in his administration of the Liquidation Trust.

On the Effective Date, the Committee shall be dissolved and its members shall be deemed released of all of their duties, responsibilities and obligations in connection with the Bankruptcy Cases or the Plan and its implementation, and the retention or employment of the Committee's attorneys, financial advisors, and other agents shall terminate.

### G. Exculpation of Debtors, Committee, Ad Hoc Consortium and Their Respective Officers, Directors and Professionals

The Plan provides that to the fullest extent provided by applicable law, neither the Debtors, Committee, Ad Hoc Consortium nor any of their respective members, officers, directors, employees, advisors, agents or Professionals shall have or incur any liability to any holder of a Claim for any action or omission in connection with, related to, or arising out of, the Bankruptcy Cases, the preparation or formulation of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, except for willful misconduct or gross negligence, and in all respects, the Debtors, the Committee, and the Ad Hoc Consortium and each of their respective members, officers, directors, employees, advisors, agents and Professionals shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; provided, however, that nothing in the Plan shall, or shall be deemed to, release or exculpate such parties with respect to their obligation or covenants arising pursuant to the Plan.

### H. Release

The Plan provides that holders of Claims or Equity Interests that specifically vote in favor the release as a separate item on the ballot will release all applicable direct or derivate claims against the Debtors, the Debtors' present and former directors and officers, the Committee, and each of their respective employees, agents, financial advisors, attorneys and professionals prior to the Effective Date except for causes of action arising out of the contractual obligations owing by any such party or the willful misconduct, gross negligence, intentional fraud or criminal conduct of any such party.

The Plan provides that holders of Claims or Equity Interests will release all applicable direct or derivate claims against the Ad Hoc Consortium and its members and the respective employees, agents, financial advisors, attorneys and professionals prior to the Effective Date except for causes of action arising out of the contractual obligations owing by any such party or the willful misconduct, gross negligence, intentional fraud or criminal conduct of any such party.

The Plan further provides that the Debtors will release all applicable claims against the Debtors' present and former directors and officers, the Committee, the Ad Hoc Consortium and its members and the respective employees, agents, financial advisors, attorneys and professionals prior to the Effective Date except for causes of action arising out of the contractual obligations owing by any such party, any Avoidance Actions, or the willful misconduct, gross negligence, intentional fraud or criminal conduct of any such party.

The Debtors believe the releases are appropriate because, as to past and present officers and directors and the Committee, the release is only applicable to holders of Claims or Equity Interest that vote for the release. Moreover, there exists an identity of interest between officers, directors and the Estates. ECD is obligated, pursuant to both its articles of incorporation and bylaws, to indemnify its past and present directors and officers against any actual and reasonable expenses if they are made or threatened to be made a party or otherwise involved in any action, suit or proceeding by reason of their position with ECD. As to the Ad Hoc Consortium, the commitments provided under the Plan Support Agreement, in which the releases are integrally

incorporated, have provided a substantial benefit to the estate and continues to benefit the Estates.

The releases purporting to bind non-Debtor entities that did not vote in favor the Plan may not be valid and enforceable under applicable law. The Debtors intend for these releases to be valid only to the extent that they are permissible under applicable law, and are not effective to the extent that they are not permissible under applicable law.

### *I.    Indemnification and Officer & Director Tail Insurance*

The Plan provides that all indemnification provisions currently in place (whether in the bylaws, certificates of incorporation, articles of limited partnership, operating agreements, board resolutions, contracts or otherwise) for the current and former directors, managers, members, officers, employees, attorneys, financial advisors, other professionals and agents of the Debtors shall be deemed to have been assumed by the Liquidation Trustee, be payable from the Liquidation Trust, and shall survive effectiveness of the Plan. In addition, to the extent to purchased prior to the Effective Date, the Debtors shall obtain sufficient tail coverage for a period of six years under a directors' and officers' insurance policy for current and former officers and directors of the Debtors in accordance with the Cash Management Order. The estimated cost of the tail policy is approximately $600,000.

### *J.    Financial Statements*

Attached as **Exhibit G** are the Debtors' 2008 and 2009 and 2010 audited financial statements.

### *K.    No Discharge*

Because the Plan is a liquidating plan, under 11 U.S.C Section 1141(d)(3), the Plan does not provide for a discharge of indebtedness. Notwithstanding the foregoing, nothing in the plan, disclosure statement or confirmation order will impair (i) the offset or recoupment rights of the United States of America, or any agency or instrumentality thereof, or (ii) any cause of action or claim under the Internal Revenue Code.

## VII.    Voting procedures

### *A.    Voting Procedures*

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of claims, or equity interests, that are impaired under the plan. Accordingly, classes of claims or interests that are not impaired are not entitled to vote on the plan.

Creditors that hold claims in more than one impaired class are entitled to vote separately in each class. Such a creditor will receive a separate ballot for all of its claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot

separately. A creditor who asserts a claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.

Votes on the plan will be counted only with respect to claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities other than as disputed, contingent or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are Allowed by Court order). However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the plan and disclosure statement, each holder of such a claim or interest should vote on the enclosed ballot either to accept or to reject the plan, and then return the ballot by mail to the debtor's attorney by the deadline previously established by the Court.

Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the debtor's attorney.

### B.    *Acceptance*

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the plan.

### C.    *Confirmation*

11 U.S.C. § 1129(a) establishes conditions for the confirmation of a plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a plan under 11 U.S.C. § 1129(a) are these:

a.  Each class of impaired creditors and interests must accept the plan, as described in paragraph VI.B., above.

b. Either each holder of a claim or interest in a class must accept the plan, or the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

### D. *Modification*

The debtor reserves the right to modify or withdraw the plan at any time before confirmation.

### E. *Effect of confirmation*

If the plan is confirmed by the Court:

1. Its terms are binding on the debtor, all creditors, shareholders and other parties in interest, regardless of whether they have accepted the plan.

2. Except as provided in the plan and in 11 U.S.C. § 1141(d):

    a. In the case of a corporation that is reorganizing and continuing business:

        i. All claims and interests will be discharged.

        ii. Creditors and shareholders will be prohibited from asserting their claims against or interests in the debtor or its assets.

    b. In the case of a corporation that is liquidating and not continuing its business:

        i. Claims and interests will not be discharged.

        ii. Creditors and shareholders will not be prohibited from asserting their claims against or interests in the debtor or its assets.

    c. In the case of an individual or husband and wife:

        i. Claims will be discharged, except as provided in 11 U.S.C. §§ 523 and 1141(d).

        ii. Creditors will be prohibited from asserting their claims except as to those debts which are not discharged or dischargeable under 11 U.S.C. §§ 523 and 1141(d).

See Part II-A of this Disclosure Statement to determine which of the above paragraphs applies in this case.

## VIII. Cram-down and Absolute Priority Rule

If one or more of the impaired Classes of Claims does not accept the Plan, it may nevertheless be confirmed and be binding upon the non-accepting impaired Class through the

"cram-down" provisions of the Bankruptcy Code, if the Plan does not "discriminate unfairly" and is "fair and equitable" to the non-accepting impaired Classes.

## A.      Discriminate Unfairly

The Bankruptcy Code requirement that a plan not "discriminate unfairly" means that a dissenting class must be treated equally with respect to other classes of equal rank. The Plan does not "discriminate unfairly" with respect to any Class of Claims or Equity Interests because no class is afforded treatment which is disproportionate to the treatment afforded other Classes of equal rank, and the treatment under the Plan follows the distribution scheme dictated by the Bankruptcy Code.

## B.      Fair and Equitable Standard

The "fair and equitable" standard, also known as the "absolute priority rule," requires that a dissenting class receive full compensation for its allowed claims or equity interests before any junior class receives any distribution. The Debtors believe the Plan is fair and equitable to all Classes pursuant to this standard.

With respect to the impaired classes of claims, Bankruptcy Code Section 1129(b)(2)(B) provides that the condition that a plan is "fair and equitable" includes the requirement that (i) each holder of a claim of such a class receives or retains on account of such claim, property of a value as of the effective date of the plan equal to the allowed amount of such claim; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or interest.

The Debtors believe that the Plan satisfies the absolute priority rule or any exception thereto.  The absolute priority rule is satisfied (i) as to secured creditors and priority creditors because these creditors are being paid in full, (ii) as to Class 3 General Unsecured Claims and Class 4 Warranty Claims because Equity Interest Claims, the only party holding a subordinate interest, is not receiving any distribution on account of the Equity Interest unless Class 3 and Class 4 are paid in full.  Accordingly, if necessary, the Debtors believe the Plan meets the requirements for confirmation by the Bankruptcy Court, notwithstanding any non-acceptance by an impaired Class.

## IX.   Best Interests Test

Unless there is unanimous acceptance of the Plan by each holder of a Claim in Classes 3 and 4, the Bankruptcy Court, as an additional requirement for confirmation, must determine that, under the Plan, the members of each such Class will receive property of a value, as of the Effective Date of the Plan, that is not less than each such class member would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date of the Plan.  This is referred to as the "Best Interest Test".

With respect to each impaired class of claims and interests, confirmation of a plan requires that each holder of a claim or interest either (a) accept the plan or (b) receive or retain under the plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy

Code. The Debtors believe that holders of impaired Claims in each impaired class under the Plan would receive significantly less under chapter 7 liquidation than under the Plan.

The primary reasons why the assets would be worth less in a liquidation scenario is that substantive consolidation under the Plan settles multiple intercompany issues that otherwise would be costly to litigate and may result in distribution to either estate less than a distribution under a chapter 7. Among the multiple disputed issues resolved by substantive consolidation are (i) the character of the approximately $792,000,000 intercompany claim, (ii) the character of the $5,000,000 secured credit facility provided by ECD to USO, (iii) any fraudulent conveyance claims between the Debtors, (iv) the allocation of intercompany expenses, (v) litigation of various Causes of Action being released and (vi) subrogation and contribution claims between the Debtors. Further, in addition to the expenses and uncertain outcome of litigating these intricate and substantial claims, the appointment of a chapter 7 trustee would set back the significant progress made by the Debtors in liquidating the assets and require greater administrative costs for any trustee to achieve the Debtors' current status.

Finally, the Plan provides the most expedited recovery. Litigation of the intricate issues could delay distribution to any creditors for extensive periods. The Plan, on the other hand, contemplates an initial distribution as to Administrative Expense Claims, Priority Claims, Priority Tax Claims, and Secured Claims on the Effective Date and will facilitate prompt distributions thereafter.

The SEC has notified the Debtors of its belief that because the Plan provides for non-Debtor third party releases that are binding on claim and interest holders who do not vote to accept the Plan, in its view the Plan would likely not be confirmable. The non-Debtor third party releases may be challenged at confirmation by the SEC or by other parties.

The Committee has asserted that as to ECD creditors, the releases of the Ad Hoc Consortium may violate the Best Interest Test. Further, the Committee has asserted that the release of ECD and USO and the directors and officers of ECD and USO may also violate the Best Interest Test.

## X.  Feasibility

The Bankruptcy Code requires that the Bankruptcy Court determine that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization of the debtor. The Plan meets the feasibility standard as this is a Plan of liquidation and there will not be a subsequent liquidation or reorganization after the Effective Date.

## XI.  Alternatives to Confirmation and Consummation of the Plan

If the Plan is not confirmed, the potential alternatives include (a) alternative plans of liquidation under chapter 11, including without limitation, separate liquidating plans for each Debtor, (b) dismissal of the case, or (c) conversion of these Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code.

## A. Alternative Plan

A likely alternative plan involves separate liquidating plans for each Debtor without substantive consolidation.

## B. Liquidation under Chapter 7

If the Plan is not confirmed, the Bankruptcy Cases may be converted to chapter 7 liquidation cases. In a chapter 7 case, a trustee would be elected or appointed to liquidate the assets of the debtor. The proceeds of the liquidation would be distributed to the holders of Claims and Equity Interests in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in a diminution in the value of the Debtors' assets and increased administrative costs to the Estates which would result in significantly less distributions to creditors and an increased delay in distribution.

## XII. Certain United States Federal Income Tax Consequences of the Plan

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED TO OR WRITTEN TO BE USED, AND CANNOT BE USED, BY SUCH HOLDERS FOR THE PURPOSE OF AVOIDING PENALITIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE PLAN; AND (C) SUCH HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. ALL HOLDERS OF CLAIMS AGAINST IN THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE PLAN INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN (NON-US) TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

The following discussion addresses certain United States Federal income tax consequences of the consummation of the Plan to the Debtors.

## A. Federal Income Tax Consequences to ECD

ECD may realize cancellation of debt income to the extent of any debt forgiveness. [3] Such cancellation of debt income is generally excludible from ECD's gross income under the

---

[3] USO is a single member limited liability company wholly owned by ECD that has not elected to be treated as a corporation for federal income tax purposes. Accordingly, USO should be taxed as a disregarded entity that is treated as a branch or division of ECD for federal tax purposes.

bankruptcy exception of Section 108(a)(1)(A) of the Tax Code. To the extent there is cancellation of debt income, the same would reduce the Federal tax attributes of ECD, including its net operating loss carry-forwards and the tax bases of its assets on the first day of ECD's next tax year; if cancellation of debt income exceeds these attributes, it would be exempt from tax.

Pursuant to the Plan, all of the Debtors' remaining assets other than those sold or abandoned prior to the Effective Date will be transferred directly or indirectly (through the Liquidation Trust or Warranty Trust) to Holders of Allowed Claims in liquidation of the Debtors. For federal income tax purposes, any such assets transferred to the Liquidation Trust or the Warranty Trust will be treated, respectively, as described above.

The Debtors' transfer of their assets pursuant to the Plan will be treated as a taxable disposition of such assets by ECD. It is not known at the present time whether the transfer of the Debtors' assets will result in any gain to the ECD. If such a transfer results in gain, it is not known at the present time whether ECD will have sufficient losses or loss carryforwards to offset that gain. If the transfer results in gain and ECD does not have losses or loss carryforwards to offset that gain, the transfer of such assets will result in federal income tax liability.

If a corporation undergoes an ownership change, as defined in IRC section 382(g), the application of pre-change NOLs to reduce income for any post-change year is limited by IRC section 382. Based on advice from ECD's tax advisors, ECD does not believe that it has undergone an ownership change.

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## XIII.  Voting Instructions

### A.    *How to Vote*

Each holder of a Claim in a voting Class should read this Disclosure Statement, together with the Plan and other exhibits hereto, in their entirety. After carefully reviewing the Plan and this Disclosure Statement and their respective exhibits, please complete the enclosed ballot, including indicating your vote thereon with respect to the Plan, and return it as provided below.

If you are a member of a voting Class and did not receive a ballot, if your ballot is damaged or lost, or if you have any questions concerning voting procedures, please call Robert B. Weiss or Aaron M. Silver, counsel for the Debtors, at (313) 465-7596 or (313) 465-7560, respectively.

**YOU SHOULD COMPLETE AND SIGN THE ENCLOSED BALLOT AND RETURN IT AS DESCRIBED BELOW. IN ORDER TO BE COUNTED, BALLOTS MUST BE DULY COMPLETED AND EXECUTED AND RECEIVED BY NO LATER THAN 4:30 P.M. (PST) ON THE BALLOT DATE DEADLINE OF [_], 2012, UNLESS SUCH DEADLINE IS EXTENDED BY COURT ORDER.**

All ballots should be returned and delivered by first class U.S. mail or delivered by messenger or overnight courier, ballots sent by facsimile, telecopy, or e-mail will not be accepted. Ballots must be received on or before the ballot deadline by KCC as follows:

> Energy Conversion Devices Ballot Processing
> Kurtzman Carson Consultants LLC
> 2335 Alaska Avenue
> El Segundo, CA 90245

As the holder of an Allowed Claim in the voting Classes, your vote on the Plan is extremely important. In order for the Plan to be accepted and thereafter confirmed by the Bankruptcy Court without resorting to the "cram-down" provisions of Section 1129(b) of the Bankruptcy Code as to other classes of Allowed Claims, votes representing at least two-thirds in amount and more than one-half in number of Allowed Claims of each impaired Class of Claims that are voting must be cast for the acceptance of the Plan. The Debtors are soliciting acceptances only from members of the voting Classes. You may be contacted with regard to your vote on the Plan.

**B.    *Confirmation Hearing***

The Bankruptcy Court has granted this Disclosure Statement preliminary hearing. The Bankruptcy Court has ordered that the hearing ("**Confirmation Hearing**") on the final approval of this Disclosure Statement shall be consolidated with the hearing on the confirmation of the Plan, which hearing has been set for **[_], 2012 at [_] (EST)** at the U.S. Bankruptcy Court for the Eastern District of Michigan located at Courtroom 1925, 211 West Fort Street Bldg., Detroit, MI 48226. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the hearing.

Objections to confirmation of the Plan or to approval of the Disclosure Statement shall be filed with the Bankruptcy Court on or before **[_], 2012** and served by the same date on counsel to the Debtors, Honigman Miller Schwartz and Cohn LLP, 660 Woodward Avenue, Suite 2290, Detroit, MI 48226, Attn: Aaron M. Silver and Robert B. Weiss.

## XIV.   Summary, Recommendation, and Conclusion

The Plan provides for an orderly and prompt distribution to holders of Allowed Claims against the Debtors. The Debtors believe that the Plan is in the best interests of all holders of Claims, even though holders of Unsecured Claims may not be paid in full. In the event of a liquidation of the Debtors' Assets under chapter 7 of the Bankruptcy Code, the Debtors believe that holders of Unsecured Claims would receive less than they would under the Plan. For these reasons, the Debtors urge that the Plan is in the best interests of all holders of Claims and that the Plan be accepted.

Respectfully submitted,

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Attorneys for the Debtors


By:    /s/ Aaron M. Silver
Robert B. Weiss (P28249)
Aaron M. Silver (P65481)
2290 First National Building
Detroit, MI 48226
(313) 465-7000
asilver@honigman.com

Dated: May 31, 2012


**Exhibits**

Exhibit A:      Prior Year Compensation
Exhibit B:      Declaration of William C. Andrews, Executive Vice President and Chief
                Financial Officer, In Support of First-Day Motions
Exhibit C:      Operating Reports
Exhibit D:      Liquidation Analysis
Exhibit E:      SIT Annual Trustee's Report
Exhibit F:      Preserved Causes of Action
Exhibit G:      Audited Financial Statements

# EXHIBIT A

# PRIOR YEAR COMPENSATION

| Name | Position | Compensation Feb 14, 2011 – Feb 13, 2012) |
|------|----------|-------------------------------------------|
| Julian Hawkins | President and CEO | $ 384,615 [1] |
| Jay B. Knoll | Executive Vice President and Chief Restructuring Officer | $ 409,886 [2] |
| William C. Andrews | Executive Vice President and CFO | $ 363,997 [3] |
| Joseph P. Conroy | Executive Vice President | $ 342,338 [4] |
| Gregory G. Coppola | Vice President and Treasurer | $ 197,154 [5] |

(1) Mr. Hawkins joined the Company as President and CEO effective December 5, 2011. The salary reported covers pay periods December 3, 2011 - February 11, 2012 (pay dates December 9, 2011 – February 17, 2012) and $300,000 sign-on bonus pursuant to Mr. Hawkins's employment agreement and paid in its entirety as a lump sum upon Mr. Hawkins joining the Company.

(2) Includes $48,419 earned under the Company's annual incentive plan in fiscal year 2011 and $7,503 upon the acquisition of 5,000 shares of restricted stock awards and 2,470 shares of restricted stock units.

(3) Includes $17,458 earned under the Company's annual incentive plan in fiscal year 2011.

(4) Paid by United Solar Ovonic LLC. Includes $40,716 earned under the Company's annual incentive plan in fiscal year 2011 and $661 upon the acquisition of 880 shares of restricted stock units.

(5) Includes $8,200 earned under the Company's annual incentive plan in fiscal year 2011.

**EXHIBIT B**

**<u>DECLARATION OF WILLIAM C. ANDREWS, EXECUTIVE VICE PRESIDENT AND
CHIEF FINANCIAL OFFICER, IN SUPPORT OF FIRST-DAY MOTIONS</u>**

**EXHIBIT C**

**<u>OPERATING REPORT</u>**

**EXHIBIT D**

**LIQUIDATION ANALYSIS**

**EXHIBIT E**

**<u>SIT ANNUAL TRUSTEE'S REPORT</u>**

**EXHIBIT F**

**PRESERVED CAUSES OF ACTION**

**EXHIBIT G**

## AUDITED FINANCIAL STATEMENTS

ACTIVE\10811502.12