UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| In re:<br><br>**ENERGY CONVERSION DEVICES, INC., et al.**[1]<br><br>               Debtors. | **Chapter 11**<br><br>Case No. 12-43166<br>(Jointly Administered)<br><br>Judge Thomas J. Tucker |
|---|---|

**DEBTORS' OMNIBUS OBJECTION TO THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS' (I) MOTION TO TERMINATE THE DEBTORS'
EXCLUSIVITY PERIOD AND (II) MOTION FOR A LIMITED ADJOURNMENT
OF SOLICITATION OF VOTING ON THE DEBTORS'
FIRST AMENDED JOINT PLAN OF LIQUIDATION**

## Introduction

This is exactly the wrong time to terminate exclusivity or delay the solicitation of the Debtors' proposed plan. The Debtors are preparing to solicit a plan that was the product of months of good-faith negotiation between the Debtors, the Committee (as defined below), and the Ad Hoc Consortium (as defined below), which will fully and fairly resolve numerous complex inter-creditor and inter-Debtor issues. If the plan is confirmed, all parties will benefit from the rapid conclusion of these chapter 11 cases.

Now, with potential confirmation imminent, the Committee filed two related motions seeking extraordinary relief: a court order halting the Debtors' solicitation efforts and terminating the Debtors' exclusivity period. The motions would unnecessarily confuse creditors, delay and complicate the confirmation process, compromise fragile agreements between various stakeholders, and open the door to the filing of numerous competing plans, all of which could cost the estate and creditors millions.

---

[1] The Debtors in these jointly-administered cases are Energy Conversion Devices, Inc. (Case No. 12-43166) and United Solar Ovonic LLC (Case No. 12-43167).

The motions are unadulterated gamesmanship: tactical measures intended to strengthen the hand of the Committee (or a faction thereof), which cannot say with certainty that it would even recommend its hypothetical "alternative plan" over the Debtors' plan. The Committee also cannot credibly contend that the Debtors have failed to make progress towards the confirmation of a plan. Instead, the Committee argues that exclusivity should be terminated because creditors deserve a "meaningful choice" between competing plans, and that the current plan does not contain certain provisions that the Committee prefers. The Committee's reservations regarding the Debtors' plan, however, are not a basis for terminating exclusivity or delaying solicitation. Neither is the Committee's belief that creditors are entitled to a choice between competing plans—a concept that Congress definitively rejected when it enacted section 1121 of the Code. The Debtors are entitled to an exclusive period to propose and solicit a plan of reorganization, without interference or threats from creditors and other constituents, and presently stand on the doorstep of confirmation. The motions are grossly premature, will materially disrupt the cases, and should be denied.

## **Background**

**A.  The Debtors' Chapter 11 Cases**

On February 14, 2012 (the "**Petition Date**"), each of the Debtors filed voluntary petitions for relief (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code. Each of the Debtors continues to operate its business and manage its financial affairs and properties as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in either of the Chapter 11 Cases.

**B.  The Committee**

The Official Committee of Unsecured Creditors (the "**Committee**") was formed on February 27, 2012 (Docket No. 80). The Committee consists of seven creditors. The Committee

purports to represent all creditors of both estates, but has a composition weighed strongly in favor of United Solar Ovonic LLC ("**USO**") creditors. The indenture trustee of the Energy Conversion Devices, Inc. ("**ECD**") bonds is one of the seven creditors on the Committee. The remaining six creditors are USO creditors.

## C. The Plan Support Agreement

Prior to the Petition Date, the Debtors negotiated a Plan Support Agreement ("**PSA**") with the Ad Hoc Consortium of Noteholders (the "**Ad Hoc Consortium**"). The Ad Hoc Consortium consists of the Debtors' three largest creditors, comprising more than $193,000,000 in claims—over one-half of the aggregate claims against the two estates, with the ability under the Indenture to bind all of the Notes. The Debtors disclosed the PSA to the Committee immediately after the Committee's formation, and filed the PSA with the Bankruptcy Court on March 15, 2012 (Docket No. 167).

The Debtors believe, based on their analyses and sound business judgment, that the PSA, including the substantive consolidation contemplated by the PSA, is in the best interest of all parties because it avoids significant intercompany litigation, facilitates the efficient administration of the estates, allows for prompt distributions to creditors and, as to USO creditors, offers a more certain distribution percentage. The Debtors have consistently informed the Committee of this position.

The PSA is a pre-petition executory contract that the Debtors could, at any time, reject in accordance with 11 U.S.C. § 365. At various times throughout the case, the Committee's counsel has acknowledged the clear benefits of the PSA, planned actions to avoid any potential defaults under the PSA, and sought to retain the ability to enforce the terms of the PSA. Moreover, the Committee has informed the Debtors that it is likely that the Committee will

3

12-43166-tjt    Doc 648    Filed 06/05/12    Entered 06/05/12 14:08:19    Page 3 of 20

support the provision that calls for the separate estates to be substantively consolidated. The Committee has **never** urged the Debtors to relinquish the benefits of the PSA.

D.      The plan negotiations with the Ad Hoc Consortium and the Committee

With the PSA and substantive consolidation as the framework for discussion, the Debtors, the Committee, and the Ad Hoc Consortium engaged in extensive discussions regarding various modifications to the plan contemplated by the PSA. The Debtors have attempted to facilitate consensual resolutions of various conflicts between the Committee and the Ad Hoc Consortium.

The Committee has been actively engaged in analyzing the proposed Plan (as defined below), and the Debtors—in a good-faith attempt to facilitate the Committee's analysis— have been transparent in all aspects of the case administration. The Debtors have: (i) provided the Committee's financial advisors with access to documents, records and personnel to conduct expansive due diligence; (ii) provided weekly sale-process conference calls and detailed summaries of discussions with potential buyers; (iii) allowed the Committee access to potential bidders to discuss and clarify potential transactions; (iv) responded to extensive written discovery requests and document requests; (v) produced representatives to appear at two separate depositions; and (vi) developed, in cooperation with the Committee, a thorough and complete disclosure statement.

The Debtors have also shared with the Committee their detailed liquidation analysis that was included in the Disclosure Statement, including the underlying data and sub-analyses. The liquidation analysis reflects great variability in the recovery to USO creditors, estimating that

4

12-43166-tjt    Doc 648    Filed 06/05/12    Entered 06/05/12 14:08:19    Page 4 of 20

that USO unsecured creditors may receive a recovery between 22 percent and 70.5 percent,[2] with all such variability attributable to non-intercompany obligations.[3] The recovery variability for ECD creditors is less, with distributions estimated between 56.4 percent and 57.8 percent.

**E.     The Debtors file their Second Amended Joint Plan of Liquidation**

On May 31, 2012, the Debtors filed their Second Amended Joint Plan of Liquidation (Docket No. 611) (the "**Plan**"),[4] which generally reflects the plan outlined in the PSA, with certain differences that have been negotiated collaboratively over the past several months. The Debtors had extensively negotiated numerous variations of the Plan with multiple constituents, including the Committee and the Ad Hoc Consortium. One of the variants contained an option to separately liquidate the estates; however, the Debtors believe, in their business judgment, that the added complexity of these alternative plan structures would only confuse creditors and delay the process, outweighing any potential benefit.

The same day, the Committee filed its Motion to Terminate the Debtors' Exclusivity Period (the "**Motion to Terminate**") and its Motion for a Limited Adjournment of Solicitation of Voting on the Debtors' First [sic] Amended Joint Plan of Reorganization (the "**Motion to Adjourn**," and together with the Motion to Terminate, the "**Motions**").

---

[2] The risk to USO creditors is mitigated by substantive consolidation; accordingly, the provision requiring substantive consolidation is one of the most important terms in the Plan.

[3] The distributions are significantly worse if any meaningful portion of the intercompany unsecured claim is an allowed claim against USO.

[4] The Debtors filed their Joint Plan of Liquidation on May 24, 2012 (Docket No. 562) and their First Amended Joint Plan of Liquidation on May 29, 2012 (Docket No. 595).

5

The Motion to Terminate purports to have been filed by the entire Committee. The ECD subcommittee,[5] however, does not support the relief sought in the Motion and it is unclear whether ECD's subcommittee's separate counsel was consulted in connection with the Motion. Thus, it appears that, although fashioned as a "Committee" motion filed on behalf of all creditors, the Motion to Terminate was in fact filed by USO creditors only.

## Argument

I. **There is no cause to terminate the Debtors' exclusivity period**

    A. **The Debtors have an exclusive period to file and solicit a plan**

Only the debtor can file a plan during the first 120 days of a bankruptcy case. 11 U.S.C. § 1121(b). And if the debtor files a plan during the first 120 days of a bankruptcy case, it has an additional 60 days of exclusivity to attempt to confirm a plan. *See* 11 U.S.C. § 1121(c). The purpose of the exclusive period is to provide a debtor with breathing room: an exclusive opportunity to negotiate and propose a plan without interference or threats from creditors and other constituents. *See In re Clamp-All Corp.*, 233 B.R. 198, 207 (Bankr. D. Mass 1999) ("'It was intended that at the outset of a Chapter 11 case a debtor should be given the unqualified opportunity to negotiate a settlement and propose a plan of reorganization without interference from creditors and other interests.'") (quoting *In re Texaco*, 81 B.R. 806, 809 (Bankr. S.D.N.Y. 1988)); *Geriatrics Nursing Home v. First Fidelity Bank, N.A.* (*In re Geriatrics Nursing Home, Inc.*), 187 B.R. 128, 131-32 (D.N.J. 1995).

---

[5] To address actual or potential conflicts that may arise attributable to the Committee consisting of creditors from two separate estates, the Committee was authorized to form subcommittees consisting of a subcommittee comprised of USO creditors and a subcommittee consisting of ECD creditors (i.e., the indenture trustee).

## B. The exclusivity period can only be shortened on a showing of cause

Section 1121(d) of the Bankruptcy Code enables a bankruptcy court to extend or reduce the exclusivity period for cause. 11 U.S.C. § 1121(d). While the elements that constitute "cause" for termination are not precisely defined by the Bankruptcy Code, courts have held that certain factors should be considered when determining whether "cause" exists to, "on the one hand, extend, or on the other, terminate, a debtor's statutory period of exclusivity." *In re Dow Corning Corp.*, 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997).

The *Dow* factors for terminating or extending exclusivity include:

    i.    the size and complexity of the case;

    ii.    the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information to allow a creditor to determine whether to accept such plan;

    iii.    the existence of good faith progress towards reorganization;

    iv.    the fact that the debtor is paying its bills as they become due;

    v.    whether the debtor has demonstrated reasonable prospects for filing a viable plan;

    vi.    whether the debtor has made progress in negotiations with its creditors;

    vii.    the amount of time which has elapsed in the case;

    viii.    whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and

    ix.    whether an unresolved contingency exists.

*Id.* at 664-65.

As the Committee acknowledges, the Court's primary consideration is "whether or not [terminating exclusivity] would facilitate moving the case forward." *Id.* at 670; Termination Motion ¶ 20. This is a "practical call that can override a mere toting up of the factors." *Dow*, 208 B.R. at 670.

## C. Right before potential plan confirmation is "exactly the wrong time to be terminating exclusivity"

This "moving the case forward" analysis strongly supports continuing the exclusivity period if the debtor may soon be in a position to confirm a plan. *Adelphia Communications Corp.*, 352 B.R. 578, 590 (Bankr. S.D.N.Y. 2006). In *Adelphia*, a group of bondholders moved to terminate the Debtors' exclusivity period. *Id.* at 582. Like in this case, the debtors had already filed a plan. *Id.* at 588. And like in this case, the debtors were in the process of solicitation and were close to potential confirmation. *Id.* This was, the court held, "exactly the wrong time to be terminating exclusivity":

> In this case, termination of exclusivity, **just a few weeks before the Debtors might be in the position to confirm a plan, would be at odds with moving the case forward**, and could be disastrous. Terminating exclusivity might well result in the solicitation of three or even more plans (not just one or two), with some addressing only parochial concerns. Or, given predictions creditors have made to me, several creditor constituencies might file their own "wish list" plans, with each being no more palatable to other constituencies than all of the proposals that I've seen to date. A competing plans battle now might well jeopardize current fragile agreements between various stakeholders, re-ignite intercreditor disputes, and push this process back to square one. A competing plans battle would also likely drag out the solicitation process, subjecting the estate to substantial extra costs that might otherwise be avoided . . . .

*Id.* at 590 (emphasis added); *see also In re Grand Traverse Development Co. Ltd. Partnership*, 147 B.R. 418, 421 (Bankr. W.D. Mich. 1992) ("To the extent that the [Debtors' filed] plan may be confirmable, the filing of a competing plan at this point in time would seriously erode the Debtors' chance of reaching confirmation, thus effectively diminishing the protection which the exclusivity period of § 1121(b) is intended to afford diligent debtors."); *Official Unsecured Creditors' Committee v. Eagle-Picher Industries, Inc.* (*In re Eagle-Picher Industries, Inc.*), 176 B.R. 143, 147-48 (Bankr. S.D. Ohio 1994) ("As a matter of judgment and experience,"

8

terminating exclusivity to permit "the filing of competing plans 'would undermine the prospects for a prompt resolution of [these] Chapter 11 cases.'") (quoting *Texaco*, 81 B.R. at 811).

D.      **The Committee seeks extraordinary relief**

An order shortening the exclusivity period is extraordinary relief that is rarely granted. *In re Fountain Powerboat Industries, Inc.*, No. 09-07132-8, 2009 WL 4738202, *7 (Bankr. E.D.N.C. Dec. 4, 2009) ("Courts have found granting a motion to reduce exclusivity is so serious a matter that the Court has located only two published cases where 'cause' has been established to reduce the initial exclusivity periods of 120 and 180 days."); *In re Lehigh Valley Professional Sports Club, Inc.*, No. 00–11296, 2000 WL 290187, *4 (Bankr. E.D.Pa. Mar. 14, 2000) ("In the 22 years since the exclusivity provision was promulgated in the Bankruptcy Reform Act of 1978, there have been only two reported cases that permitted shortening the exclusivity period . . . .").

E.      **The Committee bears a heavy burden of proof**

A party that seeks to establish "cause" to terminate the exclusivity period "bears a heavy burden." *Matter of Interco, Inc.*, 137 B.R. 999, 1000 (Bankr. E.D. Mo. 1992) (citing *Texaco*, 81 B.R. at 812); *Geriatrics*, 187 B.R. at 132 ("A party in interest which seeks to establish 'cause' to terminate the exclusivity period 'bears a heavy burden.'") (quoting *Interco*, 137 B.R. at 1000). The Court in *Dow* noted that a moving party's burden to terminate "gets lighter with the passage of time"; thus, the Committee's burden of proof in this case, which was recently filed in February of this year, is particularly heavy. *Dow*, 208 B.R. at 664; *see also* Motion to Terminate ¶ 36 ("[O]nly about three months have passed since the filing of the petitions . . . .").

## F. The Committee has failed to carry its heavy burden of proof

### 1. Terminating exclusivity at this critical stage would not move the cases forward

The most important consideration under *Dow*—whether terminating exclusivity will "move the case forward"—strongly weighs in favor of denying **both Motions**. The Debtors are close to being in a position to confirm a Plan. The Committee admits that these cases have "moved very quickly and [are] now in [their] final stages." Motion to Terminate ¶ 36. After extensive negotiations, Debtors determined that proceeding with the Plan as outlined in the PSA and with the timeline outlined in the PSA is the best course for advancing this case. Terminating exclusivity (or suspending solicitation) at such a critical time would not move the cases forward. Quite the opposite. Termination in these circumstances could fatally disrupt the cases, risk a breach of the PSA, delay confirmation, cause creditor confusion, and drain estate resources. *See Adelphia*, 352 B.R. at 580; *Grand Traverse*, 147 B.R. at 421; *Eagle-Picher*, 176 B.R. at 147-48.

### 2. None of the nine *Dow* factors supports terminating exclusivity

#### i. Factor 1: The size and complexity of the case

The larger and more complex the case, the more likely that exclusivity will be continued or even extended. *Dow*, 208 B.R. at 665 (stating that large, complex cases merit continuation of exclusivity).

On this factor, the Committee cannot seem to keep its story straight. In its Motion to Terminate, the Committee argues that "this case, in all relevant respects, is not complex." Motion to Terminate ¶ 31. But in its Motion to Adjourn, the Committee identified a host of "complex issues" in these cases, "such as substantive consolidation, conflicts between the Debtors, the intercompany claims, the potential claims and allocation of expense issues that

10

could significantly impact the USO estate, and the outcome of the soon to be held liquidation auction." Motion to Adjourn ¶ 21.

The Committee's position in its Motion to Adjourn is the correct one. This case presents a number of complex issues, including substantive consolidation, inter-Debtor issues and claims, and conflicts between the Debtors' core constituency groups, including the Committee and the Ad Hoc Consortium. But despite these issues, the Debtors have proposed a confirmable plan within the 120-day exclusivity period (which would resolve these complex issues), and are making appropriate preparations to timely solicit and confirm that plan.

> **ii.** **Factor 2: The necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information**

In this case, as in *Adelphia*, the Debtors have already filed a plan, and are in the process of preparing to solicit the necessary votes to ensure confirmation. This favors the Debtors' retention of exclusivity, particularly where, as here, interested parties need only wait a short time before knowing whether the Debtors' Plan will be confirmed. *Adelphia*, 352 B.R. at 588 (holding that the fact that a debtor has already filed a plan that can be solicited weighs in favor of continuing exclusivity). The standard exclusivity period provides adequate—but essential—time to solicit the Debtors' Plan and permit creditors an opportunity to accept or reject the Plan before the deadlines in the PSA.

> **iii.** **Factor 3: The existence of good faith progress toward reorganization**

In *Dow*, the debtors had filed a plan, but had made no progress towards confirmation or approval of the disclosure statement. *Dow*, 208 B.R. at 662-63. Despite the fact that only "some progress towards reorganization" had been made, the Court concluded that this factor favored—if only slightly—continuation of exclusivity. *Id.* at 665.

11

Here, in contrast, the Debtors have made substantial progress towards plan confirmation. The Committee itself admits that these cases have "moved very quickly and [are] now in [their] final stages." Motion to Terminate ¶ 36. The Debtors have filed a plan, prepared in consultation with the Ad Hoc Consortium and the Committee, that has the support of key case constituents and that the Debtors believe will be confirmed by the Court. The Debtors' disclosure statement has received preliminary approval, and the Debtors are preparing to commence solicitation. This factor strongly favors continuing exclusivity. *See Dow*, 208 B.R. at 665; *see also Adelphia*, 352 B.R. at 588.

### iv. Factor 4: Whether the debtor is paying its bills as they become due

The fourth factor is clearly favorable to continuing exclusivity since the Debtors are paying their bills on time. *See Dow*, 208 B.R. at 665.

### v. Factor 5: Whether the debtor has demonstrated reasonable prospects for filing a viable plan

On this factor, the Committee bears the burden of demonstrating that the Debtors' "lac[k] any realistic prospect of proposing a viable plan." *Dow*, 208 B.R. at 665. This factor supports continuing exclusivity if the debtor is able to attain confirmation of at least "some viable plan, not necessarily the plan currently proposed." *Adelphia*, 352 B.R. at 588; *see also Dow*, 208 B.R. at 665.

If the Committee believes that the Debtors cannot attain the confirmation of any viable plan, it is not clear from the Motion to Terminate, which does not contain any attempt by the Committee to make the requisite showing. And even with respect to the current Plan, the Committee argues only that the Plan "**may** not be viable," that it "**might** not be confirmed," and that there "**may** be other issues" that could impede confirmation—feeble, heavily qualified, and poorly supported allegations that could be fairly made with respect to any proposed plan in

almost any complex, contested chapter 11 proceeding. Motion to Terminate ¶ 35 (emphasis added). Moreover, the Ad Hoc Consortium has informed the Debtors that it supports the Plan, believes the Plan complies with the PSA, and will vote in favor of the Plan—provided that the Debtors continue to comply with the PSA, including the July 30, 2012 confirmation deadline. The Committee cannot demonstrate that the current Plan is not viable, let alone that the Debtors cannot confirm any viable plan. The Committee has unquestionably failed to carry its burden on this factor.

Ultimately, the fairness and confirmability of the Debtors' Plan will be determined at a confirmation hearing. Neither is a basis for prematurely terminating exclusivity now. *Adelphia*, 352 B.R. at 588 n. 18 ("[T]he merits of the plan are to be examined at confirmation and don't play a meaningful role in the court's decision as to whether or not to terminate exclusivity.").

### vi. Factor 6: Whether the debtor has made progress in negotiations with its creditors

The Committee places considerable—and undue—weight on the sixth factor, asserting that the "Debtors have deferred to the Ad Hoc Consortium at every critical point in this case," and that the Debtors have been "held hostage" by the terms of the PSA. Motion to Terminate ¶ 23.

The Committee's own recitation of the facts, however, evidences the robust, lengthy and earnest negotiations that occurred between the parties—negotiations that yielded the Debtors' proposed plan. *Id.* at ¶¶ 10-17. Clearly "progress" is being made. The Committee simply dislikes one, and only one, part of the product of that progress. But displeasure with a plan on file "is not one of the enumerated factors, and is not a basis for terminating exclusivity." *Adelphia*, 352 B.R. at 587; *see also Geriatrics*, 187 B.R. at 134 ("Further, the Court cannot conclude . . . that the fact that one creditor constituency is not happy with the debtor's plan

13

constitutes cause to undermine the debtor's chances of winning final confirmation of its plan during the exclusivity period."). This is particularly true where, as here, "the unhappy creditor constituency has been saying inconsistent things, and has not given the Court comfort that there is an objective other than disrupting things." *Adelphia Communications Corp.*, 336 B.R. 610, 676 (Bankr. S.D.N.Y. 2006); *see also* Motion to Terminate ¶ 31 (arguing that these cases "[are] not complex"); Motion to Adjourn ¶ 21 (listing all of the "complex issues" in these cases).

The Committee clearly resents that the Plan does not reflect its wish list of preferred terms. *See* Motion to Terminate ¶ 23. This, however, is not a basis to conclude that the Debtors have not made progress in their negotiations with all creditors, and is not a basis to terminate exclusivity.

### vii. Factor 7: The amount of time which has elapsed in the case

As the Committee admits, "only about three months have passed since the filing of the petitions, [and] the case has moved very quickly and its now in its final stages." Motion to Terminate ¶ 36. The Plan is in the process of solicitation and is close to potential confirmation.

Based on similar facts, the court in *Adelphia* resolved this factor in favor of continuing exclusivity. In *Adelphia*, the debtors' exclusivity period had been extended nearly **four years**. *Adelphia*, 352 B.R. at 589. The court held, however, that giving the length of the exclusivity period "material weight under the facts of this case would be . . . inappropriate":

> [I]t would be premature to say that it's time for the Debtors to abandon their efforts to bring creditors together, and to subject the estate to the discord that would result from competing plans. That's particularly so since within just a few more weeks, we'll be able to ascertain, with much more precision, the level of creditor support for the Joint Plan. Spending a few more weeks with exclusivity would hardly be inappropriate in light of the complexity of this case.

14

*Id.* The fact that the debtors' plan was in the process of solicitation and was close to potential confirmation tipped the scales on this factor in favor of the debtors. *Id.*

According to the Committee, however, the fact that the Debtors have filed a Plan **supports** terminating exclusivity: "There is no reason to keep exclusivity in place when the Debtors have already filed the Amended Plan and do not plan to further negotiate it." Motion to Terminate ¶ 36. The Committee offers no authority whatsoever for this extraordinary argument, which, if true, supports the absurd proposition that exclusivity should be terminated any time that a debtor has proposed a plan.

> viii. **Factor 8: Whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands**

This factor is inapplicable. The Debtors are not seeking to extend exclusivity, but are only seeking to continue the statutory exclusivity periods in order to facilitate a timely confirmation that is consistent with the terms of the PSA.

> ix. **Factor 9: Whether an unresolved contingency exists**

In *Dow*, the Court held that the type of unresolved contingency that would be relevant to a motion to extend or to terminate exclusivity "is one which is external to the case itself"—e.g., the debtor's negotiations to sell its main asset. *Dow*, 208 B.R. at 666. As the court noted in *Adelphia*, however, it is unclear whether this factor is applicable in the case of a motion to terminate exclusivity; an unresolved contingency, the court noted, "might support continuing exclusivity . . . ." *Adelphia*, 352 B.R. at 590.

Here, most of the contingencies listed by the Committee—e.g., the timing of the bar date, the range of possible recoveries under the plan, the amount of warranty claims—are **not external** to the case, and are therefore irrelevant to the Court's analysis of this factor. *Dow*, 208 B.R. at 666. The only arguably relevant contingency—certain future asset sales—would, if the Debtors'

15

were so inclined, **support the extension of exclusivity**. *See Adelphia*, 352 B.R. at 590. The Committee does not explain—nor could it—why this contingency supports the premature termination of exclusivity.

### G. The Committee's additional arguments are irrelevant and unavailing

#### 1. Creditors are not entitled to choose between alternate plans

The argument underlying both of the Committee's Motions is that creditors are entitled to a choice: "With two plans, creditors can pick the plan they prefer." Motion to Terminate ¶ 29. This is not a valid basis for terminating exclusivity, and the Committee cites to no case holding otherwise. Indeed, Congress' decision to afford the Debtors with an exclusive opportunity to propose and confirm a plan rebuts any suggestion that creditors are entitled to a choice of competing plans during the statutorily prescribed exclusivity period. *See Eagle-Picher*, 176 B.R. at 147 ("The concept of an exclusivity period in favor of a debtor, a consideration at the heart of the Bankruptcy Code, on its face contradicts the notion that parties in a Chapter 11 bankruptcy case be given an equal opportunity to seek confirmation of a plan.").

#### 2. The risk of a failed confirmation is inherent to section 1121

The Committee states that it "fears" that the Debtors' Plan will not be confirmed, "leaving the estates with the expense of crafting a new plan." Motion to Terminate ¶ 29. But this is a risk inherent in section 1121—one that Congress presumably contemplated. The mere possibility that the Debtors' current Plan may not be confirmed, even if proven, is not a basis for terminating the Debtors' exclusivity period. *See Geriatrics*, 187 B.R. at 134 (stating that "the prospect of not getting confirmation of [the] debtor's plan" does not constitute cause to terminate exclusivity); *see also Dow*, 208 B.R. at 665 (the Committee bears the burden of demonstrating that the Debtors' "lac[k] any realistic prospect of proposing a viable plan").

### 3. The merits of the Committee's hypothetical plan are irrelevant

It is unclear from the Motions whether the Committee actually prefers its hypothetical alternative plan.[6] It is also unclear whether the Committee believes that the PSA is not in the best interests of the estates and creditors. What is clear, however, is that the Committee disagrees with certain decisions that the Debtors made with respect to the terms of the Plan and is attempting to leverage the Motions to obtain more favorable treatment of one class of creditors (*i.e.*, USO creditors).

The Committee's attempts to second-guess the Debtors' well-supported business judgment are unavailing. Even if the Committee demonstrated by a preponderance of the evidence that its hypothetical plan offered a superior outcome for its constituents—which it has not done or even attempted to do—the fact that a creditor can propose a more favorable plan is not a basis to terminate exclusivity. *Adelphia*, 352 B.R. at 588 n. 18 ("[T]he merits of the plan are to be examined at confirmation and don't play a meaningful role in the court's decision as to whether or not to terminate exclusivity."); *see also Geriatrics*, 187 B.R. at 134.

## II. There is no cause to delay the solicitation of the Debtors' Plan

The Committee advances three arguments in support of its Motion to Adjourn: (i) adjourning the solicitation of the Plan will not prejudice any party; (ii) the Committee has filed a motion to terminate exclusivity, which must be resolved by the Court before the Debtors can solicit their Plan; and (iii) there are unresolved "contingencies" that must be resolved for the Committee to analyze the Plan. The motion to terminate exclusivity should be denied for the

---

[6] The Committee stays largely neutral on which plan it prefers, stating that terminating exclusivity will allow the Committee to "recommend one or the other plan." Motion to Terminate ¶ 29; *see also id.* at 37. However, the Debtors believe that discovery would show that the Committee's financial analysis favors support of the Debtors' Plan.
17

reasons stated above, and is therefore not a reason to delay solicitation. The Committee's remaining arguments are also without merit.

### A. Estate creditors will be harmed by any delay in the solicitation process

#### 1. Delay will compromise—potentially fatally—the Debtors' ability to confirm the Plan and comply with the terms of the PSA, to the detriment of unsecured creditors

The Debtors have consistently maintained that the PSA provides the best possible outcome for creditors because, as discussed above, it avoids significant intercompany litigation, resolves complex issues, facilitates the efficient administration of the estates, allows for prompt distributions to creditors and mitigates the variability in creditor distribution outcomes. Section 4(c) of the PSA requires the Debtors to obtain confirmation of the Plan on or before July 30, 2012. Failure to comply with this deadline would result in a Noteholder Termination Event under Section 6(a) of the PSA, permitting the Noteholders to terminate the PSA.

To meet the July 30, 2012 Plan confirmation deadline, solicitation must occur immediately and cannot be delayed. The document production associated with the solicitation is extensive, and the solicitation process in this case is complicated by the existence of the publicly traded Notes (as defined in the Plan). As more fully described in the Debtors' solicitation motion (Docket No. 628), the Debtors must work through bank and brokerage houses to solicit the beneficial holders of the Notes, a process that requires an additional layer of solicitation.

Accordingly, if approval for solicitation is obtained on June 6, 2012, the earliest that the Debtors' balloting agent can commit to complete service is June 11, 2012. A voting and objection deadline 31 days after completion of the solicitation results in a voting deadline of July 12, 2012, leaving the Debtors only two short weeks to tabulate votes, estimate any claims for voting purposes, resolve any objections, prepare for confirmation and seek confirmation prior to the July 30, 2012 deadline. Delay—even for a few days—would likely compromise the Debtors'

18

12-43166-tjt    Doc 648    Filed 06/05/12    Entered 06/05/12 14:08:19    Page 18 of 20

efforts to confirm a Plan consistent with the terms of the PSA, leading to the precise scenario that the Committee purportedly fears: the Plan cannot be confirmed (due to the breach of the PSA), a new plan must be negotiated and proposed, and the estates incur additional expenses.

## 2. Delay will cost unsecured creditors significant cash burn

The Committee all but admits—as it must—that delaying solicitation will result in additional costs to the estates in "cash burn"—fees, costs, overhead, and other expenses. Motion to Adjourn 2 (discussing the estates' "cash burn"). But incredibly, the Committee nevertheless insists that no party will be harmed by delaying solicitation. This is obviously false: Creditors will be harmed by any delay in these Chapter 11 Cases, minimally through the additional cash burn caused by the delay. And if the delay leads to the breach and termination of the PSA and the submission of multiple competing plans, the costs to the estate and to creditors will, as discussed above, be significant.

## B. Delay will not materially clarify the Committee's so-called "contingencies"

Delay, according to the Committee, is necessary to resolve certain open items relating to the Plan: (i) the amount of claims that will be filed against the estates, particularly with respect to warranty and take-or-pay contract claims against USO; and (ii) the sale price for certain USO assets, which will be sold in June.

These items will not be meaningfully resolved by the Committee's proposed extension of the soliciting deadline. While proof of claims, including claims for contract rejection and lease rejections, are due on June 21, 2012, the Debtors expect to litigate many of the claims. This litigation will not be resolved before June 21, 2012 and will likely not be resolved before July 30, 2012.

Further, the Debtors have filed a motion to estimate warranty claims (Docket No 580), which does not contemplate resolution until September 2012. Delaying solicitation for resolution of the warranty estimation would unduly delay these Chapter 11 Cases.

Finally, delaying solicitation for the auction is a red herring. As described above, the Debtors have concluded their efforts to sell the asset as a going concern and are proceeding with an auction sale of the machinery and equipment—piecemeal or as a bulk bid. The results of the auction will be known prior to the Debtors' proposed voting deadline, and it is unlikely that the auction results will have a meaningful impact on the projected recovery to creditors.

## **Conclusion**

Since the start of these Chapter 11 Cases, the Debtors have maintained that the PSA offered the best, most efficient outcome that would benefit all parties in interest, including unsecured creditors. Consistent with this position, the Debtors have, in consultation with the Committee and other key constituents, drafted a Plan that is consistent with the terms of the PSA and is currently on track for timely confirmation. The Court should permit the Debtors to put their Plan to a vote, as permitted by section 1121 of the Code, without delay or Committee interference.

Date: June 5, 2012

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Counsel for the Debtors

By: /s/Aaron M. Silver
Robert B. Weiss (P28249)
Aaron M. Silver (P65481)
Daniel N. Adams (P72328)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
Telephone: (313) 465-7000
Facsimile: (313) 465-8000
Email: asilver@honigman.com