UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re: | Case No. 12-43166 |
| | (Jointly Administered) |
| ENERGY CONVERSION DEVICES, | |
| INC., et al.,[1] | Chapter 11 |
| Debtors. | Judge Thomas J. Tucker |
| _____/ | |

**OPINION REGARDING LIQUIDATION TRUSTEE'S OBJECTION
TO THE CLAIMS OF THE PEGASUS GROUP,
AND BANKRUPTCY CODE § 502(b)(6)**

**I. Introduction**

The dispute now before the Court concerns the meaning and scope of § 502(b)(6) of the Bankruptcy Code, 11 U.S.C. § 502(b)(6). That section sets a limit on "the claim of a lessor for damages resulting from the termination of a lease of real property."

These two jointly-administered Chapter 11 cases are being administered under a confirmed plan of liquidation. The cases came before the Court for a second hearing on November 14, 2012, on the Liquidation Trustee's (formerly the Debtors') objection to The Pegasus Group's claims (Docket # 877, the "Claim Objection"). After the first hearing, held on October 3, 2012, the Court entered a scheduling order regarding the Claim Objection.[2] Among other things, the Scheduling Order permits discovery; sets deadlines for completion of discovery (March 15, 2013) and the filing of potentially dispositive motions (April 8, 2013); and schedules a final pretrial conference and trial on the Claim Objection (April 22, 2013 and May 14, 2013, respectively).

---

[1] The Debtors in these jointly administered cases are Energy Conversion Devices, Inc. (Case No. 12-43166) and United Solar Ovonic LLC (Case No. 12-43167).

[2] Docket # 1345, filed October 5, 2012, the "Scheduling Order."

During the second hearing on the Claim Objection, on November 14, the Court heard oral argument which dealt primarily with a dispute about the meaning and application of Bankruptcy Code § 502(b)(6). The Liquidation Trustee ("Trustee") and The Pegasus Group ("Pegasus") briefed this subject, among others, before the hearing.[3] Appearing at the hearing were counsel for the Trustee, counsel for Pegasus, and counsel for intervening party U.S. Bank, N.A., as Special Servicer for the lender to Pegasus.[4] At the conclusion of the hearing, the Court took the dispute under advisement, and stated its intention to issue a written opinion.

## II. Jurisdiction

This Court has subject matter jurisdiction over this bankruptcy case and this contested matter under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

## III. Background and facts

The two Pegasus claims at issue, which were amended on September 7, 2012,[5] consist of one claim against each of the two Debtors' estates in these jointly-administered cases. The claims are identical in amount, and are based on the breach of a lease of commercial real property located at 2705 Commerce Parkway, Auburn Hills, Michigan (the "Lease"). Pegasus leased the property to the Debtor United Solar Ovonic, LLC ("USO"), and the Debtor Energy Conversion Devices, Inc. ("ECD") guaranteed USO's performance under the Lease.[6] The Lease was an

---

[3] Docket ## 1148, 1449.

[4] The Court has permitted U.S. Bank to intervene with respect to the Claim Objection. *See* Order, Docket # 1504.

[5] The amended claims are claim nos. 598 and 599. Copies of the amended claims appear at Docket # 1507.

[6] A copy of the Lease and the Guaranty appear as exhibits at Docket # 1148.

unexpired lease when the Debtors filed their bankruptcy petitions. Debtors continued to occupy and use the leased property for several months after filing their petitions. Ultimately, the Lease was rejected and Debtors surrendered the property back to Pegasus, before Debtors obtained confirmation of their Chapter 11 plan.[7]

Pegasus's amended claims each total $1,933,113.38. Each claim consists of several components. These include a "Prepetition Default" amount of $332,337.25, and a credit to reflect a letter of credit balance in Pegasus's favor, as of the petition date, of $937,166.70. Another component, which Pegasus refers to as the "502(b) claim," is for $1,720,000.00. This amount, the parties agree, is one year's rent under the Lease. Pegasus's amended claims describe this amount as "one year of lease payments (base rent plus other rent)."[8] This component of Pegasus's claim is based on the formula in 11 U.S.C. § 502(b)(6)(A), discussed below. A final component of Pegasus's claim, which Pegaus refers to as the "Additional Damage Claim," is for a total of $817,942.83.

The "Additional Damages Claim" itself has numerous itemized sub-components, and it includes damages for USO's alleged breaches of the Lease for the following:

> removal of equipment and other personal property in violation of the Lease, . . . damage to the roof, damage to the parking lot, damage to HVAC and exhaust units and fire extinguishers, damage to the landscaping, environmental damage and liabilities, cleaning fees, plumbing damages and other costs to be incurred in restoring the property to the condition set forth in the Lease.[9]

---

[7] *See* Order, filed March 22, 2012 (Docket # 232) at 2 ¶ 2.

[8] Amended Proof of Claim No. 598, Docket # 1507, Addendum at p. 1 n.2; Amended Proof of Claim No. 599, Docket # 1507, Addendum at p. 1 n.2.

[9] Amended Proof of Claim No. 598, Docket # 1507, Exh. A, fourth page; Amended Proof of Claim No. 599, Docket # 1507, Exh. B, fourth page.

Pegasus and U.S. Bank say that in addition to breaching the Lease by rejecting it, *see* 11 U.S.C. § 365(g)(1), the Debtors also breached the Lease by failing to perform their obligations under several sections of the Lease, which among other things, essentially require USO to maintain and repair damage to the premises.

Among other lease provisions, Pegasus and U.S. Bank rely on sections 10.01 and 21.01 of the Lease,[10] which provide, in part, as follows:

> 10.01  Tenant agrees at its own expense to keep the Improvements, including all structural, electrical, mechanical and plumbing systems at all times in good appearance and repair.  Tenant shall keep the Premises (including all interior walls, overhead doors and doorways, the exterior and interior portion of all doors, door checks, windows, window frames, plate glass, all plumbing and sewage facilities, including free flow up to the main sewer line, fixtures, heating and air conditioning and sprinkler system, walls, floors and ceilings, all structural and nonstructural elements, craneways, cranes, electrical buss ducts, mechanical, electrical and plumbing systems, interior, exterior, and landscaped areas, sidewalks, driveway areas and all other systems and equipment) in good order, condition and repair during the Lease Term. . . . Tenant shall promptly replace any portion of the Premises or system or equipment in the Premises which cannot be fully repaired, regardless of whether the benefit of such replacement extends beyond the Lease Term, provided, however that Landlord agrees to perform at its expense any required replacement of the roof, unless replacement is required as a result of the act or omission of Tenant or the failure of Tenant to properly service and maintain same. . . . It is the intention of Landlord and Tenant that at all times during the Lease Term, Tenant shall maintain the Premises in a first-class and fully operative condition. . . .
>
> . . .
>
> 21.01  At the expiration (or earlier termination) of the Term, Tenant will surrender the Premises broom clean and, subject to the provisions of Sections 9 and 14 of this Lease, in as good condition and repair as they were at the time Tenant took possession,

---

[10] During the November 14 hearing, counsel for U.S. Bank cited sections 8.01, 10.01, 11.01, 20.03, and 21.01 of the Lease.  A copy of the Lease appears at Docket # 1148, in Exhibit A.

4

reasonable wear and tear excepted, and promptly upon surrender will deliver all keys and building security cards for the Premises to Landlord at the place then fixed for payment of rent. All costs and expenses incurred by Landlord in connection with repairing or restoring the Premises to the condition called for herein, together with liquidated damages in an amount equal to the amount of minimum net rental plus all other charges which would have been payable by Tenant under this Lease if term of this Lease had been extended for the period of time reasonably required for Landlord to repair or restore the Premises to the condition called for herein, shall be invoiced to Tenant and shall be payable as additional rent within five (5) days after receipt of invoice.

Pegasus claims that it is entitled to both the "502(b) claim" and the "Additional Damages Claim" components of its claim, as part of its allowed claim. The Trustee disagrees, and argues that all of Pegasus's Additional Damages Claim component must be disallowed, as a matter of law, because of § 502(b)(6). This opinion addresses the Trustee's argument.[11]

## IV. Discussion

Under § 502(b)(6), a claim of a lessor of real property is to be disallowed "to the extent that"

> **(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—**
>
> (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—
>
> (i) the date of the filing of the petition; and
>
> (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

---

[11] Other disputed issues exist between the parties, which this opinion does not address. Those issues remain pending for further proceedings, under the Scheduling Order.

5

> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates[.]

11 U.S.C. § 502(b)(6)(emphasis added).

The Trustee argues that this section has the effect of eliminating the entire "Additional Damages Claim" component of Pegasus's claim, because all of the items in that component are subject to the cap established by the formula in § 502(b)(6). The parties agree that the formula in § 502(b)(6)(A) yields a cap in this case of $1,720,000.00, which is the amount of Pegasus's "502(b) claim" component. According to the Trustee, this sum, plus the amount referred to in § 502(b)(6)(B), which in this case means the amount of any unpaid rent due under the Lease, without acceleration, as of the petition date, is the maximum amount of Pegasus's claim that can be allowed. According to the Trustee, the entire "Additional Damages Claim" component is part of "the claim of a lessor for damages resulting from the termination of a lease of real property," within the meaning of § 502(b)(6).

Pegasus and U.S. Bank argue that none of the "Additional Damages Claim" component of Pegasus's claim is subject to the § 502(b)(6) cap, because none of it is part of "the claim of a lessor for damages resulting from the termination of a lease of real property," within the meaning of § 502(b)(6).

As the parties point out, there is a split in the case law regarding the meaning and scope of this statutory phrase. On the one hand, the Trustee relies on cases that interpret the phrase "claim . . . for damages resulting from the termination of a lease" broadly. These cases hold that a debtor's rejection of a real estate lease under 11 U.S.C. § 365(a) constitutes a breach of all covenants in the lease, including, for example, covenants requiring the debtor to maintain and

6

repair the premises. From this, these cases reason, all damage claims by the lessor are subject to the cap of § 502(b)(6)(A) plus § 502(b)(6)(B).

The parties point out that there are no Sixth Circuit cases on this issue. Cases supporting the Trustee's position include the following three cases: *In re Foamex Int'l., Inc.*, 368 B.R. 383 (Bankr. D. Del. 2007); *Kuske v. McSheridan* (*In re McSheridan*), 184 B.R. 91 (B.A.P. 9th Cir. 1995), *overruled in part by In re El Toro Materials Co., Inc.*, 504 F.3d 978 (9th Cir. 2007), *cert. denied, El Toro Materials Co., Inc. v. Saddleback Valley Cmty. Church,* 552 U.S. 1311 (2008); and *In re Mr. Gatti's, Inc.*, 162 B.R. 1004 (Bankr. W.D. Tex. 1994).

On the other hand, Pegasus and U.S. Bank argue for a narrower reading of § 502(b)(6). They cite cases holding that this section applies, as one case puts it, "to solely those damages arising as a consequence of the lease being terminated." *In re Brown*, 398 B.R. 215, 218 (Bankr. N.D. Ohio 2008)(citations omitted). Under this view, the application of § 502(b)(6) depends on the answer to the following question: "'Assuming all other conditions remain constant, would the landlord have the same claim against the tenant if the tenant were to assume the lease rather than rejecting it?'" If the claim at issue "would still have existed even had the debtor 'accepted the lease and committed to finish its term' then the claim is *not* subject to the § 502(b)(6) cap. *Id.* at 218-19 (quoting, in part, *In re El Toro Materials Co., Inc.*, 504 F.3d 978, 981 (9th Cir. 2007), *cert. denied, El Toro Materials Co., Inc. v. Saddleback Valley Cmty. Church,* 552 U.S. 1311 (2008)).

Cases adopting this more narrow view of § 502(b)(6) include the following five cases: in addition to the *Brown* and *El Toro Materials* cases cited above, *In re Atlantic Container Corp.*, 133 B.R. 980 (Bankr. N.D. Ill.1991); *In re Bob's Sea Ray Boats, Inc.*, 143 B.R. 229 (Bankr.

7

D.N.D. 1992); *In re Best Products Co., Inc.*, 229 B.R. 673 (Bankr. E.D. Va.1998). *See also* 4 *Collier on Bankruptcy* ¶ 502.03[7][a], at 502-40 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012)("It is important to recognize that [§ 502(b)(6)] addresses only lease terminations. Claims for damages arising under a lease for items such as physical damages to the premises [are] not subject to the section 502(b)(6) limitation.")(citing *In re Bob's Sea Ray Boats, Inc.*).

The Court has carefully reviewed all of the cases cited by the parties. The cases thoroughly discuss the issue, and present interesting arguments on both sides. But the Court is persuaded that Pegasus and U.S. Bank have the better view of § 502(b)(6). The review of the background and legislative history of § 502(b)(6) and the wording of that section, and the other points made by the courts in the *El Toro Materials* and *Atlantic Container Corp.* cases, cited above, are particularly persuasive. First, the Court agrees with the following observations by the court in *Atlantic Container Corp.*:

> [T]he phrase "damages resulting from the termination of a lease" does not seem to contemplate the type of damages being sought here. The phrase suggests that § 502(b)(6) is intended to limit only those damages which the lessor would have avoided but for the lease termination. Any damages caused to the Premises by the Debtor's failure to fulfill its repair and maintenance obligations are unrelated to the termination of the lease.
>
> In addition, the formula for calculating the maximum allowable claim for termination damages under § 502(b)(6) suggests that the primary purpose of the section is to limit claims for *prospective* damages resulting from the lease termination. Under § 502(b)(6)(B), a lessor is permitted to claim, without limitation, the entire amount of rent which is due and owing under the lease as of the earlier of the bankruptcy filing date and the date the lessee ceased to occupy the premises. 11 U.S.C. § 502(b)(6)(B). Claims for *future rent* under the lease, however, are subject to a statutory limit.

8

*In re Atlantic Container Corp.*, 133 B.R. at 987 (italics in original).

Second, the Court finds persuasive the opinion of the United States Court of Appeals in the *El Toro Materials* case, and will quote it at length:

> Claims made by landlords against their bankrupt tenants for lost rent have always been treated differently than other unsecured claims. Prior to 1934, landlords could not recover at all for the loss of rental income they suffered when a bankrupt tenant rejected a long-term lease agreement; future lease payments were considered contingent and thus not provable debts in bankruptcy. *See Manhattan Props., Inc. v. Irving Trust Co.,* 291 U.S. 320, 332–36, 338, 54 S.Ct. 385, 78 L.Ed. 824 (1934).
>
> The Great Depression created pressure to reform the system: A wave of bankruptcies left many landlords with broken long-term leases, buildings sitting empty and no way to recover from the estates of their former tenants. *See Oldden v. Tonto Realty Corp.,* 143 F.2d 916, 919–920 (2d Cir.1944). On the one hand, allowing landlords to make a claim for lost rental income would reduce the harm done to them by a tenant's breach of a long-term lease, especially in a down market when it was difficult or impossible to re-lease the premises. On the other hand, "extravagant claims for . . . unearned rent" could quickly deplete the estate, to the detriment of other creditors. *See In re Best Prods. Co.,* 229 B.R. 673, 676 (Bankr.E.D.Va.1998). The solution was a compromise in the Bankruptcy Act of 1934 allowing a claim against the bankruptcy estate for back rent to the date of abandonment, plus damages no greater than one year of future rent. *See Oldden,* 143 F.2d at 920–21.
>
> Congress dramatically overhauled bankruptcy law when it passed the Bankruptcy Reform Act of 1978. However, section 502(b)(6) of the 1978 Act was intended to carry forward existing law allowing limited damages for lost rental income. S.Rep. No. 95–989, at 63 (1978) *as reprinted in* 95th Cong., 2nd Sess. 1978, 1978 U.S. Code Cong. & Admin.News 5787, 5849 (the cap on damages is ''derived from current law''). Only the method of calculating the cap was changed. Under the current Act, the cap limits damages "resulting from the termination of a lease of real property" to "the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease.'' 11 U.S.C. §

502(b)(6). The damages cap was ''designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate.'' S.Rep. No. 95–989, at 63, 1978 U.S.Code Cong. & Admin. News at 5849.

**The structure of the cap—measured as a fraction of the remaining term—suggests that damages other than those based on a loss of future rental income are not subject to the cap.** It makes sense to cap damages for lost rental income based on the amount of expected rent: Landlords may have the ability to mitigate their damages by re-leasing or selling the premises, but will suffer injury in proportion to the value of their lost rent in the meantime. In contrast, collateral damages are likely to bear only a weak correlation to the amount of rent: A tenant may cause a lot of damage to a premises leased cheaply, or cause little damage to premises underlying an expensive leasehold.

One major purpose of bankruptcy law is to allow creditors to receive an aliquot share of the estate to settle their debts. Metering these collateral damages by the amount of the rent would be inconsistent with the goal of providing compensation to each creditor in proportion with what it is owed. Landlords in future cases may have significant claims for both lost rental income and for breach of other provisions of the lease. **To limit their recovery for collateral damages only to a portion of their lost rent would leave landlords in a materially worse position than other creditors. In contrast, capping rent claims but allowing uncapped claims for collateral damage to the rented premises will follow congressional intent by preventing a potentially overwhelming claim for lost rent from draining the estate, while putting landlords on equal footing with other creditors for their collateral claims.**

**The statutory language supports this interpretation. The cap applies to damages "resulting from" the rejection of the lease. 11 U.S.C. § 502(b)(6). . . . [Here] the harm to [the landlord's] property existed whether or not the lease was rejected. A simple test reveals whether the damages result from the rejection of the lease: Assuming all other conditions remain constant, would the landlord have the same claim against the tenant if the tenant were to assume the lease rather than rejecting it?** Here, Saddleback would still have the same claim it

10

> brings today had El Toro accepted the lease and committed to finish its term.
>
> . . .
>
> **Further, extending the cap to cover any collateral damage to the premises would allow a post-petition but pre-rejection tenant to cause any amount of damage to the premises—either negligently or intentionally—without fear of liability beyond the cap.** If the tenant's debt to the landlord already exceeded the cap then there would be no deterrence against even the most flagrant acts in violation of the lease, possibly even to the point of the tenant burning down the property in a fit of pique. Absent clear statutory language supporting such an absurd result, we cannot suppose that Congress intended it.

*In re El Toro Materials Co., Inc.*, 504 F.3d at 979-81 (emphasis added; footnotes omitted).

The Court adopts the views of the *Atlantic Container Corp.* and *El Toro Materials* court, and their more narrow interpretation of §502(b)(6), discussed above. For this reason, to the extent the Trustee seeks disallowance of the entire $817,942.83 "Additional Damages Claim" component of Pegasus's claim, based on § 502(b)(6), that relief is denied, and the Court will enter an order to that effect.

The present procedural posture and record does not permit the Court to be more specific than this, at this time, in ruling on the numerous particular items that make up the "Additional Damages Claim" component of Pegasus's claim. That will have to await further briefing and argument, at a minimum, after discovery and further proceedings have been completed, all under the Scheduling Order already in place.

**Signed on November 21, 2012**          /s/ Thomas J. Tucker
                                         **Thomas J. Tucker**
                                         **United States Bankruptcy Judge**

11