UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                      Chapter 11

ENERGY CONVERSION DEVICES,                  Case No. 12-43166
INC., et al.,[1]                            (Jointly Administered)

            Debtors.                        Judge Thomas J. Tucker
_____/

**OPINION REGARDING LIQUIDATION TRUSTEE'S OBJECTION TO
CLAIM NUMBER 321 OF JOHN AUSTIN MURPHY**

The dispute now before the Court, at this post-confirmation stage in these jointly-

administered Chapter 11 cases, concerns the claim of a shareholder of one of the bankruptcy

Debtors, seeking damages for an alleged post-petition breach of fiduciary duty by that Debtor.

The shareholder's damage claim is that this breach caused a substantial drop in the value of his

stock in the Debtor.  The issue is whether the shareholder's claim must be subordinated under 11

U.S.C. § 510(b), as a claim "for damages arising from the purchase or sale of" a security of the

Debtor.  The Court agrees with the broad reading that most courts have given this statutory

phrase, and concludes that subordination is required.

These jointly-administered cases are before the Court on the objection by the Liquidation

Trustee of the Energy Conversion Devices Liquidation Trust (the "Liquidation Trustee") to

Claim Number 321 of John Austin Murphy (Docket # 1285, the "Claim Objection").  The Court

held a hearing on the Claim Objection, after which the Court entered a series of orders permitting

the parties to file supplemental briefs on specified issues.

After considering all of the briefs of the parties, and all of their oral and written

_____
[1]  The Debtors in these jointly administered cases are Energy Conversion Devices, Inc. (Case No.
12-43166) and United Solar Ovonic LLC (Case No. 12-43167).

arguments, and for the reasons stated in this opinion, the Court will enter an order sustaining the Claim Objection to the extent of subordinating John Austin Murphy's claim under § 510(b), and otherwise overruling the Claim Objection without prejudice.

## I. Jurisdiction

This Court has subject matter jurisdiction over this contested matter under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a)(E.D. Mich.). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), 157(b)(2)(B), and 157(b)(2)(O).

This proceeding also is "core" because it falls within the definition of a proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within this category in § 1334(b) are deemed to be core proceedings. *See Allard v. Coenen* (*In re Trans-Industries, Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009). This is a proceeding "arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases." *See id.* at 27.

## II. Background

### A. The bankruptcy cases

Just before they filed these Chapter 11 bankruptcy cases on February 14, 2012, Energy Conversion Devices, Inc. ("ECD") and its wholly-owned operating subsidiary, United Solar Ovonic LLC ("USO"), entered into an agreement with a group of ECD's unsecured note holders referred to in the agreement as the "Supporting Noteholders," entitled "Plan Support Agreement." That agreement was dated as of February 13, 2012, the day before the Chapter 11 cases were filed.[2]

---

[2] A copy of the Plan Support Agreement was filed on March 15, 2012, at Docket # 167 (the "Plan Support Agreement").

In the Plan Support Agreement, the parties recited that ECD and USO had "determined that a prompt and structured sale process implemented through" a Chapter 11 bankruptcy proceeding "is in the best interests of" the "stakeholders" of ECD and USO.[3]  The Plan Support Agreement contemplated a Chapter 11 filing, followed promptly by (1) a bidding and sale process by which ECD and USO would try to sell their "stock or assets . . . that comprise the Debtors' solar business exclusive of all cash, cash equivalents, and accounts receivable;" and (2) a joint liquidating Chapter 11 plan.[4]

While the parties to the Plan Support Agreement hoped to achieve one or more going-concern sales, in order to maximize the sale value of the Debtors' assets, the bankruptcy bidding and sale process failed to achieve a going-concern sale of the solar business.  Several months after filing bankruptcy, in July 2012, the Debtors completed a public auction of the machinery, equipment, and inventory of USO's solar business.  And other assets of the Debtors were sold during the first several months of the bankruptcy case.  The various sales of Debtors' assets were approved by this Court, on motion and notice, and after a hearing.

The Debtors proposed a joint liquidating plan that was consistent with the Plan Support Agreement.  After objections to confirmation were resolved, the Plan was confirmed with modifications, in an order confirming the plan entered on July 30, 2012.[5]  The effective date of the confirmed Plan was to August 28, 2012.[6]

---

[3]  Plan Support Agreement at 1 (first Recital).

[4]  See id. at 1, 5; Ex. D (Bidding Procedures) at 1; Ex. A (Joint Plan Term Sheet).

[5]  Docket # 1064, the "Order Confirming Plan."  The Plan was filed on June 20, 2012 (Docket # 754, the "Plan").

[6]  See Notice of Effective Date, etc. (Docket # 1220).

3

**B. The claim of John Austin Murphy**

John Austin Murphy ("Murphy") timely filed a proof of claim in the case of the Debtor

ECD.[7]  The amount of the claim is $136,890.00, all of which allegedly is entitled to priority

under "[11 U.S.C. §§] 507(a)(1) and 510(c)(1)."  Murphy's claim alleges that as of the end of the

day before the bankruptcy petition date, he owned 116,950 shares of ECD stock, and that the

bankruptcy filing and ECD's post-petition announcement that the solar business of the Debtors

would be sold, in what Murphy repeatedly characterizes as a "fire sale," caused the value of

Murphy's stock to decline drastically, and eventually to become worthless.  Murphy contends, in

substance, that such a liquidation was unnecessary; that the Debtors and their solar business were

viable; and that on a long-term basis it would have been better for all "stakeholders," including

the ECD shareholders, for the Debtors to remain in the solar business, and to invest in newer

solar technology, rather than selling the business in a bankruptcy proceeding.

In Murphy's proof of claim, the basis for the claim is stated as "[c]ompensatory damages

for breach of performance and violations of fiduciary responsibility to shareholders on 2/14/12."[8]

In an attachment to his proof of claim, Murphy summarized his claim this way:

> [ECD] . . . had a fiduciary responsibility to John Austin Murphy on
> the morning of 2/14/12, including at the time of [ECD's] filing of
> bankruptcy as well as subsequently when it announced its intention
> to liquidate the company in a "Planned Support Agreement" made
> with the [ECD] noteholders (that was filed subsequently with the
> Bankruptcy Court). The fiduciary responsibility to John Austin
> Murphy was thus violated subsequent to the bankruptcy filing in
> order to carry out the bankruptcy liquidation process and thus

---

[7]  Murphy's claim was given the claim number 321 by the claims agent.  A copy of the claim
appears as Exhibit A to Murphy's initial written response to the Claim Objection (Docket #
1367)(sometimes cited in this opinion as the "Murphy Proof of Claim").

[8] Murphy Proof of Claim at 1.

4

qualifies as an administrative expense, . . . . These necessary expenses of carrying out the bankruptcy liquidation amount to $136,890, . . . .[9]

## C. The Claim Objection

The Liquidating Trustee objected to Murphy's claim, arguing among other things that Murphy had only an equity interest in the Debtor ECD, and not a claim. And as the Trustee points out, under the confirmed Plan of liquidation, all allowed claims, including the allowed claims of the non-priority unsecured creditors, must be paid in full before the holders of allowed equity interests of ECD are paid anything.[10]

Murphy argues that in addition to his equity interest in ECD, he has a claim for breach of fiduciary duty against ECD, as described above. ECD is a Delaware corporation, and Murphy does not dispute the Trustee's argument that under Delaware law, a shareholder can have no claim for breach of fiduciary duty against the corporation itself. Rather, any such claim may exist only against officers and directors of the corporation. *See A.W. Fin. Servs. S.A. v. Empire Res., Inc.*, 981 A.2d 1114, 1127 (Del. 2009); *Arnold v. Society for Savings Bancorp, Inc.*, 678 A.2d 533, 539 (Del. 1996); *Alessi v. Beracha*, 849 A.2d 939, 950 (Del. Ch. 2004); *Furchtgott–Roth v. Wilson*, No. 09–CV–9877, 2010 WL 3466770, at *5 (S.D.N.Y. Aug. 31, 2010)(applying Delaware law).

So it is clear and undisputed that Murphy has no valid claim for breach of fiduciary duty against ECD based on any pre-petition conduct, such as ECD's entering into the Plan Support Agreement with the Supporting Noteholders shortly before filing bankruptcy. Nor does Murphy

---

[9] *Id.* at 2.

[10] Plan (Docket # 754) at 13 (describing the treatment of the Class 5 Equity Interests).

5

have any valid claim, under applicable non-bankruptcy (Delaware) law, for breach of fiduciary duty against ECD.

But Murphy argues that he has a valid claim for breach of fiduciary duty against ECD based on ECD's conduct shortly after filing bankruptcy, on the bankruptcy petition date, when ECD announced its intention of proceeding with an orderly liquidation, consistent with the Plan Support Agreement. This, Murphy contends, was a breach by ECD of a fiduciary duty that it owed to its shareholders, as a bankruptcy debtor-in-possession. And Murphy has made clear that his breach-of-fiduciary-duty claim is based only on ECD's conduct on the bankruptcy petition date, February 14, 2012, and not on any conduct that occurred either before or after that date.[11]

Murphy carefully limits his theory of breach of fiduciary duty to ECD's conduct on the day of the bankruptcy petition, February 14, 2012, and specifically to the time that day after ECD filed its bankruptcy petition. This no doubt is because Murphy recognizes (1) that he has no possible breach of fiduciary duty claim against ECD, as distinguished from possible claims against ECD's officers and directors, for any pre-petition conduct by ECD; and (2) he would have a very difficult time showing any breach of duty by ECD for any conduct occurring much after the petition date. This latter point is because the Court later approved the sale of the various assets of the Debtors ECD and USO, on motions and after hearings, in sale orders and in confirming the Debtors' joint Chapter 11 Plan. Murphy did not object to these sale motions or to confirmation. He explains this by saying, in substance, that after ECD made its petition-date announcement to the world of its intention to liquidate, the die was cast and the damage to his ECD stock value was done. So, according to Murphy, by the time the Debtors ECD and USO

---

[11] *See, e.g.*, Response of John Austin Murphy, etc. (Docket # 2408) at 1-2, ¶¶ 1-3.

later filed motions for approval of the sales of their assets, it was too late to salvage the value of Murphy's ECD stock.

The Liquidation Trustee makes several arguments challenging Murphy's fiduciary duty claim. One of the arguments is that under 11 U.S.C. § 510(b), any such claim by Murphy must be subordinated to the claims of the confirmed liquidating Plan's unsecured creditor classes, including Class 3, the class of general unsecured claims.

## III. Discussion

### A. Murphy's claim must be subordinated under Bankruptcy Code § 510(b).

As noted in Part II-C of this Opinion, it is clear that before the Debtor ECD filed bankruptcy, ECD itself, as distinguished from ECD's officers and directors, had no fiduciary duty to its shareholders, such as Murphy, under applicable non-bankruptcy law (the law of Delaware). There is some authority, however, suggesting that beginning when ECD filed its Chapter 11 bankruptcy petition on February 14, 2014, ECD owed a fiduciary duty to its shareholders, including Murphy. Such a fiduciary duty arises under federal, bankruptcy-related common law. According to some cases, a bankruptcy debtor-in-possession owes a fiduciary duty not only to its creditors and the bankruptcy estate, but also to its shareholders. *See In re SunCruz Casinos, LLC*, 298 B.R. 821, 829-30 (Bankr. S.D. Fla. 2003); *In re Bellevue Place Assocs.*, 171 B.R. 615, 623-24 (Bankr. N.D. Ill. 1994), and cases cited therein. The nature of such a fiduciary duty to shareholders does not appear to be well-defined in the case law, particularly regarding how such a duty operates and co-exists with the bankruptcy debtor's fiduciary duty to its creditors, when the interests of the creditors conflict with the interests of the shareholders.

In any event, the Liquidation Trustee argues that under Bankruptcy Code § 510(b),

7

Murphy's claim for breach of fiduciary duty, even if valid, must be subordinated for purposes of distribution under the confirmed liquidating Plan, to all allowed claims of the non-shareholder creditors, including the claims of the general unsecured creditors in Class 3 of the confirmed Plan. This is so, the Trustee argues, because Murphy's claim is a claim "for damages arising from the purchase or sale of" a security of the Debtor, within the meaning of § 510(b).

Section 510(b) states:

> **For the purpose of distribution under this title, a claim** arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, **for damages arising from the purchase or sale of such a security**, or for reimbursement or contribution allowed under section 502 on account of such a claim, **shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.**

11 U.S.C. § 510(b)(emphasis added).

If the Trustee is correct that § 510(b) applies to Murphy's claim, then that claim must be subordinated such that it has the same priority as the common stock of the Debtor ECD — *i.e.*, the same priority as the equity interests treated under Class 5 of the confirmed Plan. This means that Murphy's breach of fiduciary duty claim would not be entitled to any distribution unless and until all of the non-shareholder creditor classes, including Class 3 (general unsecured creditors) were paid in full.[12]

The Court agrees with the Trustee's argument that Murphy's breach of fiduciary duty claim is one "for damages arising from the purchase or sale" of Murphy's stock in the Debtor ECD, within the meaning of § 510(b).

---

[12] *See* Plan at 13; Order Confirming Plan at 5-6.

8

Some cases interpreting § 510(b) have concluded that this statutory language is ambiguous, and that it reasonably could be read in at least one of two ways — a narrow reading, or a broader reading. As one court put it:

> Initially, the phrase "arising from the purchase or sale" is ambiguous. Something "arises" from a source when it originates from that source. The phrase "arising from" signifies some causal connection. A literal reading implies that the injury must flow from the actual purchase or sale; a broader reading suggests that the purchase or sale must be part of the causal link although the injury may flow from a subsequent event. Since the [claim in this case] cannot exist without the initial purchase, the purchase is a causal link. Reasonably well-informed persons could interpret section 510(b) in either sense, and hence, the section is ambiguous.

*In re Granite Partners, L.P.*, 208 B.R. 332, 339 (Bankr. S.D.N.Y. 1997)(citations omitted).

Many courts, including the courts of appeal in at least two circuits, have held that the broader reading of the statute is most consistent with the legislative history and purposes of § 510(b), and have adopted that broader reading. These cases have held that § 510(b) subordination is not limited to a claim for fraud or other misconduct in the actual purchase or sale transaction of stock in the debtor. Rather, the cases have broadly applied § 510(b) to claims based on acts or omissions that occurred well after the claimant purchased his stock in the debtor. These cases include the following:

- *Allen v. Geneva Steel Co.* (*In re Geneva Steel Co.*), 281 F.3d 1173, 1178-82 (10th Cir. 2002)(investor claimed that Chapter 11 debtor's fraud caused him to retain his debt securities, which then lost value; claim was subordinated under § 510(b) to claims of bondholders and "general goods and services creditors")

- *Baroda Hill Invs., Ltd. v. Telegroup, Inc.* (*In re Telegroup, Inc.*), 281 F.3d 133, 141-

9

44 (3d Cir. 2002)(shareholders of Chapter 11 debtor filed claims for damages for debtor's alleged breach of a contract to use its best efforts to ensure that their stock was registered and freely tradeable; the court subordinated such claims under § 510(b))

- *Hasson v. Motors Liquidation Co. GUC Trust* (*In re Motors Liquidation Co.*), Nos. 09–50026 (REG), 11 Civ. 8444(RJS), 2012 WL 1886755, at *6-7 (S.D.N.Y May 21, 2012)(shareholder of Chapter 11 debtor alleged he was fraudulently induced to retain stock of debtor because of fraud by the debtor; claim was subordinated under § 510(b); and court noted that "courts in this Circuit have strictly construed § 510(b) . . . and specifically held that the provision applies to a stockholder's equity interest. . ., whether or not the 'loss in the value of his stock was caused by a pre-purchase fraud which induced his purchase. . .  or a post-purchase fraud . . . which undermined the value of his stock.'")(citation omitted)

- *Frankum v. Int'l Wireless Comm'ns Holdings, Inc.* (*In re Int'l Wireless Comm'ns Holdings, Inc.*), 279 B.R. 463, 467-71 (D. Del. 2002)(shareholders of Chapter 11 debtor claimed debtor breached a contract requiring it to make initial public offering of stock within eighteen months; court subordinated such claim under § 510(b))

- *Granite Partners, L.P.*, 208 B.R. at 342, 344 (investor alleged that Chapter 11 debtors misrepresented their financial performance, by among other acts, issuing false operating reports, which induced investor to retain its investments, which then lost value; claim was subordinated under § 510(b))

- *In re Worldcom, Inc.*, 329 B.R. 10, 15-17 (Bankr. S.D.N.Y. 2005)(shareholder of

10

Chapter 11 debtor Worldcom alleged that it was fraudulently induced to retain its

Worldcom stock because of fraud by the debtor, which stock later lost value; claim

was subordinated under § 510(b))

- *In re Enron Corp.*, 341 B.R. 141, 159, 162 (Bankr. S.D.N.Y. 2006)(former employees

  of debtor whose stock options in the debtor declined substantially in value claimed

  that they were induced by debtor's fraud to delay exercising the options, and also

  alleged breach of contract; claims subordinated under § 510(b))

- *In re NAL Fin. Grp., Inc.*, 237 B.R. 225, 230-34 (Bankr. S.D. Fla. 1999)(holder of the

  debentures for two stock offerings of Chapter 11 debtor claimed that the debtor

  breached contract requiring it to use its best efforts to register the debentures by a

  certain date; court subordinated the claim under § 510(b))

In addition, the courts of appeal in at least two other circuits have generally adopted a

broad reading of § 510(b).  *See American Broadcasting Systems, Inc. v. Nugent* (*In re Betacom of

Phoenix*, *Inc.*), 240 F.3d 823, 830-31 (9th Cir. 2001)(holding that § 510(b) is not limited to an

actual purchase or sale of a security and subordinating a shareholder's claim arising from the

breach of a merger agreement); *Rombro v. Dufrayne* (*In re Med Diversified, Inc.*), 461 F.3d 251,

254-58 (2nd Cir. 2006)(adopting a broad interpretation of § 510(b) to subordinate a former

executive's claim for breach of contract damages based on the debtor's failure to issue stock as

required by a termination agreement).

This Court agrees with the many courts that have adopted the broader reading of § 510(b),

for the reasons stated in those cases, and particularly, of the cases cited above, in *Granite

Partners, L.P.*; *Geneva Steel*; and *Telegroup, Inc.*  And as the courts of appeal in at least two

11

circuits have emphasized:

> "When a corporation becomes bankrupt, the temptation to lay aside
> the garb of a shareholder, on one pretense or another, and to
> assume the role of a creditor, is very strong, and all attempts of that
> kind should be viewed with suspicion."

*Geneva Steel*, 281 F.3d at 1182 n.6 (quoting *Jezarian v. Raichle* (*In re Stirling Homex Corp.*),

579 F.2d 206, 213 (2d Cir. 1979)). The Court in *Granite Partners* explained part of the policy

behind a broad reading of § 510(b), which applies with equal force to this case, as follows:

> Claims of mismanagement, waste and breach of fiduciary duty
> describe conduct which harms an entity directly, and its investors
> and creditors derivatively. The investors and creditors suffer an
> indirect injury because the wrongful conduct erodes the entity's
> assets, making it less likely that it will be able to pay creditors and
> distribute profits to investors.
>
> This is simply another way of describing insolvency. Yet under the
> absolute priority rule, the creditors stand ahead of the investors on
> the receiving line; the enterprise cannot distribute profits until it
> satisfies its creditors' claims. Twenty years ago, in *Stirling Homex*,
> 579 F.2d at 213, the Second Circuit counseled suspicion—with
> good reason—whenever an investor in an insolvent entity attempts
> to step up to the level of creditor. When an investor seeks *pari
> passu* treatment with the other creditors, he disregards the absolute
> priority rule, and attempts to establish a contrary principle that
> threatens to swallow up this fundamental rule of bankruptcy law. In
> this case, he also disregards the purposes of section 510(b).

*Granite Partners, L.P.*, 208 B.R. at 344 (citation omitted).

The Court concludes that the type of actionable wrong alleged by ECD shareholder

Murphy in this case — breach of fiduciary duty by ECD that allegedly caused a drop in the value

of Murphy's stock in the Debtor — is a claim for damages that arises from Murphy's purchase of

the Debtor ECD's stock, within the meaning of § 510(b), and such claim therefore must be

subordinated. The Court agrees with the following reasoning in the *Worldcom* case, which also

applies to this case:

> From the perspective of Section 510(b), **it makes no difference whether the stockholder's loss in the value of his stock was caused by** a pre-purchase fraud which induced his purchase, **or a post-purchase** fraud, embezzlement, looting, **or other corporate misconduct which undermined the value of his stock.** In either case, the stockholder's loss represented by diminution in or destruction of the value of his stock ultimately constitutes a claim for damages derived from his ownership of stock and therefore "arising" from his purchase of the stock, whether the stockholder retained his stock or sold it.

*Worldcom, Inc.*, 329 B.R. at 15-16 (emphasis added).

### B. Murphy cannot obtain equitable subordination of any creditor's claim

Murphy argues that the claims of the Supporting Noteholders, who made the Plan Support Agreement with ECD just before ECD filed bankruptcy, and perhaps also the claims of the other members of the general unsecured Class 3 under the confirmed Plan, should be equitably subordinated to Murphy's claim. In his proof of claim and in his briefs, Murphy cites 11 U.S.C. 510(c)(1), which states:

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
>
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest[.]

But Murphy fails to allege any valid basis, under "principles of equitable subordination," that would permit this Court to subordinate the Supporting Noteholders' claims, or any other creditor claims, to Murphy's breach-of-fiduciary duty claim against the Debtor ECD.

The Sixth Circuit Court of Appeals has held that courts must "use great caution in

13

applying the remedy" of equitable subordination, and that "equitable subordination is an unusual remedy which should be applied in limited circumstances." *Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 745 (6th Cir. 2001)(citations omitted). The Sixth Circuit further held that the following requirements must be met before the bankruptcy court may equitably subordinate one claim to another claim under § 510(c)(1):

> This court has adopted a three-part standard for establishing equitable subordination: (1) **the claimant must have engaged in some type of inequitable conduct**; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act. *See In re Baker & Getty Fin. Servs., Inc.*, 974 F.2d 712, 717–18 (6th Cir.1992) (citing *In re Mobile Steel Co.*, 563 F.2d 692, 699–700 (5th Cir.1977)). Satisfaction of this three-part standard does not mean that a court is *required* to equitably subordinate a claim, but rather that the court is *permitted* to take such action. *See In re Octagon Roofing*, 157 B.R. 852, 857 (N.D.Ill.1993).

*Id.* at 744 (bold emphasis added; italics in original).

Murphy's argument for equitable subordination of the Supporting Noteholders' claims fails because, among other possible reasons, Murphy's argument is based only on a claimed breach *by the Debtor ECD* of its fiduciary duty to shareholders. This breach of duty by ECD occurred, according to Murphy, when ECD announced, on the day of, and shortly after, it filed the bankruptcy case, that it planned to pursue a sale of its solar business, consistent with the Plan Support Agreement. Murphy argues that this, and the ultimate sale of ECD's business and assets in this bankruptcy case, was done for the benefit of the Supporting Noteholders (who were general unsecured creditors), at the expense of ECD's other "stakeholders" — including ECD shareholders like Murphy. And, according to Murphy, the Debtor ECD's petition-date

14

announcement of its sale intentions caused the value of Murphy's stock in ECD to decline, causing Murphy's claimed damages.

Murphy's theory cannot support an equitable subordination of *the Supporting Noteholders' claims* to Murphy's claim, because Murphy fails to allege any "inequitable conduct" *by the Supporting Noteholders*. Rather, it is the bankruptcy Debtor ECD's conduct that Murphy claims was legally wrong. The only thing Murphy alleges about the Supporting Noteholders is that they entered into the Plan Support Agreement with ECD, shortly before ECD filed bankruptcy. The Court cannot find that there was anything inequitable, wrongful, or inappropriate in the Supporting Noteholders' conduct, either before or after ECD filed bankruptcy. Those unsecured creditors simply acted in their own self-interest, and persuaded ECD to agree to the Plan Support Agreement, and then, post-petition, to follow generally the path outlined in the Plan Support Agreement.

But as Murphy seems to recognize, even after ECD filed its bankruptcy petition on February 14, 2012, ECD was not legally bound to comply with the Plan Support Agreement. Rather, ECD could have rejected the Plan Support Agreement, under 11 U.S.C. § 365(a),[13] and chosen to try to pursue a Chapter 11 reorganization in which ECD and USO retained their solar business and assets — the course of action Murphy believes would have been better. The fact that ECD and USO chose not do this, after filing bankruptcy, cannot be blamed on any "inequitable conduct" by the Supporting Noteholders. Murphy simply disagrees, vehemently, with the Debtors' business judgment.

---

[13] Section 365(a) states that, with exceptions not applicable here, that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). A Chapter 11 debtor in possession has the powers of a trustee for purposes of § 365(a). *See* 11 U.S.C. §§ 1107(a); 1101(1).

Because Murphy has not alleged any facts which, if true, would show that the Supporting Noteholders engaged in any "inequitable conduct," this Court is not permitted to equitably subordinate the Noteholders' claims, or the claim of any other non-shareholder creditor, to Murphy's claim. *See Autostyle Plastics*, 269 F.3d at 747, 747 n.9 (in which the Sixth Circuit rejected equitable subordination because the creditor seeking it was unable to establish the "first required element"of equitable subordination — *i.e.*, "inequitable conduct" by the creditor to be subordinated).

### C. Murphy is not entitled to an allowed administrative expense under Code § 503(b)

Murphy also argues that, rather than being subordinated, his claim should be given priority under 11 U.S.C. § 507(a)(2), as an allowed administrative claim under 11 U.S.C. § 503(b)(1)(A), as part of the "actual, necessary costs and expenses of preserving the estate." In interpreting this statutory language, the Sixth Circuit has held:

> In order to qualify a claim for payment as an administrative expense
>
> > a claimant must prove that the debt (1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity (or, alternatively, that the claimant gave consideration to the debtor-in-possession); and (2) directly and substantially benefitted the estate.

*United Trucking Serv., Inc. v. Trailer Rental Co., Inc.* (*In re United Trucking Serv., Inc.*), 851 F.2d 159, 161-62 (6th Cir. 1988)(quoting *Employee Transfer Corp. v. Grigsby* (*In re White Motor Corp.*), 831 F.2d 106, 110 (6th Cir. 1987)).

Courts give "strict construction of the Bankruptcy Code provisions governing requests for

priority payment of administrative expenses." *Woburn Assocs. v. Kahn* (*In re Hemingway Transport, Inc.*), 954 F.2d 1, 5 (1st Cir. 1992). "[Administrative expense claims] under § 503(b) are strictly construed because priority claims reduce the funds available for creditors and other claimants." *National Union Fire Insurance Co. v. VP Buildings, Inc.*, 606 F.3d 835, 838 (6th Cir. 2010)(quoting *In re Federated Dept. Stores, Inc.*, 270 F.3d 994, 1000 (6th Cir. 2001)). "The party seeking the priority 'has the burden of proving that his claim constitutes an administrative expense.'" *Id.* (quoting *McMillan v. LTV Steel, Inc.*, 555 F.3d 218, 226 (6th Cir. 2009)).

Murphy's claim cannot qualify for priority as an allowed administrative expense, for at least two reasons. First, for the reasons discussed earlier in this opinion, 11 U.S.C. § 510(b) requires that Murphy's claim be subordinated to the claims of all non-shareholder creditors in ECD's case. That subordinated treatment is utterly inconsistent with treating Murphy's claim as a priority, administrative expense claim under 11 U.S.C. §§ 507(a)(2) and 503(b)(1)(A).

Second, the damages that Murphy allegedly suffered — the decline in the value of his ECD stock — because of ECD's alleged breach of fiduciary duty, did not "directly and substantially benefit the [bankruptcy] estate," as is required for administrative expense treatment. Quite the contrary, Murphy's claim is that ECD's alleged breach of fiduciary duty — ECD's announcing on the petition date that it would proceed with a sale of the Debtors' solar business consistent with the Plan Support Agreement — was short-sighted, and did *not* benefit the bankruptcy estates of the two Debtors, ECD and USO. Rather, Murphy argues in substance, while this may have benefitted the Supporting Noteholders, it greatly *damaged* the bankruptcy estates, by causing a substantial reduction in the value of these enterprises, to the detriment of the

17

ECD shareholders.[14]  Thus, Murphy's claim does not meet the administrative expense requirement of a "direct and substantial benefit" to the bankruptcy estate.

The requirement that an administrative expense claimant must have directly and substantially benefitted the bankruptcy estate is subject to a qualification.  When a Chapter 11 debtor in possession operates its business in bankruptcy, post-petition claims that arise from the debtor's operation of its business, concluding contract and tort claims, generally are given administrative expense priority under § 503(b)(1)(A).  This is sometimes referred to as the "*Reading*" doctrine, named for the United States Supreme Court's decision under the Bankruptcy Act, *Reading Co. v. Brown*, 391 U.S. 471 (1968).  The Seventh Circuit has described the *Reading Co. v. Brown* case in this way:

> A tort victim . . . is a creditor, but not a creditor whose actions benefit his debtor, the tortfeasor. Yet in *Reading v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), the Supreme Court held that at least in a Chapter 11 bankruptcy, tort claims arising from the continued operation of the bankrupt business should be treated as administrative claims, like other post-petition expenses. . . . Tort liability is an expense of doing business, like labor or material costs, and should be treated the same way. Businesses operating in bankruptcy that were excused from tort liability would have an inefficient competitive advantage over their solvent competitors—and deficient incentives to use due care in the operation of the business.

*In re Resource Technology Corp.*, 662 F.3d 472, 476 (7th Cir. 2011)(citations omitted).  Courts applying the *Reading* doctrine have limited administrative expense priority to claims arising from the bankruptcy debtor's operation of its business.  *See, e.g., Resource Technology*, 662 F.3d at 477; *Hemingway Transport, Inc.*, 954 F.2d at 5-7; *see also Pension Benefit Guaranty Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.)*, 126 F.3d 811, 816-17 (6th Cir.

---

[14]  This theme runs throughout Murphy's written responses and briefs filed in response to the Claim Objection.  (Docket ## 1367, 1414, 1475, 1610, 1898, 2408).

1997)(quoting *Reading* as saying that "'actual and necessary costs' should 'include costs ordinarily incident to operation of a business . . .'" and noting that "the *Reading* line of cases has created an exception to the benefit of the estate requirement for claims for costs ordinarily incident to the operation of a business.")

Murphy's claim in this case cannot qualify for administrative expense priority treatment under the *Reading* doctrine. Murphy's claim does not arise from the debtor in possession ECD's operation of its business after filing bankruptcy. Rather, Murphy's breach-of-fiduciary claim against ECD arises from ECD's petition-day decision and announcement that it would pursue the sale of its solar business in an orderly liquidation, rather than pursuing the retention and reorganization of its solar business. This claim does not fit within the *Reading* doctrine. While it is true that the debtor ECD continued to operate its business for several months after filing bankruptcy, while it sought a buyer to purchase its solar business on a going-concern basis, Murphy's claim does not arise from that operation of the business.

For these reasons, Murphy's claim, even if valid, is not entitled to priority treatment as an allowed administrative expense.

## IV. Conclusion

For the reasons stated in this opinion, the Court will enter an order sustaining the Liquidating Trustee's Claim Objection, to the extent of subordinating Murphy's claim to the allowed claims of all other creditors under the confirmed liquidating Plan, including Class 3, the class of general unsecured claims, under 11 U.S.C. § 510(b). Murphy's claim will have the same priority as the Equity Interests in Class 5 of the confirmed Plan. The Liquidating Trustee's Claim Objection otherwise will be overruled without prejudice.

The Trustee has made other arguments, not discussed in this opinion, as to why Murphy's claim should be disallowed in its entirety, not just subordinated under § 510(b). But the subordination of Murphy's claim makes it unnecessary for the Court to determine whether or to what extent Murphy's breach-of-fiduciary-duty claim against the Debtor ECD should be allowed at all, and if so, in what amount. At this time it appears that the dividend that will be paid to the Class 3 general unsecured creditors under the confirmed Plan, while substantial, will be far less than 100%. Rather, it is expected to be approximately 55%.[15] Given that, it appears unlikely that Murphy would ever be entitled to any distribution on his subordinated claim, even if it were allowed in full. As a result, the Court does not need to discuss or decide the Liquidating Trustee's other arguments against Murphy's claim at this time.

**Signed on January 30, 2015**          **/s/ Thomas J. Tucker**
                                         **Thomas J. Tucker**
                                         **United States Bankruptcy Judge**

---

[15]  In a recent hearing, on a different matter in this case, counsel for the Official Committee of Unsecured Creditors stated that currently the expectation is for a distribution to the Class 3 general unsecured creditors of approximately 55%. (MP3 of audio of January 7, 2015 hearing, filed at Docket # 2430, at 29:41 to 30:02 (statement by attorney David G. Dragich)).