UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                          Chapter 11

ENERGY CONVERSION DEVICES,                      Case No. 12-43166
INC., et al.,[1]                                (Jointly Administered)

             Debtors.                           Judge Thomas J. Tucker
_____/

**OPINION REGARDING THE "FIRST AND FINAL" FEE APPLICATION**
**OF CLARK HILL PLC**

These jointly-administered cases came before the Court for a hearing on the fee

application filed by Clark Hill PLC ("Clark Hill"), entitled "First and Final Application of Clark

Hill PLC for Allowance and Payment of Fees and Reimbursement of Expenses Incurred As

Counsel to the Official ECD Creditors Sub-Committee of the Official Committee of Unsecured

Creditors of the Debtors " (Docket # 1369, the "Fee Application").  An objection to the Fee

Application was filed by the Liquidation Trustee of the Energy Conversion Devices Liquidation

Trust (the "Liquidation Trustee")(Docket # 1454, the "Objection").  The Court has considered

the papers filed by the parties (Docket ## 1369, 1454, and 1579), and other parts of the record,

and the oral arguments of counsel made at the hearing.

For the reasons stated in this opinion, the Court will sustain the Objection in part and

otherwise overrule it, and will grant the Fee Application, subject to certain relatively minor

reductions from the fee amount requested.  But the Court will deny, in its entirety, a

supplemental request filed by Clark Hill, seeking approval of an additional $12,541.50 in fees for

work done by Clark Hill in defending its Fee Application against the Liquidation Trustee's

_____

[1]  The Debtors in these jointly administered cases are Energy Conversion Devices, Inc. (Case No.
12-43166) and United Solar Ovonic LLC (Case No. 12-43167).

Objection.

## I. Jurisdiction

This Court has subject matter jurisdiction over this contested matter under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a)(E.D. Mich.). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), 157(b)(2)(B), and 157(b)(2)(O).

This proceeding also is "core" because it falls within the definition of a proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within this category in § 1334(b) are deemed to be core proceedings. *See Allard v. Coenen* (*In re Trans-Industries, Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009). This is a proceeding "arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases." *See id.* at 27.

## II. Background

### A. The bankruptcy cases

Just before they filed these Chapter 11 bankruptcy cases on February 14, 2012, Energy Conversion Devices, Inc. ("ECD") and its wholly-owned operating subsidiary, United Solar Ovonic LLC ("USO"), entered into an agreement with a group of ECD's unsecured note holders referred to in the agreement as the "Supporting Noteholders," entitled "Plan Support Agreement." The Supporting Noteholders held about 70% of ECD's bond debt, and overall, ECD's bond debt represented about 99% of ECD's total debts.[2] The ECD bondholders are not creditors of USO. The Plan Support Agreement was dated as of February 13, 2012, the day

_____

[2] *See* Amended Supplement to [Foley & Lardner Employment Application] (Docket # 261) at ¶ 8.

before the Chapter 11 cases were filed.[3]

In the Plan Support Agreement, the parties recited that ECD and USO had "determined that a prompt and structured sale process implemented through" a Chapter 11 bankruptcy proceeding "is in the best interests of" the "stakeholders" of ECD and USO.[4]   The Plan Support Agreement contemplated a Chapter 11 filing, followed promptly by (1) a bidding and sale process by which ECD and USO would try to sell their "stock or assets . . . that comprise the Debtors' solar business exclusive of all cash, cash equivalents, and accounts receivable;" and (2) a joint liquidating Chapter 11 plan.[5]

While the parties to the Plan Support Agreement hoped to achieve one or more going-concern sales, in order to maximize the sale value of the Debtors' assets, the bankruptcy bidding and sale process failed to achieve a full going-concern sale of the solar business.  Several months after filing bankruptcy, in July 2012, the Debtors completed a public auction of the machinery, equipment, and inventory of USO's solar business.  And other assets of the Debtors were sold during the first several months of the bankruptcy case.  The various sales of Debtors' assets were approved by this Court, on motion and notice, and after a hearing.

The Debtors proposed a joint liquidating plan (the "Plan") that was consistent with the Plan Support Agreement.  Among other things, the Plan proposed the substantive consolidation of the bankruptcy estates of the two debtors, ECD and USO.  After objections to confirmation were resolved, the Plan was confirmed with modifications, in an order confirming the Plan

---

[3]  A copy of the Plan Support Agreement was filed on March 15, 2012, at Docket # 167 (the "Plan Support Agreement").

[4]  Plan Support Agreement at 1 (first Recital).

[5]  *See id.* at 1, 5; Ex. D (Bidding Procedures) at 1; Ex. A (Joint Plan Term Sheet).

3

entered on July 30, 2012.[6]  The confirmed Plan included the substantive consolidation of the

ECD and USO estates.  The effective date of the confirmed Plan was August 28, 2012.[7]  Under

the Plan, John Madden was appointed the Liquidation Trustee, and in that capacity he objected to

the Clark Hill Fee Application.

**B.  The ECD Sub-Committee and its retention of Clark Hill**

**1.  The Foley Retention Order**

Although there are two debtors in these jointly-administered cases, the United States

Trustee chose to appoint only one Official Committee of Unsecured Creditors (the

"Committee").  The Committee chose to employ the law firm Foley & Lardner LLP ("Foley") as

its counsel.  As part of the Committee's amended application for approval of its employment of

Foley, the Committee and Foley recognized that there were potential conflicts of interest between

the estates of the two bankruptcy debtors, and proposed a method for handling such conflicts of

interest.  The amended supplement to Foley's employment application explained:

> Because there is one Committee for both Debtors' estates, and there
> are potential conflicts of interest between the estates, which may
> result in a conflict of interest for Foley, the Committee requests
> that this Court approve Foley's employment, including the method
> of handling the Potential Conflicts, as defined below, in the event
> they become Actual Conflicts, as defined below, all as further
> defined and outlined below and in the Amended Supplemental
> Simon Declaration.
> . . .
>
> Conflicts between creditors of different debtors and estates are
> typically inherent in any case where there are multiple debtors, but
> only one committee. These conflicts can include, but are not

---

[6]  Docket # 1064, the "Order Confirming Plan."  The Plan was filed on June 20, 2012 (Docket # 754, the "Plan").

[7]  *See* Notice of Effective Date, etc. (Docket # 1220).

4

limited to inter-Debtor transactions, Plan confirmation issues, and consolidation issues, among others.

Based on the Debtors' filings in these Chapter 11 Cases, Foley is aware of certain potential conflicts which may arise in these Chapter 11 Cases between the creditors of both the ECD and USO estates (the "Potential Conflicts") and become actual conflicts of interest between the estates and for Foley as counsel to the single Committee (the "Actual Conflicts"). The Potential Conflicts include, but are not limited to: (a) pre-petition intercompany transfers from ECD to USO of approximately $800 million, as set forth in the Declaration of William C. Andrews, Executive Vice President and Chief Financial Officer, In Support of the First-Day Motions (Dkt. No. 10), ¶ 25; (b) the propriety and characterization of the foregoing transfers (e.g. whether they should be considered debt or equity) and the treatment thereof in these Chapter 11 Cases; (c) the propriety and characterization of the $5 million line of credit ECD purportedly advanced to USO in December 2011, asserted to be secured by a lien on USO's assets; (d) the extent, nature, characterization, perfection, and treatment of such inter-company debt; (e) post-petition transactions between the Debtors and affiliates, including nature and treatment of such claims; (f) the propriety and benefit of potential substantive consolidation of the Debtors; and (g) the allocation of proceeds from a sale of assets of both Debtors in one sale. The position taken regarding the foregoing issues, and the outcome, may benefit one Debtor's creditors more than the other Debtor's creditors, or could benefit the creditors of one Debtor and be detrimental to the creditors of the other. The foregoing are the Potential Conflicts identified to date based upon the Debtors' current filings. Other Potential Conflicts could arise in the future.[8]

In its Order granting Foley's employment application, filed April 20, 2012, (Docket # 406, the "Foley Retention Order"), the Court adopted the procedure proposed by the Committee and Foley, and ordered the following:

[IT IS] ORDERED, that as it relates to the representation of the Committee with respect to the Potential Conflicts which result in Actual Conflicts, if they arise, the following procedure is approved:

---

[8] Amended Supplement, etc. (Docket # 261) at ¶¶ 9-11 (footnote omitted; underlining in original).

a. Foley will identify for the Committee members the Potential Conflicts and will determine with the Committee whether an Actual Conflict exists.

b. In the event the Committee and Foley determine that an Actual Conflict exists, the Committee will form an ad hoc sub-committee comprised of members of the Committee who are creditors of ECD, and choose to participate on such sub-committee (the "ECD Creditors Sub-Committee"), and an ad hoc sub-committee comprised of members of the Committee who are creditors of USO and choose to participate on such sub-committee (the "USO Creditors Sub-Committee" and together with the ECD Creditors Sub-Committee, the "Sub-Committees"). In the event a member of the Committee is a creditor of both Debtors, such member may be a member of both Sub-Committees, but shall have the opportunity to recuse itself from one or both Sub-Committees if it feels that the dual claims present a conflict for such member.

c. The ECD Creditors Sub-Committee shall have the right to retain independent special conflicts counsel and other professionals to evaluate the conflict and take any required action in these Chapter 11 Cases, subject to the usual retention requirements under the Bankruptcy Code. The ECD Creditors Sub-Committee shall also have the right, in its discretion, to enter into other agreements to receive counsel from other attorneys and professionals, including, for example, attorneys and professionals representing the creditors on the ECD Creditors Sub-Committee individually or the Ad Hoc Professionals, under a joint defense agreement or otherwise, or elect not to retain counsel.

d. Either the ECD Creditors Sub-Committee or the USO Creditors Sub-Committee will have the right to take independent action in these Chapter 11 Cases, as if a separate, official committee of such Debtor, if it determines to do so, including without limitation filing pleadings, objections, or supporting matters, with respect to the Actual Conflicts.

6

> e. In order to avoid unnecessary costs to the estates, and any
> conflicts of interest resulting from an Actual Conflict, if an
> Actual Conflict arises where the ECD Creditors
> Sub-Committee has been formed and where the USO
> Creditors Sub-Committee has been formed and the
> Sub-Committees are addressing an Actual Conflict, Foley
> will represent only the USO Creditors Sub- Committee and
> not the ECD Creditors Sub-Committee with respect to
> those limited Actual Conflicts. This will avoid the expense
> of a third law firm being retained to represent a portion of
> the Committee on the Actual Conflicts; . . .[9]

### 2. The Committee's determination that "Actual Conflicts" existed, and events that followed

Soon after entry of the Foley Retention Order, the Committee and Foley determined that

"Actual Conflicts" existed, and the Committee formed the subcommittees as authorized in the

Foley Retention Order. The Official ECD Creditors Sub-Committee (the "ECD Sub-Commitee")

initially consisted of only one member, namely Bank of New York Mellon Trust Company, as

indenture trustee for ECD's 3% Convertible Senior Notes ("BNY Mellon"). Later, another

creditor was added to that subcommittee, namely the Pegasus Group.[10]

As permitted by the Foley Retention Order, the ECD Sub-Committee chose to employ

Clark Hill as its counsel. With the concurrence of the United States Trustee, the ECD Sub-

Committee sought the Court's approval of the employment of Clark Hill, and that approval was

granted in an order filed on May 8, 2012.[11] The Order (Docket # 501, the "Clark Hill Retention

Order") authorized the ECD Sub-Committee to employ Clark Hill as its counsel "in accordance

---

[9] Foley Retention Order (Docket # 406) at 2-3. The above quotation omits footnote 2, which states that "[c]apitalized terms not defined herein shall have the meaning ascribed to them in the Application and/or the Supplement." *Id.* at 2 n.2.

[10] *See* Tr. of June 6, 2012 hearing (Docket # 2397) at 23 (Statement of John Simon, attorney for the Committee).

[11] Docket ## 459, 501.

with Bankruptcy Code Sections 328 and 1103, effective *nunc pro tunc*, to April 20, 2012, pursuant to the terms set forth in the Application and procedures outlined in the Court's [Foley Retention Order]."[12]

### C. The Court's denial of the motion to vacate the Clark Hill Retention Order

On May 14, 2012, the ECD noteholders who had signed the Plan Support Agreement, calling themselves the "Ad Hoc Noteholder Consortium," (the "Consortium") filed a motion to vacate the Clark Hill Retention Order.[13] The primary argument in this motion was that the ECD Sub-Committee should not have been appointed, nor did that Sub-Committee need to employ separate counsel from the Committee's counsel, because there was in fact no "Actual Conflict" to permit these things, within the meaning of the Foley Retention Order. The ECD Sub-Committee objected to the motion,[14] and the Committee (through its counsel, Foley) also filed a response to the motion.[15] After holding a hearing on June 6, 2012, the Court denied the motion.[16]

In its response to the Consortium's motion, the Committee stated that it had determined that an "Actual Conflict" exists, so that its appointment of the ECD Sub-Committee was authorized and proper under the Foley Retention Order. And the Committee argued that under the Foley Retention Order, the ECD Sub-Committee had the right to retain its own counsel "to evaluate any conflict issue and to take any required action in these Chapter 11 cases." The

---

[12] Order Approving Employment of Clark Hill PLC as Counsel to the Official ECD Creditors Sub-Committee of the Official Committee of Unsecured Creditors of the Debtors *Nunc Pro Tunc* to April 20, 2012 (Docket # 501) at ¶ 1.

[13] Docket # 529.

[14] Docket # 576.

[15] Docket # 608.

[16] Docket # 676.

Committee stated:

> The Consortium bases its Motion to Vacate largely on the mistaken assumption that there are no Actual Conflicts. As the facts demonstrate, **several irreconcilable Actual Conflicts exist between the creditors of ECD and the creditors of USO. Approximately $792 million in prepetition intercompany transfers from ECD to USO, a purported $5 million secured line of credit extended by ECD to USO, the characterization of such transfers, plan negotiations and the undecided issue of substantive consolidation are a few examples of such Actual Conflicts.**
> . . .

> 7. . . . The Foley Retention Order provides, *inter alia*, that Foley will identify for the Committee members the Potential Conflicts and will determine with the Committee whether an Actual Conflict exists.

> 8. Pursuant to the Foley Amended Supplement and the Foley Retention Order, the ECD Sub-Committee has the right to retain independent special conflicts counsel and other professionals to evaluate any conflict issue and take any required action in these Chapter 11 Cases.
> . . .

> 10. On March 15, 2012, ECD filed its Schedules showing an intercompany receivable from USO with a book value of $792,138,554.00 (the "USO Receivable"). In their initial schedules, the Debtors valued the USO Receivable at zero, but then in amended schedules listed the value as "unknown." On March 27, 2012, ECD filed its first Monthly Operating Report [Dkt. No. 264], which included a balance sheet listing the USO Receivable at its face value of $793.1 million as an asset. The Debtors' Chief Financial Officer, Mr. Andrews, testified that ECD has never documented the USO Receivable as a loan in any way, prior to the changed characterization on the Debtors' books approximately 7 months before the bankruptcy filing. Testimony of Mr. Andrews, CFO, § 341 meeting, March 23, 2012. USO, in its Schedules filed on March 15, 2012, includes the USO Receivable as a claim of unknown value.

> 11. The Debtors have filed a chapter 11 plan that calls for

9

substantive consolidation of the Debtors' estates, including releases of intercompany claims.

12. In accordance with the procedures set forth in the Amended Foley Application and the Foley Retention Order, based on actual conflicts identified and discussed with the Committee, including regarding the intercompany claims and transfers and plan negotiations (including substantive consolidation issues), as noted in the Amended Foley Application, the Committee decided to form the ECD Sub-Committee and a sub-committee comprised of USO creditors (the "USO Sub-Committee").
. . .

15. The Consortium's claim that this Court should vacate the Clark Hill retention order under Rule 60(b)(6) or 60(b)(1) because Actual Conflicts somehow do not exist is based on an incorrect premise and should be rejected. To the contrary, as discussed above, Actual Conflicts plainly do exist, and the ECD Sub-Committee was formed in order to address those Actual Conflicts.

16. The Consortium further argues that the Clark Hill [R]etention [O]rder should be vacated under Rule 60(b)(6) because the ECD Sub-Committee does not require separate counsel as it is currently comprised of only one member, BNY Mellon, which has its own counsel, and the Consortium also has its own counsel. This argument ignores the realities of the ECD Sub-Committee and its significant duties. First, the ECD Sub-Committee has a fiduciary duty to act in the best interests of <u>all</u> creditors of ECD — not merely the interests of BNY Mellon, the noteholders or the Consortium members. The ECD Sub-Committee's interests are distinct and call for separate counsel, rather than mere regurgitation of the positions taken in support of certain members of the ECD creditor constituency. Moreover, the composition of the ECD Sub-Committee may change.[17]

---

[17]  Response of Official Committee of Unsecured Creditors[, etc.] (Docket # 608) at 2, 3-6 ¶¶ 7-8, 10-12, 15-16 (bold emphasis added, underlining in original).  In its Response, the Committee also argued that Clark Hill had a conflict of interest in acting as counsel for the ECD Sub-Committee, because it also represented that the Sub-Committee's sole member, BNY Mellon.  That conflict was resolved, to the satisfaction of the Committee (and the Court) when Clark Hill agreed that it would no longer represent BNY Mellon individually, but rather would represent only the ECD Sub-Committee.  As a result, during the June 6, 2012 hearing the Committee dropped its objection to Clark Hill acting as counsel for the ECD Sub-Committee.

During the June 6, 2012 hearing on the Consortium's motion, counsel for the Committee

(an attorney with the Foley firm) reiterated on behalf of the Committee that the Committee

"generally supported the retention of Clark Hill . . . because there are actual conflicts.  So the

ECD Sub-Committee does need counsel. . . ."[18]

At the conclusion of the June 6 hearing, the Court gave a bench opinion explaining why it

was denying the Consortium's motion to vacate the Clark Hill Retention Order.  In that bench

opinion, the Court stated, among other things, the following:

> The motion by the ad hoc committee [(the Consortium)] will be
> denied for the following reasons.
>
> First, . . . in my view there is not a problem with . . . the genesis of
> the appointment of the Clark Hill firm to represent the ECO
> creditors subcommittee under the applicable orders.
>
> This begins with the Foley -- the so-called Foley Retention Order
> which was filed April 20, 2012 at docket number 406.  That order
> authorized the retention . . . of the Foley Lardner Firm as counsel
> to the committee.  It also contained provisions dealing with what
> happens with potential conflicts and actual conflicts as those terms
> are defined in the amended supplement to the employment
> application of Foley at docket number 261 at paragraph 11.
> . . .
>
> It's apparent to me from [the Foley Retention Order] that first of all
> the committee had the discretion with Foley to determine whether
> an actual conflict existed and if they determined that an actual
> conflict existed the committee had the authority without further
> authorization from the Court, without any notice, without any right
> on the part of anybody to object, to form this EC creditor
> subcommittee and they did so and as the committee stated in its
> response to the present motion at docket 608, paragraphs 12 and 15
> among other places and as they have acknowledged in this hearing
> and I think in other hearings the committee did determine that an
> actual conflict existed and formed the ECD creditor subcommittee
> as a result.

---

[18]  Tr. of the June 6, 2012 hearing (Docket # 2397) at 9.

There is then -- there is authority in the Foley Retention Order for the committee to have done what they did in establishing the ECD creditor subcommittee. The provision I read from paragraph C on page 3 of that Foley Retention Order authorized them once it was formed, the ECO creditor subcommittee to retain independent special conflict counsel for the purpose, . . . "To evaluate the conflict and take any required action in these Chapter 11 cases subject to the usual retention requirements under the bankruptcy code."

So, the ECD subcommittee had the right to retain independent counsel for the purpose stated in the Foley Retention Order, to evaluate the conflict or conflicts and take -- and that 's a small "c", conflict, and take any required action in these Chapter 11 cases. So it 's clear from the Foley Retention Order in the events that have occurred that the committee had authority to form and it did form the ECD creditor subcommittee and once that subcommittee was formed that committee had the right to retain independent conflict counsel for the purposes stated, to evaluate the conflict or conflicts and take any required action in these Chapter 11 cases, that that subcommittee, the ECD creditor subcommittee chose . . . the Clark Hill firm to be its counsel under this provision. In the order that with the U.S. Trustee's concurrence . . . approved the employment of Clark Hill for that purpose which is the order that's under challenge by the present motion, docket number 501 stated that Clark Hill was authorized and empowered as counsel for the ECD creditor 's subcommittee among other things pursuant to the terms set forth in the application and the procedures outlined in the Foley retention Order." That's paragraph one.

So the order approving the employment of Clark Hill as counsel for the ECD creditors subcommittee is clear, I think that Clark Hill's employment was for the purposes stated and authorized in paragraph C of the Foley Retention Order which I read from earlier, "To evaluate the conflict or conflicts and take any required action in these Chapter 11 cases."
. . .

. . . the ECD creditor subcommittee was validly formed and it did have authority under the Foley Retention Order to . . . choose the Clark Hill firm and so there was authority to seek to employ the Clark Hill firm. And any arguments by the ad hoc committee note holders that, "Well, there really was never any actual conflict," in

12

my view is an argument that even if the ad hoc note holders are
actually correct on that point or if they are correct in their view as
the case progresses that the actual conflicts are much fewer in
number and quite more limited than what the committee thought at
any point the actual conflicts were[,] . . .

. . . under the Foley Retention Order it is not for the ad hoc
committee note holders to say or even have a voice in arguing . . .
there has been no Actua1 Conflict, . . . and so the EC creditors
subcommittee should not have been formed and they should not
have had the authority to hire counsel.  **That's a matter within the
purview solely of the committee and the committee . . . is
charged with determining if in their view there was an [A]ctual
[C]onflict and they did so that's the end of it[,] . . .
[i]n terms of whether the EC creditors subcommittee was
properly formed.  Once they are properly formed they have the
right to retain counsel to evaluate the conflict, take any
required action in these Chapter 11 cases.**

**So, there clearly was authority for this . . . EC creditor
subcommittee to hire counsel.  They chose Clark Hill.**[19]

### D.  The Clark Hill Fee Application

In its Fee Application, Clark Hill seeks final approval of attorney fees in the amount of

$123,242.00 and reimbursement of expenses in the amount of $414.25, for Clark Hill's services

as counsel to the ECD Sub-Committee.  This is for Clark Hill's work during the time period

April 20, 2012 through August 28, 2012 (the Effective Date of the confirmed Plan).  Under an

Order filed on May 4, 2012, establishing procedures for interim compensation of professionals,[20]

Clark Hill has been paid, on an interim basis, fees totaling $92,124.80 and reimbursement for

expenses of $414.25, for the time period April 20, 2012 through July 31, 2012.[21]

---

[19]  *Id*. at 25-31 (emphasis added).

[20]  Docket # 477.

[21]  Fee Application (Docket # 1369) at ¶¶ 8-11.

There were many professionals, including attorneys and financial advisors, who were employed and paid in this case, with the Court's approval. As one might expect under the circumstances of this case, Clark Hill's request for approval of fees totaling $123,242.00 is much smaller than the total fee requests that were made by the Debtors' attorneys and by the Committee's attorneys (Foley), and allowed by the Court (in a reduced amount in the case of Foley). For example, the Court approved total fees for the Debtors' primary counsel (Honigman Miller Schwartz and Cohn LLP), for its work through the August 28, 2012 Effective Date of the confirmed Plan, of $2,026,221.50.[22] The Court approved total fees for the Committee's counsel Foley, for its work through the August 28, 2012 Effective Date, of $779,129.00. (This was a reduced amount from Foley's original request of $874,129.00 in fees. It was reduced by stipulation between Foley and the Liquidation Trustee, after the Trustee objected to Foley's original fee application).[23]

The Liquidation Trustee filed a timely objection to the Clark Hill Fee Application, to which Clark Hill filed a written response.[24] The Court then held a hearing.

The day before the hearing on the Fee Application, Clark Hill filed a "Supplement" to the Fee Application, in which Clark Hill seeks approval of additional fees in the amount of $12,541.50.[25] In that Supplement, Clark Hill seeks fees for the time period November 12, 2012 through December 11, 2012, for a total of 27.90 hours of attorney time. All but .6 hours of this

---

[22] Docket ## 1490, 1372. No objections were filed by anyone to Honigman Miller's fee application.

[23] Docket ## 1721, 1375, 1455, 1717.

[24] Docket ## 1454, 1579.

[25] Docket # 1595, entitled "Supplement to First and Final Application of Clark Hill PLC for Allowance and Payment of Compensation" (the "Supplement").

time was spent reviewing the Liquidation Trustee's objection to Clark Hill's Fee Application and preparing and filing Clark Hill's written response to the objection. The other .6 hours of attorney time was to prepare the Supplement itself.

### E. The Liquidation Trustee's objection to the Fee Application

In objecting to the Clark Hill Fee Application, the Liquidation Trustee makes several arguments. Its primary argument is that much of Clark Hill's work as counsel for the ECD Sub-Committee was unnecessary, and unrelated to any actual conflict between the interests of the ECD creditors and the ECD Sub-Committee on the one hand, and the interest of the USO creditors and the USO Sub-Committee on the other hand. For example, the Liquidation Trustee argues:

> The Ad Hoc Noteholders Consortium (the "AHNC") [previously] raised the concern that "it is difficult to imagine . . . what work Clark Hill could perform on behalf of the Sub-Committee that is not entirely duplicative of other work already being performed" and warned of "the gratuitous multiplication of committees and professionals where none are needed." [Docket No. 535, p. 6.] Reviewing Clark Hill's Application, it is clear that these fears have been fully borne out.
>
> There was never any serious doubt that a substantive consolidation plan would be proposed and supported by all concerned, and, therefore, the number of conflict issues between the so-called ECD Subcommittee and USO Subcommittee should have been minimal. Nonetheless, Clark Hill's Application seeks compensation for an astonishing $123,242 for services performed in its capacity as conflicts counsel to the ECD Subcommittee. Even a cursory review of Clark Hill's time records, however, reveals that many of the services performed were unrelated to any actual conflict. Moreover, the AHNC, which represents 70% of the ECD debt, found that they received *no* benefit from Clark Hill's activities but rather were harmed by the needless dissipation of estate assets on unnecessary professionals' fees and costs.[26]

---

[26] Objection (Docket # 1454) at ¶¶ 1-2 (italics in original).

15

The Liquidation Trustee "requests that 40% of the total Clark Hill time charges of $123,242.00 be disallowed . . . [and] that the Court set a status conference to establish a schedule for discovery and an evidentiary hearing on this Objection and that there be reserved to the Trustee the right to seek further disallowance based on more specific information which may be developed following such discovery and evidentiary hearing."[27]

## III. Discussion

### A. Principles regarding fee applications under Bankruptcy Code § 330

Bankruptcy Code § 330 provides, in relevant part:

> (a)(1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, a consumer privacy ombudsman appointed under section 332, an examiner, an ombudsman appointed under section 333, or professional person employed under section 327 or 1103–
>
> (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person;  and
>
> (B) reimbursement for actual, necessary expenses.
>
> (2)  The court may, on its own motion or on the motion of the United States Trustee, the United States Trustee for the District or Region, the trustee for the estate, or any other party in interest, award compensation that is less than the amount of compensation that is requested.
>
> (3)  In determining the amount of reasonable compensation to be awarded to an examiner, trustee under Chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including–

---

[27] *Id.* at ¶ 3.

(A)  the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

(4)(A) Except as provided in subparagraph (B), the court shall not allow compensation for–

       (i) unnecessary duplication of services;  or

       (ii) services that were not–

       (I) reasonably likely to benefit the debtor's estate;  or

       (II) necessary to the administration of the case.

. . .

(6) Any compensation awarded for the preparation of a fee application shall be based on the level and skill reasonably required to prepare the application.

11 U.S.C. § 330.

"A bankruptcy court is afforded broad discretion in determining attorney's fees." *In re McLean Wine Co., Inc.*, 463 B.R. 838, 846 (Bankr. E.D. Mich. 2011)(quoting *Thomas v. Robinson* (*In re Robinson*), 189 Fed.Appx. 371, 373 (6th Cir.2006)).  Under § 330,

17

> To determine the amount of compensation that is "reasonable," the Court must use the lodestar method of fee calculation, based on the . . . fee application . . . . *See generally Boddy v. United States Bankruptcy Court, Western District of Kentucky* (*In re Boddy*), 950 F.2d 334, 337-38 (6th Cir.1991). This involves a two-step analysis. First, "the court multiplies a reasonable hourly rate by the proven number of hours reasonably expended on the case by counsel" to arrive at the lodestar figure. *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004). "Once the lodestar figure is established, the trial court is permitted to consider other factors, and to adjust the award upward or downward to achieve a reasonable result." *Id.* at 792 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)).
>
> In determining the lodestar figure, courts generally consider the factors listed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir.1974):
>
>> (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.
>
> *See Geier*, 372 F.3d at 792. Although "'many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate to arrive at the lodestar figure'" in the first step of the analysis, some of these factors may still serve as a basis for an upward or downward adjustment of the lodestar figure in the second step of the analysis. *Id.* at 793-94. For example, in a case where "the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional,'" an upward enhancement may be appropriate. *Id.* at 794.

*In re Moss*, 320 B.R. 143, 156-57 (Bankr. E.D. Mich. 2005).

The fee applicant must exercise appropriate "billing judgment" in its fee application:

> The standard practice of professionals submitting fee applications
> should be to "make a good faith effort to exclude from a fee
> request hours that are excessive, redundant or otherwise
> unnecessary; just as a lawyer in private practice ethically is
> obligated to exclude such hours from his fee submission." *Hensley
> v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939–40, 76
> L.Ed.2d 40 (1983) (discussing billing practice in context of
> statutory attorney fees). This exercise of "billing judgment" is an
> essential, and as noted above, ethically mandated, component of
> every fee application submitted to the [bankruptcy] court [under
> §§ 330 and 331].

*In re Bennett Funding Grp., Inc.*, 213 B.R. 234, 241 (Bankr. N.D.N.Y. 1997); *see also McLean Wine Co.*, 463 B.R. at 853 ("Courts have stated that '"billing judgment is an absolute requirement of fee applications in bankruptcy."'")(citation omitted).

In this case, the Liquidation Trustee does not argue that the attorney hourly rates in the Clark Hill Fee Application are unreasonable, and the Court finds them to be reasonable. The dispute concerns the work done by Clark Hill, and in some respects, the amount of time spent on that work.

### B. The Liquidation Trustee's "no actual conflict" argument

As an initial point, the Court disagrees with the Liquidation Trustee's argument that there were never any actual conflicts of interest that reasonably required the involvement of Clark Hill as counsel for the ECD Sub-Committee. Rather, the Court finds that early in these Chapter 11 cases, and until the Court was able to confirm the Plan in these cases (which included the substantive consolidation of the two bankruptcy estates), there *were* actual conflicts of interest between the interests of the ECD creditors on the one hand, and the interests of the USO creditors on the other hand, such that each of the following things were justified and reasonable: (1) the Committee's appointment of the ECD Sub-Committee; (2) the ECD Sub-Committee's

19

employment of Clark Hill as its counsel; and (3) all but a very minor part of Clark Hill's work and attorney time in this case.

As permitted by the Foley Retention Order — an order that no party in interest ever objected to or sought relief from — the Committee, with the advice of its counsel Foley, determined that actual conflicts existed ("Actual Conflicts" as that term is defined in the Foley Retention Order). As the Committee accurately found and described, these actual conflicts included the following:

> As the facts demonstrate, several irreconcilable Actual Conflicts exist between the creditors and ECD and the creditors of USO. **Approximately $792 million in prepetition intercompany transfers from ECD to USO, a purported $5 million secured line of credit extended by ECD to USO, the characterization of such transfers, plan negotiations and the undecided issue of substantive consolidation** are a few examples of such Actual Conflicts. . . .

> 10. On March 15, 2012, ECD filed its Schedules showing an intercompany receivable from USO with a book value of $792,138,554.00 (the "USO Receivable"). In their initial schedules, the Debtors valued the USO Receivable at zero, but then in amended schedules listed the value as "unknown." On March 27, 2012, ECD filed its first Monthly Operating Report [Dkt. No. 264], which included a balance sheet listing the USO Receivable at its face value of $793.1 million as an asset. The Debtors' Chief Financial Officer, Mr. Andrews, testified that ECD has never documented the USO Receivable as a loan in any way, prior to the changed characterization on the Debtors' books approximately 7 months before the bankruptcy filing. Testimony of Mr. Andrews, CFO, 341 meeting, March 23, 2012. USO, in its Schedules filed on March 15, 2012, includes the USO Receivable as a claim of unknown value.

> 11. The Debtors have filed a chapter 11 plan that calls for substantive consolidation of the Debtors' estates, including releases of intercompany claims.

12. . . . [B]ased on actual conflicts identified and discussed with the Committee, including regarding the intercompany claims and transfers and plan negotiations (including substantive consolidation issues), . . . the Committee decided to form the ECD Sub-Committee and a sub-committee comprised of USO creditors. . . .

15. . . . [A]s discussed above, Actual Conflicts plainly do exist, and the ECD Sub-Committee was formed in order to address those Actual Conflicts.[28]

Contrary to the Liquidation Trustee's view, and notwithstanding the Plan Support Agreement described in Part II.A of this opinion, the Court finds that until the Debtors' Plan was confirmed, the confirmation of a plan based on substantive consolidation of the two bankruptcy estates was *not* a foregone conclusion. The Court must view the Fee Application with this in mind, even though in the end such a plan was confirmed, as it turned out, with substantial voting support from both the ECD creditors and the USO creditors. The Court must avoid using only hindsight — viewing the matter only from an after-the-fact, post-confirmation perspective. *See, e.g.*, 11 U.S.C. § 330(a)(3)(C)(relevant factors include "whether the services were necessary to the administration of, or beneficial **at the time at which the service was rendered** toward the completion of, a case under this title")(emphasis added); *McLean Wine Co.*, 463 B.R. at 848:

When evaluating the benefit to the estate, "courts objectively consider whether the services rendered were reasonably likely to benefit the estate from the perspective of the time when such services were rendered." *In re Value City Holdings, Inc.*, 436 B.R. 300, 305 (Bankr.S.D.N.Y.2010) (citation omitted). "The pertinent question is not whether the services performed by the professional conferred an actual benefit upon the estate; but whether, when viewed under the circumstances in existence at the time, the services were reasonably calculated to benefit the estate." *In re Kennedy Mfg.*, 331 B.R. 744, 748 (Bankr.N.D.Ohio 2005) (citation omitted). In making this determination, however, "[a] court should resist

---

[28] Response of Official Committee of Unsecured Creditors[, etc.] (Docket # 608) quoted in Part II.C of this opinion, at 2, 3-6 ¶¶ 10-12, 15 (emphasis added).

the temptation to engage in '20/20 hindsight,' and focus instead on facts known (or which should have been known) to the applicant at critical points during the pendency of the case." *In re Arnold*, 162 B.R. 775, 778 (Bankr.E.D.Mich.1993) (citation omitted).

Under the circumstances, the Court finds that the formation of the ECD Sub-Committee and that Sub-Committee's employment of Clark Hill were reasonable and necessary. And, with the exceptions discussed below, the Court finds that all of Clark Hill's work reflected in the Fee Application constituted "actual, necessary services" and was "necessary to the administration of, or beneficial at the time at which the service[s] [were] rendered toward the completion of" these Chapter 11 cases. 11 U.S.C. §§ 330(a)(1)(A), 330(a)(3)(C). And such work was "reasonably likely to benefit" the estate of ECD, and was not an "unnecessary duplication of services" with work done by the Foley firm. *See* 11 U.S.C. §§ 330(a)(4)(i); 330(a)(4)(ii)(I). And as discussed in more detail below, the Court finds that such work was within the scope of work authorized by the Clark Hill Retention Order.

## C. Other, specific objections raised by the Liquidation Trustee

### 1. Clark Hill's time spent obtaining approval of its employment

The Liquidation Trustee complains that Clark Hill's time spent obtaining approval of its own employment was excessive.[29] The Court agrees. According to the time records filed with the Fee Application, Clark Hill spent the following total time on work to obtain the Clark Hill Retention Order that was filed on May 8, 2012.[30] (This does not include time spent later defending against the Consortium's motion to vacate the Clark Hill Retention Order, discussed in Part II.C of this opinion).

---

[29] *See* Tr. of 12/12/12 hearing (Docket # 1924) at 9-11.

[30] Docket # 501.

| | | | |
|---|---|---|---|
| Evan J. Feldman ("EJF") (Associate, $235.00/hour rate): | 9.8 hours | ($2,303.00) | |
| Robert D. Gordon ("RDG") (Partner, $550.00/hour rate): | 14.3 hours | ($7,865.00) | |
| Total: | 24.1 hours | ($10,168.00)[31] | |

(blended rate = $422 per hour)

This time includes some unspecified amount of time, not exceeding .8 hours of RDG time (= $440.00), devoted to obtaining a conflict waiver required by Clark Hill's previous representation of the City of Greenville, which work is not compensable under § 330, but rather should be treated as in the nature of firm overhead.[32] The Court finds that the above total amount of time is excessive, and exceeds what is reasonable by 10 hours, which using the blended rate of $422 per hour equals $4,220.00. The fees allowed will be reduced by this amount.

### 2. Clark Hill's time spent successfully defending against the Consortium's motion to vacate the Clark Hill Retention Order

Contrary to the argument made by the Liquidation Trustee during the hearing on the Fee Application,[33] the Court finds that the work done and the amount of time spent by Clark Hill in successfully defending against the Consortium's motion to vacate the Clark Hill Retention Order (discussed in Part II.C. of this opinion) was reasonable and necessary.

### 3. Clark Hill's time spent in opposing the Committee's motion to terminate exclusivity

After the Debtors had filed their second amended joint liquidation plan on May 31, 2012,

---

[31] *See* Fee Application, Ex. 4, June 29, 2012 invoice at 4-6 (Code B170).

[32] *Id.* at 5, second RDG entry for 5/3/12 and RDG entry for 5/7/12.

[33] *See* Tr. of 12/12/12 hearing at 11.

which proposed substantive consolidation of the two bankruptcy estates, the Committee, by its counsel Foley, filed two related motions, also on May 31, 2012. First, the Committee filed a motion to delay solicitation of voting on the Debtors' plan.[34] Second, the Committee filed a motion under 11 U.S.C. § 1121(d)(1), asking the Court to terminate the Debtors' then-exclusive right to file a plan under 11 U.S.C. § 1121(b)(the "exclusivity motion").[35] On June 5, 2012, the ECD Sub-Committee, the Debtors, and the Consortium all filed objections to the Committee's motions.[36] The Court held an expedited hearing on June 6, 2012 on the Committee's motions, during which Clark Hill argued for the ECD Sub-Committee. The Court filed a written opinion and order the next day, denying both of the Committee's motions.[37]

The Liquidation Trustee argues that Clark Hill's work for the ECD Sub-Committee in opposing the Committee's exclusivity motion should not be compensated, because it was both unreasonable and unnecessary, and because it was outside the scope of work authorized by the Clark Hill Retention Order. This is so, the Trustee argues, because there was no "Actual Conflict" between the ECD creditors and the USO creditors with respect to the exclusivity motion. One reason for this, the Trustee says, is because the Committee as a whole, representing both the ECD creditors and the USO creditors, filed the exclusivity motion; thus there was no "Actual Conflict" after the motion was filed.[38]

---

[34] Docket # 613.

[35] Docket # 617.

[36] Docket ## 648, 649, 650, 651.

[37] Docket ## 683, 685.

[38] The Committee, through its counsel Foley, made a similar argument about the ECD Sub-Committee's opposition to the exclusivity motion, during the June 6, 2012 hearing. (The Court did not rule on such argument then, finding it unnecessary to do so at that time.) *See* Tr. of June 6, 2012 hearing

24

The Court must reject the Trustee's arguments. First, the Court finds that Clark Hill's work was well within the scope of the work authorized by the Clark Hill Retention Order. As the Court has found, above, the Committee had previously, and accurately, determined that "Actual Conflicts" existed, including conflicts about "prepetition intercompany transfers from ECD to USO, a purported $5 million secured line of credit extended by ECD to USO, the characterization of such transfers, plan negotiations and the undecided issue of substantive consolidation."

Once the Committee had determined that these broad "Actual Conflicts" existed, and formed the ECD Sub-Committee, that subcommittee's appointed counsel, Clark Hill, was broadly authorized, by the Clark Hill Retention Order and the Foley Retention Order, to do the following work: (1) "evaluate the conflict[s] and take any required action in these Chapter 11 Cases, subject to the usual retention requirements under the Bankruptcy Code" and (2) represent the ECD Sub-Committee in exercising its "right to take independent action in these Chapter 11 Cases, as if a separate, official committee of [the Debtor ECD], if [the ECD Sub-Committee] determines to do so, including without limitation filing pleadings, objections, or supporting matters, with respect to the Actual Conflicts."[39]

The work Clark Hill did in helping the ECD Sub-Committee oppose the exclusivity motion clearly was related to several "Actual Conflicts" previously identified by the Committee, namely the "undecided issue of substantive consolidation;" the issues relating to inter-company transfers and debts and their characterization; and "plan negotiations" relating to such issues.

---

(Docket # 2397) at 10, 29-30.

[39] Foley Retention Order (Docket # 406) at 3.

25

This is so because in the exclusivity motion, the Committee sought the ability to file a competing plan that did not involve substantive consolidation, and let the creditors of the two bankruptcy estates decide, by voting, which plan they preferred. That ran counter to the position that the ECD Sub-Committee, with Clark Hill's advice and assistance, had decided to take by that time, to support confirmation of the Debtors' substantive consolidation plan, with as little delay and expense over the matter as possible.[40]

The Court agrees with Clark Hill's view of the permitted scope of its work for the ECD Sub-Committee, including this point:

> In the course of [its] analysis, the ECD Creditors Sub-Committee ultimately determined that substantive consolidation, as proposed under the Debtors' plan of liquidation, represented the best and most efficient outcome for ECD unsecured creditors. Accordingly, it was the well-considered view of the Sub-Committee that any hearings and issues that might impact the process of confirming the Debtors' plan of liquidation constituted a matter as to which the ECD Creditors Sub-Committee should voice its position on behalf of the ECD unsecured creditors.[41]

The mere fact that the Committee as a whole was supporting the exclusivity motion did not preclude the ECD Sub-Committee and its counsel Clark Hill from opposing that motion. Once the Committee had determined (accurately, as the Court has found) that the several broad areas of "Actual Conflict" existed, it was no longer up to the Committee to decide which of those "Actual Conflicts" the ECD Sub-Committee and its counsel could work on, or what positions they could take, or when they could take action on these issues. Those decisions were for the ECD Sub-Committee to make.

---

[40]  *See* Op. (Docket # 683); ECD Sub-Committee Objection [to the Committee's Exclusivity Motion](Docket # 649) at ¶¶ 11-14, 17-21.

[41]  Clark Hill Reply[, etc.] (Docket # 1579) at 5 ¶ 11.

Thus, the work of Clark Hill in opposing the exclusivity motion was well within the scope of work authorized by the Clark Hill Retention Order and the Foley Retention Order. And the Court finds that all of the work done and time spent by Clark Hill in this regard, as reflected in its Fee Application, was reasonable and necessary, and therefore is fully compensable.

### 4. Clark Hill's work for the ECD Sub-Committee in furthering the cause of confirmation of the Debtors' substantive consolidation plan of liquidation, once the ECD Sub-Committee decided that such plan was in the best interests of the ECD creditors

In addition to opposing the Committee's exclusivity motion, discussed in the preceding section of this opinion, Clark Hill did other work in furthering the cause of confirmation of the Debtors' Second Amended Plan, which was a liquidation plan including substantive consolidation. (And before that, Clark Hill's work assisted the ECD Sub-Committee to the point where that Sub-Committee was able to decide that the Debtors' plan was in the best interests of the ECD creditors.)

The Liquidation Trustee objects to allowance of fees attributable to Clark Hill's work in supporting confirmation.[42] The Court overrules the Trustee's objection, however, for basically the same reasons stated above regarding Clark Hill's work on the exclusivity motion. The Court finds that all of Clark Hill's work of this type, as reflected in the Fee Application, was within the scope of work authorized by the Clark Hill Retention Order and the Foley Retention Order, and was reasonable and necessary, and therefore is fully compensable.

### 5. Clark Hill's billing for clerical work done by Robert Gordon's legal secretary

The Court agrees with the Liquidation Trustee's argument that fees should not be allowed for the work done by Lauralyn Bell-Guzzo, who was attorney Robert Gordon's legal

---

[42] *E.g.*, Objection (Docket # 1454) at ¶¶ 22-25.

secretary/assistant. The Fee Application includes a total of 1.7 hours of time for work done by Ms. Bell-Guzzo, billed at $130.00 per hour, for a total of $221.00. The Court finds that this time and work is clerical in nature, and therefore not allowable under § 330. *See, e.g., In re Bass*, 227 B.R. 103, 107 (Bankr. E.D. Mich. 1998). But to the extent the Liquidation Trustee argues that any time entries for work done by the attorneys (Robert D. Gordon and Evan J. Feldman) are for clerical work, the Court disagrees, and overrules that objection.

### 6. Clark Hill's alleged impermissible "lumping" of activities in its time entries

The Liquidation Trustee argues, without citing any specific examples, that the Clark Hill Fee Application impermissibly "lumps" activities together, "making it impossible to assess whether a reasonable amount of time was spent on each task."[43] Having reviewed the Clark Hill time entries, and in the absence of greater specificity in this objection, the Court will overrule this objection, in the exercise of its discretion.

### 7. Other arguments by the Liquidation Trustee

The Court has considered all of the other specific arguments made by the Liquidation Trustee in its written Objection to Clark Hill's Fee Application, and in the hearing held on the application, and the Court concludes that they do not warrant any disallowance of or reduction in the fees requested by Clark Hill.

In addition, the Court concludes that it is neither necessary nor appropriate to grant the Liquidation Trustee's requests for leave to conduct discovery and for an evidentiary hearing on the Fee Application.

### 8. Clark Hill's Supplement, seeking an additional $12,541.50 in fees for defending the Fee Application against the Liquidation Trustee's objection

---

[43] Objection (Docket # 1454) at ¶ 28.

As discussed in Part II.D of this opinion, Clark Hill filed a "Supplement" to its Fee Application, in which Clark Hill seeks additional fees of $12,541.50, for the time period November 12, 2012 through December 11, 2012, for a total of 27.90 hours of attorney time. This time was spent reviewing and responding to the Liquidation Trustee's objection to Clark Hill's Fee Application.

The Court must disallow all of the fees reflected in Clark Hill's Supplement. After the hearing on the Fee Application, the United States Supreme Court decided the case of *Baker Botts L.L.P. v. ASARCO LLC*, 135 S.Ct. 2158 (2015). In that case, the Supreme Court held that attorneys for a Chapter 11 debtor cannot be allowed fees under Bankruptcy Code § 330 for work done in defending a fee application against objections.

The Supreme Court's holding in *ASARCO* applies with equal force to fees sought by counsel for an official creditor's committee under § 330, even though such counsel is appointed under 11 U.S.C. § 1103(a), unlike the Chapter 11 debtor's counsel, who is appointed under 11 U.S.C. § 327(a). *See* 11 U.S.C. § 330(a)(which by its terms applies, in relevant part, to "a professional person employed under section 327 or 1103"); *In re River Road Hotel Partners, LLC*, 536 B.R. 228, 241 (Bankr. N.D. Ill. 2015)(citing *ASARCO*, and holding that "[t]here is no distinction between fees incurred by debtor's counsel and those incurred by a third party's counsel when the fees are to be reviewed under § 330;" and holding that a financial advisor retained by the debtors could not recover the attorney fees it incurred for defending its fee request).

Because all of the time reflected in Clark Hill's Supplement is for Clark Hill's defense of its earlier Fee Application, in response to the Liquidation Trustee's objections, the Court must

disallow the fees requested in the Supplement.

## IV. Conclusion

For the reasons stated in this opinion, the Court sustains the Liquidation Trustee's objections to the Clark Hill Fee Application to the extent stated. Otherwise, the Court overrules the objections. The Court will enter a separate order reflecting these rulings, and the Order will grant the Fee Application in a reduced amount, reflecting reductions that are consistent with this opinion. The Order also will disallow all of the additional fees sought in Clark Hill's "Supplement," as discussed in this opinion.

**Signed on October 16, 2015**                    **/s/ Thomas J. Tucker**
                                                  **Thomas J. Tucker**
                                                  **United States Bankruptcy Judge**

30